STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
*sbasser@barrack.com*
*sward@barrack.com*

JEFFREY A. BARRACK
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
*jbarrack@barrack.com*

*Attorneys for Lead Plaintiffs the Public*
*Employees' Retirement System of Mississippi, the*
*Public Employees Retirement Association of New*
*Mexico and the Government Employees' Retirement*
*System of the Virgin Islands*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE WAGEWORKS, INC., SECURITIES LITIGATION | CASE NO. 4:18-CV-01523-JSW<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

TABLE OF CONTENTS

I.  NATURE AND SUMMARY OF THE ACTION ............................................................. 1

   A.  The '34 Act Claims ............................................................................................... 1

   B.  The '33 Act Claims ............................................................................................ 11

II.  JURISDICTION AND VENUE ................................................................................ 11

III.  PARTIES ................................................................................................................ 12

   A.  Plaintiffs ............................................................................................................ 12

      1.  The Securities Exchange Act of 1934 Plaintiffs ..................................... 12

      2.  The Securities Act of 1933 Plaintiff ........................................................ 13

   B.  Defendants ......................................................................................................... 13

      1.  The Securities Exchange Act of 1934 Defendants .................................. 13

      2.  The Securities Act of 1933 Defendants ................................................... 14

         (a) The Underwriter Defendants .............................................................. 14

         (b) The Director Defendants ................................................................... 15

IV.  SUBSTANTIVE FACTUAL ALLEGATIONS .......................................................... 15

   A.  Background ......................................................................................................... 15

      1.  WageWorks's Business ............................................................................. 15

      2.  Comforting the Market that Prior Materially Weak and Deficient Internal
         Controls Were "Remediated" ................................................................ 17

      3.  WageWorks Outbids Competitors and Secures a Prized, Key Contract with the
         United States Office of Personnel Management ...................................... 19

   B.  False and Misleading Class Period Statements Re: Financial Performance and
      Internal Controls ...........….....…................................................................22

V.  ADDITIONAL ALLEGATIONS SUPPORTING *SCIENTER* REGARDING '34 ACT
   CLAIMS ................................................................................................................. 73

A. Inference of Knowledge Re: The Highly Important, Key OPM Contract and Terms . 73

B. Straightforward Revenue Visibility and Calculation Inferring Knowledge ................ 75

C. Senior Managements' Vacating Their Executive Positions Following Revelations
   Demonstrates Fraudulent Misconduct and *Scienter* .................................... 76

D. A Strong Inference of the Executive Defendants' *Scienter* is Further Demonstrated by
   KPMG's Expressed Concerns and Demands ............................................ 77

E. Strong Inference of *Scienter* Arising from Admission that Former Management
   Withheld Material Information from Auditors ........................................... 80

F. A Strong Inference of *Scienter* Arising from the Design, On-going Maintenance,
   Implementation and Exploitation of Materially Deficient Internal Controls, and a
   Culture Emanating from the "Tone at the Top" Lacking Ethics and Integrity ............ 81

G. Jackson's and Callan's Weaponizing False SOX Certifications Despite Exploiting the
   Ineffective Internal Controls They Designed, Support an Inference of *Scienter* ........ 87

H. Jackson's Insider Selling, Dramatically Out of Line with His Prior Trading History,
   Demonstrates a Strong Inference of *Scienter* ......................................... 88

VI.   VIOLATIONS OF GAAP AND SEC RULES ........................................... 93

A. Generally Accepting Accounting Principles and SEC Rules ........................ 93

B. Improper Revenue Recognition and Falsely Stated Financial Results ................... 97

C. Knowingly Failing to Record Impairment Charge for KP Connector ...................... 100

D. Materially Weak and Ineffective Disclosure Controls over Financial Reporting and
   False SOX Certifications ........................................................ 103

VII.  CLASS ACTION ALLEGATIONS ............................................... 108

VIII. LOSS CAUSATION RESPECTING '34 ACT CLAIMS ................................ 110

IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
      MARKET DOCTRINE) ...................................................... 111

X.    NO SAFE HARBOR ....................................................... 113

COUNT I
Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 Promulgated
Thereunder: Lead Plaintiffs MPERS and GERS, individually and on behalf of the '34 Act
Class versus Defendants WageWorks, Jackson and Callan ....................................114

COUNT II
Violation of Section 20(a) of the Securities Exchange Act of 1934: Lead Plaintiffs MPERS
and GERS Individually and on behalf of the '34 Act Class versus the Executive Defendants...116

COUNT III
Violation of Section 11 of the Securities Act of 1933:  Lead Plaintiff PERA Individually
and on behalf of the '33 Act Class versus the Securities Act of 1933 Defendants -
WageWorks, Jackson, Callan the Director Defendants and the Underwriter Defendants........117

COUNT IV
Violation of Section 12(a)(2) of the Securities Act of 1933: Lead Plaintiff PERA
individually and on behalf of the '33 Act Class versus the Underwriter
Defendants.………………..120

COUNT V
Violation of Section 15 of the Securities Act of 1933: Lead Plaintiff PERA individually and
on behalf of the'33 Act Class versus the Executive Defendants and the Director Defendants…122

PRAYER FOR RELIEF ........................................................................................... 124

JURY TRIAL DEMANDED.................................................................................... 124

1.      Lead Plaintiffs, the Public Employees' Retirement System of Mississippi and the Government Employees' Retirement System of the Virgin Islands, assert claims against WageWorks, Inc. ("WageWorks" or the "Company"), and its former senior managers, Chief Executive Officer and Chief Financial Officer, defendants Joseph L. Jackson ("Jackson") and Colm M. Callan ("Callan"), respectively, for violations of the Securities Exchange Act of 1934 ("'34 Act").  Lead Plaintiff, the Public Employees Retirement Association of New Mexico, asserts claims against the Company, Jackson, Callan, the Company's board of directors and the Company's underwriting syndicate for their separate violations of the Securities Act of 1933 ("'33 Act") in connection with WageWorks's June 19, 2017 public offering of 2.5 million shares of its stock to the investing public ("June 2017 Offering").  Except as to the allegations of paragraphs 29-32 respecting themselves, Lead Plaintiffs' allegations are based upon information and belief, including an investigation of counsel which includes a review of United States Securities and Exchange Commission ("SEC") filings by WageWorks, as well as regulatory filings, reports, advisories, press releases, and other public statements issued or rendered by the Company, or the defendants named herein, and media reports about the Company.  Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE AND SUMMARY OF THE ACTION

### A.  The '34 Act Claims

2.      Lead Plaintiffs, the Public Employees' Retirement System of Mississippi ("MPERS") and the Government Employees' Retirement System of the Virgin Islands ("GERS") (collectively, the "'34 Act Plaintiffs"), bring a federal securities class action on behalf of all investors who purchased or otherwise acquired WageWorks common stock between May 6, 2016 and March 1, 2018, inclusive ("'34 Act Class Period"), against defendants WageWorks, the Company's former Chief Executive Officer ("CEO"), Joseph L. Jackson, and its former Chief

Financial Officer ("CFO"), Colm M. Callan (collectively, the "'34 Act Defendants"),[1] for violations of section 10(b) and 20(b) of the Securities Exchange Act of 1934 ("'34 Act"), 15 U.S.C §§78(i)(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10(b)-5.  During the '34 Act Class Period, the Company issued its Annual Report on Form 10-K for the year, ending December 31, 2016 ("2016 Form 10-K"), related interim financial statements on Form 10-Q for the second and third quarters of 2016, interim financial statements on Form 10-Q for the first, second, and third quarters of 2017, and press releases and conference calls with analysts, containing materially false and misleading statements and omissions, as more fully alleged below.

3.      The Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), was enacted to promote the dissemination of truthful information to the investment community and thereby strengthen the integrity of our capital markets, which are vital to the nation's economic well-being.  WageWorks, its former CEO Jackson and its former CFO Callan, violated this basic principal and tenant of the federal securities laws.  During the '34 Act Class Period, WageWorks and the Executive Defendants issued or otherwise engaged in a series of materially false and misleading statements to, and omissions from, the investment community regarding WageWorks's financial results and performance metrics, materially overstating its revenue, net income and earnings per share, consequently artificially inflating the price of its publicly traded common stock and causing investors to suffer significant economic harm when the truth was revealed and the Company's stock price dropped as a result.

4.      The Executive Defendants also executed Sarbanes-Oxley ("SOX") certifications and reports on Form 10-Q on Form 10-K filed with the SEC during the '34 Act Class Period, falsely attesting to the effectiveness of WageWorks's internal controls over financial reporting, which they designed, maintained, and implemented, and which were, unbeknownst to investors, materially weak and deficient, and rendered WageWorks's reported financial results unreliable.  The Executive Defendants exploited these materially weak and deficient internal controls throughout

---

[1]      Jackson and Callan are referred to collectively as the "Executive Defendants."

the '34 Class Period in order to report false financial results and inflate the Company's revenues and financial performance metrics, fooling auditors and deceiving investors in the process.

5.      The '34 Act Defendants' conduct was intentional and deliberately reckless. Pursuant to their fraudulent scheme, they improperly recognized revenue in the second and third quarters of 2016,[2] and for the full-year of 2016, that the Company had not earned and for which it was not entitled to be paid. This revenue was improperly attributed to a key customer — the United States Office of Personnel Management ("OPM") — which the Company had acquired on March 1, 2016 under the terms of a key contract ("OPM Contract" or "Contract") to administer its Federal Flexible Spending Account Program, or "FSAFEDS" program for government employees. In addition, the '34 Act Defendants did not write down $3.7 million of carried value of a specific software asset known as KP Connector, which WageWorks developed for a specific client, Kaiser Permanente, that terminated its relationship with the Company, rendering the asset valueless and "unrecoverable" by the end of the second quarter of 2016.

6.      In order to successfully continue their deception of the market, and with a contemplated June 19, 2017 public offering of 2.5 million shares of the Company's stock looming, it was necessary to paper its files and fool auditors who were conducting a year-end audit before the Company closed its books for the year ending December 31, 2016.  To that end, WageWorks issued a bogus invoice dated February 15, 2017, for $5,117,856.39 (Invoice No. 37943) to OPM for payment on approximately 409,494 accounts, charged at $2.53 per participant, per month, from March 1, 2016 through August 31, 2016. WageWorks was not entitled to be paid for such professed "services" under the March 1, 2016 OPM Contract, as modified in writing and executed by the Company's General Counsel on July 20, 2016, until WageWorks began administering the OPM Contract respecting the agency's FSAFEDS program on its "implementation date" of September 1, 2016.

---

[2]      As a result of this improper revenue recognition, WageWorks's net income and earnings per share ("EPS") were inflated by material amounts in the second and third quarters and full-year 2016.

7.     Both accounting falsehoods — alone or in combination — had a material impact on the Company's financial results.  The improper revenue recognition related to the OPM Contract materially inflated WageWorks's 2016 net income by 4.57% and its 2016 diluted earnings per share ("EPS") by 4.35%.  The concealment of the unrecoverable KP Connector asset value, and failure to take a $3.7 million write down of that asset in the second quarter of 2016, materially inflated WageWorks's 2016 net income by 3.93% and its 2016 diluted EPS by 4.35%.  This false accounting materially inflated WageWorks's 2016 net income by 8.5% and diluted EPS by 8.7%.  But for either of these accounting shenanigans, the Company would have fallen below its EPS guidance for 2016 — a material earnings miss that, had its EPS been truthfully and timely disclosed, would have adversely impacted the trading price of WageWorks common stock at a time when the '34 Act Defendants were motivated to inflate its trading price in advance of WageWorks's planned June 2017 Offering for which it was important to show favorable financial results over the prior four quarters.

8.     Meanwhile, throughout the '34 Act Class Period, while engaging in improper revenue recognition and other tactics inflating net income and EPS, Defendants Jackson and Callan continued to assure investors that the Company's internal controls over financial reporting were effective and that its financial results were accurate, stated in accordance with GAAP, and devoid of fraud.  They were not.  In truth, the Company's internal controls were so weak and ineffective that Jackson and Callan — senior management — could override accounting and financial reporting, or even withhold information from WageWorks's Audit Committee and its independent auditor, KPMG.  In fact, Jackson and Callan withheld material information, advancing their fraudulent accounting scheme.

9.     The '34 Act Defendants' fraudulent scheme was a resounding success. WageWorks's stock price climbed from $54.53 per share at the close of trading on May 6, 2016, at the advent of the '34 Act Class Period, to as high as $80.20 per share on March 17, 2017, and was comfortably trading at or near $69.45 per share at the time of WageWorks's June 2017 Offering.

4

10.     Meanwhile, the strong executive leader of WageWorks, CEO Jackson, who reportedly ran the Company with an "iron fist," profited handsomely during the '34 Act Class Period from the materially false and deceptive statements, pocketing insider sales proceeds of over $41.69 million, taking advantage of the artificial inflation embedded in WageWorks common stock, including garnering personal proceeds of $31.3 million from his stock sales in the June 2017 Offering.  Jackson's '34 Act Class Period sales were dramatically out of line with his pre-class period trading history, in terms of share volume, percentage of holdings, and the amount of the trading proceeds, further demonstrating that he knew that the Company was falsely accounting for its financial results all along and misleading investors.  The Company garnered over $130 million dollars in proceeds from the sale of its common stock in the June 2017 Offering at $69.25 dollars per share, while the artificial inflation caused by the '34 Act Defendants' false and misleading statements remained embedded in its trading price.

11.     Before the end of 2017, the Office of Personnel Management, through its Contracting Officer, had affirmatively denied payment of WageWorks's February 15, 2017 bogus invoice, which was to be expected.  The truth began to emerge only after the Company could not secure the cooperation of its outside independent auditor, KPMG, with respect to placing its imprimatur on the Company's year-end financial statements for the year ending December 31, 2017, thereby disabling WageWorks from completing a year-end audit and issuing its annual report on Form 10-K for the year end December 31, 2017 ("2017 Form 10-K").

12.     On March 1, 2018, after the trading of WageWorks common stock was halted by the New York Stock Exchange, the Company was forced to admit that it could not file its 2017 Form 10-K.  On March 2, 2018, WageWorks was further forced to reveal that it would have to restate its financial results for prior reporting periods within the '34 Act Class Period as a result of the over-statement and improper recording of revenue, while further disclosing to the investing community that its internal controls over financial reporting suffered from material weakness and were ineffective.  WageWorks further disclosed that its prior financial results should no longer be relied upon.   The March 2018 adverse revelation requiring a halt to trading stunned an

unsuspecting investment community.  The trading price of WageWorks common stock fell from $52.45 at the close of trading on February 28, 2018 to $42.70 per share by the close of trading on March 1, 2018, on historically high trading volume of almost 4.3 million shares.

13.     The senior management responsible for the accounting scandal and fraud had to be excised from the Company.  On April 5, 2018, within a short period after announcing the need for a restatement and the deficiencies of internal controls over financial reporting, and with outside independent auditor KPMG refusing to certify the accuracy of the Company's reported financial results and its internal controls for 2017, it was revealed that Jackson was replaced as CEO and that CFO Callan, along with WageWorks's General Counsel ("GC"), Kim Wilford, had "resigned" – politic corporate-speak for the fact that they were forced from their executive positions. Subsequently, finger pointing and accusations emanated from within the Company.  "Former managements' counsel" accused WageWorks's Audit Committee of being aware of the fact that material information had not been disclosed to the KPMG auditors – a tacit admission by Jackson and Callan that they knew material information regarding the OPM Contract was hidden from the auditor.  KPMG questioned whether the Audit Committee had conducted a thorough internal investigation, as required by Section 10A of the '34 Act, when there is suspected illegal conduct by corporate management.

14.     On September 12, 2018, it was publicly revealed that in August 2018, KPMG privately expressed concerns to the Company's independent director and by a letter addressed to WageWorks's Audit Committee.  KPMG's August 2018 letter and actions demonstrate the fact that it had been fooled by former CEO Jackson and former CFO Callan.  KPMG further demanded that the chairperson of WageWorks's Audit Committee, Mariann Byerwalter, be removed, and that Jackson be removed from his one remaining position as "Executive Director."  KPMG also notified the Company that: (a) it could no longer rely on the representations of the Company's former CEO, CFO, or GC; (b) it disagreed with the prior accounting for revenue respecting the OPM Contract; (c) it disagreed with WageWorks's methodology for determining the allowance for doubtful accounts; and (d) the scope of the 2016 and 2017 audits would need to be increased due to the

impact of the misstatements identified and the inability to rely on the Company's system of internal controls over financial reporting.

15.    By taking the unusual step of calling out Jackson, Callan, defendant Byerwalter, who had served as the chairman of WageWorks's Audit Committee, and WageWorks's GC, Wilford, KPMG was effectively implicating them as playing a significant role in WageWorks's accounting deception and scandal.[3] Such serious charges would not have been made if KPMG did not determine, in good faith, and based on its auditing experience and knowledge, that Jackson and Callan had committed financial fraud and deception.

16.    In response to KPMG's insistence, and no doubt crediting KPMG's concerns and objections, WageWorks removed Jackson as Executive Director of the board and removed defendant Byerwalter from the Audit Committee, announcing that she had "resigned" on September 6, 2018.  Still unable to secure an audit opinion from KPMG enabling WageWorks to close its books and report financial results for 2017, and subsequent to receiving the August 2018 letter, WageWorks's board terminated KPMG, effective October 31, 2018.

17.    The September 12, 2018 disclosures related to the '34 Act Defendants' fraud further stunned the market.  The trading price of WageWorks shares fell $8.15, or almost 17%, from $49.10 per share at the close of trading on September 12, 2018, just before the announcement, to close at $40.95 per share on September 13, 2018, on volume of almost 3 million shares.

18.    As written by Chief Justice Louis D. Brandeis, "sunlight is said to be the best of disinfectants."  On March 19, 2019, and after a year-long investigation under a new management team, and amid on-going investigations by the United States Attorney's Office for the Northern District of California, the Securities and Exchange Commission, and the United States Office of Inspector General (which OPM initiated as a result of the March 20, 2018, "false claim"), WageWorks more fully revealed the extent and gravity of the false and misleading financial

---

[3]    On March 20, 2018, WageWorks's General Counsel Wilford certified another bogus claim for over $4 million that WageWorks sent to OPM — and which OPM's Contract Officer Edward DeHarde denied, determining that it was a **false claim** in **violation of the False Claims Act**.

reporting and related misstatements that had deceived investors during the '34 Act Class Period. The Company issued a formal Restatement.  In its 2017 Form 10-K, WageWorks acknowledged and disclosed that the Company's financial statements for the quarterly periods ending June 30 and September 30, 2016, the year ended December 31, 2016, and the quarterly and year-to-date periods ended March 31, June 30 and September 30, 2017, contained material errors, needed to be restated, and were unreliable.  WageWorks's disclosure also revealed that Jackson's and Callan's prior assessments of internal control over financial reporting were false and should no longer be relied upon.

19.     WageWorks's new management acknowledged that the Company was required to reverse $3.6 million in revenue related to the OPM Contract in the 12 months ended December 31, 2016, which WageWorks admitted "should not have been recognized."  The Company further acknowledged revenue adjustments for the year ended December 31, 2016 related to "revenue recognition" in the amount of $3,017,000 and invoice adjustments of $1,163,000 starting in the second quarter of 2016 for the year ended December 31, 2016. In total, WageWorks admitted revenue "adjustments" that resulted in overstatement of net income of 5.38%, 11.87%, and 4.57% for the second and third quarters, and full-year 2016 respectively, and overstatement of diluted EPS of 5.56%, 11.76%, and 4.35% respectively for those same periods.  In addition, WageWorks admitted that in 2016 it had reassessed the fair value of KP Connector, a software platform developed for Kaiser Permanente, after it had been notified in the second quarter of 2016 (ending June 30, 2016) by Kaiser Permanente that WageWorks's services were no longer needed. Accordingly, WageWorks admitted that it was determined that KP Connector's carrying value was considered "unrecoverable" as of June 30, 2016, and that the Company should have recorded a $3.7 million impairment charge in the second quarter of 2016. As a result of this failure to timely record this charge, the Company overstated net income by 18.08% and 3.93% in the second quarter and full-year 2016, respectively.

20.     The Company further admitted in its 2017 Form 10-K that, as of December 31, 2017, "due to the existence of **unremediated material weakness** in the Company's **internal**

control over **financial reporting**" its "disclosure controls and procedures **were not effective**."[4] WageWorks's 2017 Form 10-K revealed that the Company's new management had "concluded that our internal control over financial reporting as of December 31, 2017 was not effective due to the existence of … material weaknesses in internal control over financial reporting …" including that "there was an **inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from former senior management**" concerning the OPM Contract that **"contributed to an ineffective control environment**" that was **"driven by the tone at the top"** and that **"management's failure to timely communicate all pertinent information"** led to false financial statements during years ended December 31, 2016 and December 31, 2017, and the related periods within those years.  The Company further acknowledged that it had **inadequate** or **ineffective** "**tone at the top**" and process level and monitoring controls **in the area of "accounting close and financial reporting**."

21.     A host of weaknesses with respect to WageWorks's internal controls, while defendants Jackson and Callan were at the helm, made it easy for them to exploit the control environment situation in order to fool auditors and report false, inflated revenues and resulting false, inflated performance metrics, thereby deceiving the market.  In sum, the Company's Restatement and related disclosures were corporate-speak, admitting to the fact that WageWorks's "former senior management" — the Executive Defendants, Jackson and Callan — had withheld material information from the auditors while confirming that Jackson and Callan exploited the lack of effective internal controls they designed and maintained, fostering the reporting of false financial results amid an atmosphere emanating from their "tone at the top" that lacked an open flow of information and transparency. The Executive Defendants weaponized their SOX certifications toward that end, using them to further their fraudulent scheme, rather than protect investors from accounting fraud, as the Sarbanes-Oxley Act of 2002 had intended.

---

[4]      Emphasis added throughout unless otherwise noted.

22.     As a consequence of the '34 Act Defendants' materially false and misleading statements and omissions, reporting of false financial results, exploitation of SOX certifications, and lack of integrity and ethics, which derived from and were a product of the "tone from the top" maintained and fostered by the Executive Defendants.  The '34 Act Class Members have suffered massive damages, having purchased stock at artificially inflated prices that were tainted and distorted by the fraud.  Meanwhile, Jackson has profited handsomely, as previously noted, and WageWorks has secured over $130 million in cash from unwitting investors through its June 2017 Offering at an offering price of $69.25 a share that was tainted and artificially inflated due to the '34 Act Defendants' deceptive conduct.

23.     The following chart illustrates the artificial inflation that the '34 Act Defendants' false statements caused to be imbedded in the trading price of WageWorks stock during the '34 Act Class Period, and the successful buoying and inflation of the trading price of its shares that was taken advantage of as a consequence of propitiously timed insider selling and the June 2017 Offering and the price impact of disclosures correcting the fraud.



### B.  The '33 Act Claims

24.     Separate and apart from the claim by the '34 Act Plaintiffs for violations of the Securities Exchange Act of 1934, Lead Plaintiff, the Public Employees' Retirement Association of New Mexico, ("PERA" or the '33 Act Plaintiff'), asserts claims for violation of the Securities Act of 1933, and Sections 11, 12(a)(2) and 15 thereof, against WageWorks, Jackson, Callan, the Director Defendants, and the Underwriter Defendants (collectively, the "'33 Act Defendants"), as more fully identified below.  The claims brought by the '33 Act Plaintiff on behalf of all those who purchased WageWorks common stock purchased or traceable to the June 19, 2017 Form S-3 Registration Statement under the Securities Act of 1933 ("Registration Statement"), Prospectus, and Supplemental Prospectus (the "'33 Act Class"),[5] is predicated upon the '33 Act Defendants' liability for making untrue statements and omissions of material facts in the Offering Documents of the June 2017 Offering, which incorporated the false financial statements contained in the Company's reported interim financial results on Form 10-Q, for the second and third quarters of 2016, and the Company's 2016 Form 10-K.

25.     WageWorks is strictly liable for the damages caused by the material untrue statements or omissions of fact in the Offering Documents.  Without prejudice to the '34 Act claims against the '34 Act Defendants, the '33 Act Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Documents, which incorporated the aforesaid false financial results by which the Company garnered over $130 million in proceeds from the market. The '33 Act Defendants are liable to Lead Plaintiff PERA and the other members of the '33 Act Class.

## II.     JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and section 22 of the Securities Act, 15 U.S.C. § 77v.

---

[5]     The Registration Statement, Prospectus, and Supplemental Prospectus are collectively referred to herein as the "Offering Documents."

In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the public dissemination of untrue statements of material facts, occurred in this District.  In addition, the Company's principal executive offices are located in this District.

28.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

III.    **PARTIES**

    A.    **Plaintiffs**

       1.    **The Securities Exchange Act of 1934 Plaintiffs**

29.    Lead Plaintiffs, the Public Employees' Retirement System of Mississippi and the Government Employees' Retirement System of the Virgin Islands (collectively the "'34 Act Plaintiffs"), purchased WageWorks securities during the '34 Act Class Period as set forth in their certifications, incorporated by reference herein, and suffered damages as a result of the '34 Act Defendants' respective federal securities law violations and false and/or misleading statements and/or material omissions, as alleged herein. (Dkt. Nos. 34-3 and 38-7).

30.    Lead Plaintiff MPERS provides benefits for individuals working in Mississippi state government, public schools, universities, community colleges, municipalities, counties, the legislature, highway patrol, and other such public entities.  MPERS was established in 1952 and oversees assets for the benefit of its more than 330,000 members.  Currently, more than 100,000 retirees are receiving pension benefits from MPERS.

31.    Lead Plaintiff GERS, established in 1959, provides pension benefits to government officials and employees of the United States Virgin Islands and their dependents.  GERS provides services to more than 8,700 retirees and pensioners and more than 9,300 active members.

### 2.    The Securities Act of 1933 Plaintiff

32.    Lead Plaintiff PERA, as set forth in its certification incorporated herein, purchased 8,500 shares of WageWorks common stock issued pursuant and traceable to WageWorks's June 19, 2017 Offering, and was damaged thereby.  (Dkt. No. 34-4). Established in 1947, PERA now manages thirty-one retirement plans for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators, and volunteer firefighters.

### B.  Defendants

### 1.  The Securities Exchange Act of 1934 Defendants

#### (a)    The Corporate Defendant

33.    Defendant WageWorks, Inc. is incorporated in Delaware and maintains its principal executive offices in San Mateo, California.  WageWorks common stock trades on the New York Stock Exchange ("NYSE") under the symbol "WAGE."

#### (b)    Executive Defendants

34.    Defendant Joseph L. Jackson was, until April 5, 2018, the Chairman and Chief Executive Officer of WageWorks at all relevant times.

35.    Defendant Colm M. Callan was, until April 5, 2018, the Chief Financial Officer of WageWorks at all relevant times.

36.    Defendants Jackson and Callan, because of their positions with the Company, possessed the power and authority to control the contents of WageWorks's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Executive

13

Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Executive Defendants are liable for the false statements pled herein.

37.     Collectively, WageWorks, Jackson, and Callan, are referred to as "'34 Act Defendants."

### 2.     The Securities Act of 1933 Defendants

38.     The Securities Act of 1933 imposes strict liability upon the issuer for untrue statements or omissions of material fact in its Offering Documents used to offer securities.  Other persons — including company officers and directors who sign a registration statement as well as the underwriters of an Offering — are liable for untrue statements or omissions where they acted negligently.  Claims brought under the '33 Act do not require a showing of fraud, scienter, reliance, or causation. WageWorks, Jackson, Callan, and the following defendants are named herein as the "'33 Act Defendants" with respect to the '33 Act claims asserted by Lead Plaintiff, PERA:

### (a)     The Underwriter Defendants

39.     The following investment banks (collectively, the "Underwriter Defendants") were underwriters of offerings of WageWorks securities issued by way of its Offering Documents with respect to its June 2017 Offering of 2.5 million shares of common stock and which Offering Documents contained materially untrue and misleading statements and omitted material facts:

- William Blair & Company, L.L.C.;
- Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus");
- JMP Securities, LLC ("JMP");
- Needham & Company, LLC ("Needham"); and
- Suntrust Robinson Humphrey, Inc. ("Suntrust").

40.     The Underwriter Defendants are named in Count III (violations of Section 11 of the Securities Act of 1933) and Count IV (violations of Section 12(a)(2) of the Securities Act of 1933).

41.     Each of the Underwriter Defendants served as underwriters of and formed the underwriting syndicate respecting the WageWorks's June 2017 Offering.

### (b)     The Director Defendants

42.     In addition to defendant Jackson, the following individuals were directors of WageWorks's Board of Directors and signatories of the Offering Documents filed with the SEC on June 19, 2017, that contained materially untrue and misleading statements and omitted material facts regarding the June 2017 Offering: Mariann Byerwalter ("Byerwalter"), Thomas A. Bevilacqua ("Bevilacqua"), Bruce Bodaken ("Bodaken"), Jerome D. Gramaglia ("Gramaglia"), John W. Larson ("Larson"), and Robert L. Metzger ("Metzger") (collectively, the "Director Defendants").  The Director Defendants are named in Count III (violations of Section 11 of the Securities Act of 1933) and Count V (violations of Section 15 of the Securities Act).

## IV.     SUBSTANTIVE FACTUAL ALLEGATIONS

### A.     Background

#### 1.  WageWorks's Business

43.     Defendant WageWorks purports to be a leader in administering Consumer-Directed Benefits ("CDBs").  The Company administers CDBs, including pre-tax spending accounts, such as Health Savings Accounts ("HSAs"), health and dependent care Flexible Spending Accounts ("FSAs"), Health Reimbursement Arrangements ("HRAs"), as well as Commuter Benefit Services, including transit and parking programs, wellness programs, and other employee benefits. WageWorks's CDB programs assist employees and their families in saving money by using pre-tax dollars to pay for certain expenses related to their health care, dependent care, and commuter expenses.

44.     FSAs are employer-sponsored CDBs that enable employees to set aside pre-tax dollars to pay for eligible health care expenses that are not generally covered by insurance. Employers benefit from payroll tax savings on the pre-tax FSA contribution made by the employee.   Under WageWorks's FSA, HAS, and Commuter Programs, employee participants contribute funds from their pre-tax income to pay for qualified out-of-pocket health care expenses that are not fully covered by insurance, such as co-pays, deductibles, and over-the-counter medical products, or for commuting costs.   WageWorks states and represents the following in its 2016 Form 10-K with respect to pricing:

> We price our services based on the estimated number of types of claims, whether payment processing and client support activities will be provided within or outside of the United States, the estimated number of calls to our customer support center and any specific client requirements.   In addition, we derive a portion of our revenues from interchange fees that we receive when employee participants use the pre-paid debit cards we provide to them for health care and commuter expenses.

45.     According to WageWorks, as of January 31, 2017, the Company had approximately 6.5 million employee participants from over 100,000 employer clients. WageWorks uses January 31 as its "point-in-time" measurement date for any annual plan metrics and measurement baseline.

46.     In order to sustain its growth since becoming a publicly traded company, WageWorks needed to expand its business footprint and increase its revenues.   To that end, the Company supplemented its growth by acquiring approximately eleven separate companies and lines of business.   Included among these was an acquisition of Conexis Benefits Administration in August 2014 for $118 million in cash.   In November 2016, WageWorks acquired competitor ADP's Consumer Health Spending account and COBRA businesses providing services, including FSA and COBRA administration, for $235 million in cash.

47.     WageWorks's acquisition strategy necessitated the expenditure of considerable cash and the need for cash infusions from capital markets, in addition to maintaining lines of credit. A growth strategy to develop WageWorks's business, including growth in its footprint and

revenues, was an important component to increasing investor interest in purchasing the Company's common stock and its stock price.

48.     Prior to the advent of the '34 Act Class Period, in the January 2, 2015 through March 24, 2015 timeframe, WageWorks's stock price traded in the mid-to-upper $50 per share range, and sometimes into the low $60's per share.  But its stock price languished from March 24, 2015 onward until May 5, 2015, falling from $56.18 per share to $50.66 per share.  At the close of trading on May 6, 2015, the trading price of WageWorks common stock fell to $46.48 and continued to struggle thereafter, reaching as low as $39.24 per share at the close of trading on July 6, 2015.  Its trading price remained in the 40 dollars per share range for the balance of 2015 (except for just a few trading days) through March 28, 2016.  Given the consequent decrease of the Company's market cap, the value of major shareholder Jackson's stock and options, and the need for cash infusions, WageWorks needed a shot in the arm that would trigger a significant rise in the trading price of its stock.

## 2.   Comforting the Market that Prior Materially Weak and Deficient Internal Controls Were "Remediated"

49.     In the past, particularly with respect to its financial results for 2010, WageWorks admitted that it experienced "**significant deficiencies relating** to: the completion of … financial reporting" and its "**ability to produce reliable financial statements** in the period that would normally be expected of a public company."  Included among WageWorks's 2010 significant internal control deficiencies were "a number of errors, missing disclosures and incorrect numbers in the financial statements that were delivered to our independent registered public accounts for audit."  According to WageWorks's Form 10-K for the year ending December 31, 2012, "the inconsistencies and omissions in key documents related to certain agreements that were not appropriately documented or referred to other **agreements that did not exist**," including other agreements relating to acquisitions of certain assets.

50.     Before the beginning of the '34 Act Class Period, the Company assured investors that its prior accounting issues and significant deficiencies impacting WageWorks's "lack of" timely financial reporting and lack of "reliable financial statements" had been "**remediated**." This was material to investors.  It was important information to assess in determining a fair price for WageWorks stock.  WageWorks professed that "we remediated the significant deficiency related to inconsistencies and omissions in some of our key documents and agreements."  Internal control deficiencies were spoken of as having existed in the "past," rather than existing in the then-current reporting period.  For example, WageWorks's Annual Report on Form 10-K for 2015, filed with the SEC on February 25, 2016, stated "**in the past** significant deficiencies in our internal control over financial reporting have been identified."  The Executive Defendants were acutely aware that "any failure to maintain or implement required new or improved controls . . . could cause us to fail to meet our periodic reporting obligations or result in material misstatements in our financial information" and resulting delays, or that a restatement could cause investors to "lose confidence in our reported financial information and **lead to a decline in our stock price**."  These assurances would later be parroted in WageWorks's 2016 Form 10-K.

51.     Having already experienced significant deficiencies or material weaknesses in internal controls impacting the reliability of its financial reporting, defendants Jackson and Callan were obligated to keep abreast of, and pay particularly strict attention to, WageWorks's system of internal controls over financial reporting – which they themselves had designed, implemented, and maintained.  Consequently, they knew and had to be aware at all times material of any deficiencies in such controls, especially since the very weaknesses in the controls they designed could be exploited, especially to the extent they could override them, as more fully alleged below.

### 3. WageWorks Outbids Competitors and Secures a Prized, Key Contract with the United States Office of Personnel Management

52.     In March 2016, WageWorks was selected by the United States Office of Personnel Management to administer its Federal Flexible Spending Account Program, or FSAFEDS. Securing the Contract in March 2016 to administer OPM's FSAFED's Program was a considerable feather in the cap for WageWorks.  With over 1.8 million potential federal employee participants in OPM's FSAFEDS program – by far the largest single participant population of any of its clients – the OPM Contract was both the crown jewel of its client enterprise and a key contract.

53.     Prior to WageWorks's winning the Contract, on December 22, 2014, OPM posted solicitation No. OPM35-14-R-0004 for a contractor to administer its FSAFEDS Program. FSAFEDS is a voluntary program that allows federal workers to place pre-tax income into a savings account to pay for eligible out-of-pocket healthcare and dependent care expenses.  OPM's then incumbent contractor, ADP Benefit Services KY, Inc., ("ADP"), formally known as SHPF Human Resources Solutions, Inc., was initially awarded the contract to administer the government's FSAFEDS Program in 2003.  OPM extended the contract with ADP on four occasions, without opening up a competitive bidding process, thereby allowing ADP to run the program for a total of 12 years.

54.     OPM's December 22, 2014, invitation to bidders requested third party proposals in response to its Request for Proposal No. OPM35-14-R0004 (the "Solicitation").  The Solicitation required that the bids be submitted by February 6, 2015 — a deadline OPM subsequently moved to February 13, 2015.  The Solicitation specified the Government's expectation to award a contract that included a firm-fixed-price "Contract Line Item Nos." (CLINs) with pricing for each of the deliverables associated with the described requirements.  Pricing guidelines provided that "pricing is all inclusive and FFP" (Firm-Fixed-Price).  WageWorks submitted its proposal in response to the Solicitation on February 13, 2015.

55.     During this process, on October 14, 2015, Patrick McFarland, the Inspector General of the Office of Personnel Management, expressed "serious concerns" regarding its benefits

procurement process.  In an October 14, 2015 memo to OPM acting director Beth Cobert, the OPM Inspection General reported "two very serious concerns" raised by his office regarding FSAFEDS. One concern related to the fact that the OPM contract with ADP for FSAFEDS did not have a single re-competition in seven years.  Another concern focused on the fact that program offices had been administering contracts with possible conflicts of interest.  Significantly, McFarland's memo noted that absent addressing such issues, OPM was "**concerned that the government will not receive the best value** in meeting its needs for these programs and could **potentially overpay** for the **services** provided."  Hence, price was a major concern of OPM's.

56.     The fact that ADP had already significantly exceeded the period of performance limitation of the Federal Acquisition Regulation associated with the FSAFEDS was one of the issues that had previously been formally brought to McFarland's attention during an audit of FSAFEDS program operations and administration for contract years ending from 2006 to 2010, and in a review of FSAFEDS' procurement process starting in February 2015.  McFarland was cautioned by his office that "we believe these concerns are significant enough to warrant bringing them to your attention to ensure that future program procurements sufficiently cover the Government's interest and **provide the best value to the government, as well as to the taxpayers** whose tax dollars fund the programs' administrative fees."

57.     In an October 22, 2015 response, the OPM's Office of Procurement Operations responded that it "fully agrees that it is important to submit the FSAFEDS contract to competition," and that it had "been working to award a new contract," estimated to be made "in early 2016."  At bottom, the Government was worried about overpaying for services and was intent on securing the best value for the government and its taxpayers.

58.     OPM was required to select the bidder that gave it the **best bid** from the Government's perspective.  A bidding war had ensued for what could ultimately turn out to be the largest single contract in WageWorks's business history, and one of the largest single contracts with any government entity, with a potential for securing additional government contracts down the road.  The Executive Defendants were intent upon successfully securing this important key

contract and business.  This would require WageWorks to offer the lowest price to win the contract award.

59.     On November 5, 2015, OPM advised WageWorks that its proposal was within the competitive range.  OPM then conducted discussions with WageWorks, including the topic of its price proposal.  On December 24, 2015, OPM continued discussions with WageWorks, again informing the Company that its offer was within the competitive range.  OPM required additional development information and requested that WageWorks furnish the basis of its unit cost or pricing detail of the total dollars per CLIN to determine WageWorks's cost to perform the Contract.  On January 4, 2016, WageWorks submitted a Revised Volume 2 Price Proposal.  Discussions continued thereafter between OPM and WageWorks on or about February 1 and February 11, 2016.

60.     On February 15, 2016, WageWorks submitted its final revised proposal and detail. WageWorks's Volume 2 Final Revised Price Proposal included a per account, per month fixed price of $2.53.  Then, on March 1, 2016, OPM advised WageWorks of its notice of award of the Contract to WageWorks.  The Contract was executed by the parties on March 1, 2016, and included WageWorks's per account-per month unit price of $2.53.  The OPM Contract – Contract No. OPM3516C003 – was a firm-fixed price contract payable only upon administering the FSAFEDS Program to participants.  As both OPM and WageWorks acknowledge, pursuant to the Contract, WageWorks would not begin administering the program until September 1, 2016.  Such administration would commence only after the Company obtained an authorization to operate ("ATO") from OPM.  During the first year of the Contract, March 1, 2016 through August 31, 2016, WageWorks was required, at no-cost to OPM, to accomplish the "development" and establishment of a website and processing system prior to the September 1, 2016 transition of administration from ADP to WageWorks. Under the Contract, WageWorks was required to adhere to OPM's Security Assessment and Authorization policies, procedures and guidelines.  The Contract provided that "Security Authorization documentation must be developed with the use of OPM security documentation templates."   In bidding successfully, WageWorks deployed a

21

significant gamble designed to both secure the OPM Contract and open the door for potentially more federal contracts.

61.     Confidential Witness EEE ("CW-EEE") was employed in the position Director of Government Operations for WageWorks from approximately July 2016 to February 2017.  CW-EEE administered day-to-day operations for federal government clients under the OPM Contract. CW-EEE's work was client facing and technical.  Most of CW-EEE's job was bringing work over from ADP, which had been OPM's former program administrator.  CW-EEE previously worked at ADP.  As part of the transition of the contract from ADP to WageWorks, the Company acquired ADP employees.  CW-EEE's experience with finance was with respect to participating in the reconciliation from ADP to WageWorks on an account set up by the Federal Government for administrative costs.  CW-EEE was brought in to work for WageWorks by reason of being "the most familiar with ADP."  CW-EEE's observation with regard to the financial side of the contract with OPM was that WageWorks had bid "a lot less than ADP – which is how WageWorks got the contract."  According to CW-EEE, "we wondered how they were going to administer based on those fees – because ADP couldn't do it.  [We] were like, 'wow, how could they bid so low?'"

62.     The market was not put on notice of this pricing related risk.  Owing to news of WageWorks being awarded the OPM Contract in March 2016, WageWorks's stock price climbed into the low fifty dollars per share range, until the close of trading on May 5, 2016, when it traded at $52.82 per share.

**B.     False and Misleading Class Period Statements Re: Financial Performance and Internal Controls**

63.     Between May 5, 2016 through February 23, 2017 WageWorks and the Executive Defendants issued a steady series of false, misleading, and deceptive statements respecting the Company's 2016 financial results, which were artificially inflated by improper revenue recognition and were additionally unreliable due to undisclosed material weakness with regard to its internal controls over its financial reporting.

22

64.     On May 5, 2016, after the close of the market, WageWorks issued a press release reporting on the Company's performance for its quarter ending March 31, 2016 ("First Quarter 2016 Press Release"), stating in part the following:

> "2016 is off to a great start. … Our selling season is progressing very well, highlighted by an exciting new relationship with the Federal government. … As we move through 2016, we are well positioned to execute on our multiple avenues for growth and drive leverage in the business," said Joe Jackson, Chief Executive Officer of WageWorks.

65.     After the market close on that same day, May 5, 2016, WageWorks held an earnings conference call ("First Quarter 2016 Earnings Conference Call") with securities analysts, chaired by defendants Jackson and Callan.  During the First Quarter 2016 Earnings Conference Call, CEO Jackson reiterated his statements in the First Quarter 2016 Press Release and made particular note of the new contract with OPM, stating for example:

> During the quarter we announced that we were selected by the United States Office of Personnel Management or OPM to administer its Federal flexible spending account program.  We are extremely pleased to be partnering with them and look forward to bringing our advanced technology platform and premium service capabilities to approximately 1.8 million eligible Federal employees.

> We expect to transition existing participants to our platform on September 1st.  And based upon existing participation rates, both the OPM and WageWorks, see significant opportunities to increase enrollments going forward.

66.     During the First Quarter 2016 Earnings Conference Call CFO Callan reiterated WageWorks's financial results, and referenced its Healthcare revenue of $50.4 million for the quarter, an "increase of 7% compared to the first quarter of 2015." When asked about "adoption rates" and "rate of enrollment" associated with the important, key OPM Contract versus WageWorks's current experience, Jackson commented as follows:

> …if you look at their existing enrollments today, I would say somewhere approximately between 16% and 19%.  If you look at the industry average for

23

flexible spending accounts, I think the industry average is about 24% participation rate. At WageWorks our average rate is a little north of 30%. So obviously we think that — and so do they think there's a large opportunity through, as I mentioned in the prepared remarks, through some of the open enrollment campaigns and materials that we're putting together today I think will grow adoption over the next few years. And I would hope, I think as would the OPM, that given a couple of years, that we can get the participation rates here to be at least commensurate with where you see the industry average today, if not closer to what our WageWorks average would be.

67.     Thereafter on May 5, 2016, WageWorks filed a Form 10-Q for the quarter ending March 31, 2016 (the "First Quarter 2016 Form 10-Q"). The First Quarter 2016 10-Q was signed and certified under the Sarbanes Oxley Act of 2002 by the Executive Defendants, attesting to the accuracy of the financial statements and effectiveness of internal controls. Defendants Jackson and Callan had evaluated the effectiveness of the Company's disclosure controls and procedures, assuring investors as follows:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, or the Exchange Act, that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, or the SEC, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met.

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (Exchange Act), as of the end of the period covered by this Quarterly Report on Form 10-Q.

Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2016, our disclosure controls and

24

procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

68.     In addition, in the First Quarter 2016 Form 10-Q, the Company asserted that no material changes in internal control over accounting had occurred during the quarter.

> There was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) or the Exchange Act that occurred during the period covered by this Quarterly Report on Form 10-Q that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

69.     The trading price of WageWorks common stock closed at $52.82 per share on May 5, 2015.  Following the issuance of its First Quarter 2016 Press Release and the Company's First Quarter 2016 Earnings Conference Call, and as a consequence of the '34 Act Defendants' representations about the OPM Contract omitting any disclosure about its pricing related risk,  and their representations and assurances regarding the effectiveness of its internal controls, WageWorks's stock price moved higher, closing at $54.53 per share on May 6, 2016, and higher still to close at $57.09 per share on May 7, 2016.

70.     On June 16, 2016, CEO Jackson gave a presentation at the William Blair Growth Conference wherein he discussed the Company's First Quarter 2016 revenue results and the importance of the OPM Contract secured by the Company stating:

> …Another significant achievement in the first quarter this year was we were awarded the federal government contract to administer their Fed's FSA program. The federal government represents the largest employer in the United States, I believe. **So winning that business was a big coup for *WageWorks***…
>
> That contract **represents approximately 2.3 million eligible employees and currently with approximately 300,000 accounts the percentages there show about a 15% penetration rate.** Not only is it great that we get 300,000 new accounts, but the **opportunity we have going forward to increase that penetration is significant**…

25

71.     By the close of trading on July 8, 2016, the trading price of WageWorks common stock broke into the $60 per share range, closing on that day at $60.71 per share and continuing its ascent.

72.     On July 5, 2016, OPM and WageWorks bilaterally modified the Contract.   The modification included heightened security and additional requirements.   The modification was referred to as OPM Modification No. M0001 to Contract No. OPM3516C0003 ("MOD 0001"). The modification was a "no-cost modification" with respect to the time period from March 1, 2016 to August 31, 2016.

73.     Before execution, OPM provided a draft of MOD 0001 to WageWorks on July 5, 2016, along with new security clauses essential to FSAFEDS.   WageWorks understood that if it did not meet the new IT requirements necessary to receive "authorization to operate" (ATO), its performance of the Contract would be in jeopardy.   OPM had previously advised WageWorks, as early as March 10, 2016 – prior to the advent of the '34 Act Class Period – and during a post-award kick-off teleconference conducted among representatives of WageWorks and OPM, that its security requirements were under revision.   At the kick-off meeting, OPM imposed new design plan requirements.   On April 20, 2016, the OPM Contracting Officer, Cheryl Allen, alerted WageWorks to the fact that revised security requirements were being prepared.   On June 10, 2016, representatives from OPM and WageWorks held a meeting to confer with respect to OPM's new plan design and security requirements.   MOD 0001 added three Information Technology Contract Clauses, six OPM-Specific Clauses, and made further revisions to the FSAFEDS administration, enhancing security.   OPM's need for enhanced security was well known, specifically after it had been a victim of a major hacking in 2015.   WageWorks's GC, Kim Wilford, executed MOD 0001 on the Company's behalf on July 20, 2016.   As with her execution of the OPM Contract on WageWorks's behalf, Ms. Wilford could only do so with the approval of the Executive Defendants. Meanwhile, ADP continued to administer its contract with OPM.   To that end, ADP continued to process claims through August 23, 2016, just days before WageWorks's OPM Contract implementation date.

26

74.     On August 9, 2016, after the close of the market, WageWorks issued a press release reporting its financial results and performance metrics for its second quarter, ending June 30, 2016 ("Second Quarter 2016 Press Release"), stating in pertinent part as follows:

- Total revenue in the second quarter 2016 of $87.7 million

- Second quarter 2016 GAAP net income of $2.9 million or $0.08 per diluted share, Non-GAAP net income of $13.3 million or $0.36 per diluted share

- Second quarter 2016 non-GAAP adjusted EBITDA of $27.5 million, a 24 percent increase year-over-year

*** 

"The first half of 2016 was another strong one for WageWorks.…" said Joe Jackson, Chief Executive Officer of WageWorks.

For the second quarter, WageWorks reported total revenue of $87.7 million, compared to $82.8 million for the second quarter of 2015, an increase of 6 percent. Healthcare revenue was $48.1 million, compared to $43.8 million for the second quarter of 2015, an increase of 10 percent….

*** 

GAAP operating income was $4.6 million for the second quarter of 2016, compared to GAAP operating income of $6.8 million for the second quarter of 2015. On a non-GAAP basis, second quarter of 2016 operating income was $22.3 million, an increase compared to non-GAAP operating income of $17.5 million for the second quarter of 2015.

GAAP net income was $2.9 million, or $0.08 per diluted share, for the second quarter of 2016, compared to GAAP net income of $3.5 million, or $0.10 per diluted share, for the second quarter of 2015.

On a non-GAAP net income basis, second quarter of 2016 net income was $13.3 million, or $0.36 per diluted share, an increase compared to non-GAAP net income of $10.3 million, or $0.28 per diluted share, for the second quarter of 2015. Non-GAAP net income for the second quarter of 2015 and 2016 excludes expenses related to stock-based compensation, amortization of acquired intangibles, contingent consideration expense, severance costs related to integration initiatives and the related tax impact of these items.

Non-GAAP adjusted EBITDA was $27.5 million for the second quarter of 2016, a 24 percent increase compared to non-GAAP adjusted EBITDA of $22.2 million for the second quarter of 2015.

75.     On that same day, after the issuance of its Second Quarter 2016 Press Release, defendants Jackson and Callan hosted an earnings conference call ("Second Quarter 2016 Earnings

Conference Call"), including analysts from Stifel Nicolaus, William Blair & Company, JMP Securities, Needham & Company, and SunTrust Robinson Humphrey, during which they made the following statements and representations regarding WageWorks's financial results and the critically important OPM Contract:

> **JOE JACKSON, CEO** … Our plans to transition the existing participants on the United States Office of Personnel Management's federal flexible spending account program to our platform on September 1 remain on track. To remind you, this opportunity includes *approximately 2.3 million eligible employees and brings approximately 350,000 participants to our platform.*…

> \*\*\*

> Total revenue for the second quarter was $87.7 million, an increase 6% over the prior-year period. I am especially pleased with the leverage we continue to realize, as our non-GAAP adjusted EBITDA was $27.5 million, an increase of 24% over the prior-year period and above the high end of our guidance.

> \*\*\*

> Overall, it is clear we are successfully executing on our growth strategy. With our record results in a new sales area and expanding revenue opportunities through our partner, carrier, and channel partner relationships, we are positioning ourselves well for a strong finish to 2016 while simultaneously creating a solid foundation for 2017 and beyond.

> In addition, we are also always actively pursuing acquisition opportunities and working to ensure that we expand our footprint. We are excited about our pipeline of acquisition targets and will continue to be an active player in the continued consolidation of our industry.

> \*\*\*

> **COLM CALLAN, CFO** … Total revenue for the second quarter was strong at $87.7 million, an increase of 6% over the same period last year. Healthcare revenue was $48.1 million for the quarter, an increase of 10% compared to the second quarter of 2015.

> \*\*\*

> Our non-GAAP income from operations was $22.3 million for the second quarter, representing a non-GAAP operating margin of 25.4%. For the same period last year, non-GAAP income from operations was $17.5 million, representing a non-GAAP operating margin of 21.1%.

Our GAAP net income was $2.9 million or $0.08 per share based on 37.2 million diluted shares in the second quarter of 2016. This compares to GAAP net income of $3.5 million or $0.10 per share based on 36.6 million diluted shares in the second quarter of 2015.

On a non-GAAP basis, our net income was $13.3 million for the second quarter of 2016 compared to a non-GAAP net income of $10.3 million for the second quarter of 2015. Non-GAAP net income per diluted common share was $0.36 for the second quarter of 2016 compared with $0.28 for the second quarter of 2015, based on 37.2 million and 36.6 million shares outstanding, respectively.

Non-GAAP adjusted EBITDA for the second quarter was $27.5 million, an increase of 24% year-over-year and a 31% margin, compared to $22.2 million in the second quarter of 2015 or a 27% margin. We are pleased with the leverage we were able to realize in our business.

76.     On August 9, 2016, the Company filed a Form 10-Q for the quarter ended June 30, 2016 ("Second Quarter 2016 Form 10-Q") with the SEC, which provided the Company's second quarter 2016 financial results, including quarterly revenue, net income, and earnings per share, and stated that the Company's internal controls over financial reporting were effective as of June 30, 2016.  The Second Quarter 2016 Form 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting to the accuracy of the financial statements and effectiveness of internal controls.

77.     The '34 Act Defendants did not disclose that the Company's reported revenue included a material amount, totaling $1.1 million, that was improperly recognized and for which WageWorks could not be paid owing to the OPM Contract and MOD 0001, which the Executive Defendants, via corporate GC Wilford, had agreed to on WageWorks's behalf.  No doubt aware of the Contract terms, including as modified, and the fact that the Company had not even achieved implementation, or ATO, and had not yet started administering the FSAFEDS Program, WageWorks did not invoice OPM for such amounts at that time.  Any such invoice would have been inappropriate.

78.     Further signaling the importance of its key new contract "to administer its Federal Flexible Spending Account Program," adding that "[s]ervice to existing participants has started

and transition of all participants is expected to be fully completed by the third quarter of 2016," WageWorks's Second Quarter 2016 Form 10-Q included the following with respect to its internal controls, under the heading "Item 4. Controls and Procedures":

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, or the Exchange Act, that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, or the SEC, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met.

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (Exchange Act), as of the end of the period covered by this Quarterly Report on Form 10-Q.

Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2016, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) or the Exchange Act that occurred during the period covered by this Quarterly Report on Form 10-Q that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

79.     On November 9, 2016, after the close of the market, WageWorks issued a press release reporting the Company's financial results and performance metrics for its quarter ending September 30, 2016 ("Third Quarter 2016 Press Release"), stating and representing in pertinent part as follows:

- Total revenue in the third quarter 2016 of $88.9 million.
- Third quarter 2016 GAAP net income of $5.9 million or $0.16 per diluted share, Non-GAAP net income of $12.6 million or $0.34 per diluted share

***

- Third quarter 2016 non-GAAP adjusted EBITDA of $26.5 million

***

"I am very pleased with our strong third quarter results. We are in the midst of another record setting new sales year driven by increased interest across all of our products from employers of all sizes. The successful transition of the existing participants on the United States Office of Personnel Management's Federal Flexible Spending Account Program to our platform marks the largest transition of accounts in our history," said Joe Jackson, Chief Executive Officer of WageWorks.

***

For the third quarter, WageWorks reported total revenue of $88.9 million, compared to $83.2 million for the third quarter of 2015, an increase of 7 percent. Healthcare revenue was $48.5 million, compared to $42.2 million for the third quarter of 2015, an increase of 15 percent.

***

GAAP operating income was $9.4 million for the third quarter of 2016, compared to GAAP operating income of $12.7 million for the third quarter of 2015. On a non-GAAP basis, third quarter of 2016 operating income was $21.3 million, compared to non-GAAP operating income of $21.9 million for the third quarter of 2015.

***

GAAP net income was $5.9 million, or $0.16 per diluted share, for the third quarter of 2016, compared to GAAP net income of $7.6 million, or $0.21 per diluted share, for the third quarter of 2015.

***

31

On a non-GAAP basis, third quarter of 2016 net income was $12.6 million, or $0.34 per diluted share, compared to non-GAAP net income of $13.0 million, or $0.36 per diluted share, for the third quarter of 2015. Non-GAAP net income for the third quarter of 2015 and 2016 excludes expenses related to stock-based compensation, amortization of acquired intangibles, contingent consideration expense, severance costs related to integration initiatives, costs associated with the planned acquisition of ADP's Consumer Health Spending Account and COBRA businesses, and the related tax impact of these items.

***

Non-GAAP adjusted EBITDA was $26.5 million for third quarter of 2016, which remained flat as compared to non-GAAP adjusted EBITDA for the third quarter of 2015.

80.     Following the issuance of the Third Quarter 2016 Press Release, the Company held an earnings conference call with market analysts on November 9, 2016 ("Third Quarter 2016 Earnings Conference Call"), at which time CEO Jackson gave the following assurances and representations:

- We are in the midst of another outstanding record-setting new sales year… On September 1, we successfully transitioned the existing participants on the United States Office of Personnel Management's Federal Flexible Spending Account program to our platform, the largest transition of accounts in our history.

***

- …As I mentioned, this year's open enrollment period will also include the United States -- the addition of the United States Office of Personnel Management's Federal Flexible Spending Account Program, which transitioned to our platform on September 1. In addition to the existing business already on board, I am pleased to report that the United States Postal Service has decided to join the agencies supported by the OPMs, and will bring approximately 50,000 FSA accounts, and an additional 500,000 eligible employees to this opportunity effective January 1.

81.     On November 9, 2016, the Company filed a Form 10-Q with the SEC for the quarter ended September 30, 2016 ("Third Quarter 2016 Form 10-Q"), which provided the Company's third quarter 2016 financial results, including revenue, net income and earnings per share. WageWorks's Third Quarter 2016 Form 10-Q stated that the Company's internal controls over

financial reporting were effective as of September 30, 2016.  The Third Quarter 2016 Form 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting to the accuracy of the financial statements and effectiveness of internal controls. The financial results included revenue that the '34 Act Defendants improperly recognized in the third quarter of 2016, despite the language of the OPM Contract and MOD 0001.

82.     Once again, signaling its importance, WageWorks's Third Quarter 2016 Form 10-Q reminded investors that WageWorks was awarded the OPM Contract in March 2016, and that service to "existing participants" had started, assuring the market that the "transition of all participants was completed during the third quarter of 2016."  WageWorks's Third Quarter 2016 Form 10-Q also stated with regard to its internal controls:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, or the Exchange Act, that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, or the SEC, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met.

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (Exchange Act), as of the end of the period covered by this Quarterly Report on Form 10-Q.

Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2016, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we

file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) or the Exchange Act that occurred during the period covered by this Quarterly Report on Form 10-Q that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

83.    On January 10, 2017, WageWorks's board chairman and CEO, Jackson, gave a presentation at the Needham Growth Conference at which time he again spoke about the Company's critical and important contract with OPM, stating:

- … We implemented in September the Office of Personnel Management's Federal FSA Program, which added approximately 300,000 FSA accounts to our portfolio and probably more importantly, this represents 1.9 million eligible employees.

- …The great news about signing up the OPM is throughout the year they continue to add other agencies that are supported by the OPM. And this year, we were very pleased to see the United States post office joined the program and we implemented them on January 1 of 2017…

- So OPM in total now -- this is before open enrollment, before the new -- any new accounts were added this year, *we would have seen about 350,000 new accounts and about 2.4 million eligibles.*

- The one thing I would point out is we were awarded the federal government contract in the first quarter of last year.  We implemented them in September, so kind of a five-six-month implementation process that we successfully completed on September 1, the largest transition of accounts in our industry that we were able to effect there…

***

- … when you look at our FSA account business, the average enrollment, as a percentage of eligibles in the industry, is approximately 23%, 24%. If you look at the *WageWorks* portfolio in and of itself, we're a little bit north of 30%. So if you look at the math on

the Fed's program, we have a lot of opportunity to grow into that over time and feel very good about it…

84.     At no time during the Needham Growth Conference in January 2017, the Second Quarter 2016 Earnings Conference Call, the Second Quarter 2016 Earnings Conference Call, or within the Second Quarter 2016 Press Release, the Third Quarter 2016 Press Release, the Second Quarter 2016 Form 10-Q, or the Third Quarter 2016 Form 10-Q, did the '34 Act Defendants disclose or reveal that, despite not achieving implementation until September 1, 2016, WageWorks's reported financial results included "revenue" from OPM, with respect to the OPM Contract for time periods prior to September 1, 2016, for which OPM was not contractually obligated to pay the Company, or that its financial performance metrics, including revenue, net income, and earnings per share were materially inflated owing to the inclusion of such bogus revenue.  This remained hidden from the market despite the fact that WageWorks could not earn or realize revenue under the Contract for the "contract year 1 period" – March 1, 2016 through August 31, 2016.

85.     After the end of 2016, ending December 31, 2016, and before the Company could close its books for the year ending December 31, 2016, WageWorks had to submit to and pass an audit process in advance of being able to file its Annual Report on Form 10-K with the Securities and Exchange Commission for 2016.  The Company's outside independent auditor was KPMG. The lack of any invoicing with respect to "services" allegedly performed, and for which revenue was recognized in association with the OPM Contract for the second and third quarters of 2016, would be a huge red flag to independent auditor KPMG.  Any such lack of invoicing in 2016 was improper and constituted evidentiary support that it was, improper to recognize such "revenue," and that no such "revenue" was earned for which the Company would be paid by OPM respecting those time periods.  With the close of the end of year audit looming, the '34 Act Defendants, in order to satisfy any inquiry by auditors as to the propriety of even recognizing revenue with respect to the OPM Contract, issued an invoice to OPM on February 15, 2017, for "Base Year 1" services it claimed were payable from March 1, 2016 through August 31, 2016 and respecting which

WageWorks recognized "revenue" in 2016, despite the fact that OPM was not contractually obligated to pay for such services, if any, and such billings were inappropriate.

86.     By invoice dated February 15, 2017 (Invoice No. 37943), WageWorks claimed $5,117,856.39 against the Government, which refused to pay the invoice.  The Government did not owe WageWorks the money.  WageWorks was not entitled to seek payment for work or services from the time it executed the Contract on March 1, 2016 through August 31, 2016, after which it assumed responsibility for administering participant accounts from ADP.  Any such invoicing violated the terms of the Contract and MOD 0001.  In addition, WageWorks had not obtained the necessary ATO requirement, or met such precondition to any entitlement to payment.

87.     In denying and refusing to pay WageWorks's invoice for $5,117,856.39 for the period of March 1, 2016 to August 31, 2016, the OPM further made it clear that, under the Contract, WageWorks is responsible for "funding and accounting for its start up cost" and that WageWorks did not provide "FSAFEDS Administration Services, as defined under the contract prior to September 1, 2016."  According to OPM, WageWorks was not entitled to any CLIN00001 fees for "start-up cost," or fees prior to achieving an ATO and replacing the incumbent contractor.

88.     The OPM Contract is clear that it is a firm-fixed-price Contract.  Payment only applies to administering the FSAFEDS Program directly to participants.  WageWorks was not administering the FSAFEDS program to participants in "Contract Year 1" – prior to September 1, 2016.  Given the Contract and the "no cost" MOD 0001 executed by GC Wilford on behalf of the Company, with the approval of the Executive Defendants, its invoicing OPM in February 2017, and its recognizing revenue in the second and third quarters of 2016, and for year-end 2016, in its reported financial results, including its reports on Forms 10-Q for such interim reporting periods and its 2016 Form 10-K, was improper — and the Executive Defendants knew it.

89.     On February 23, 2017, after the close of the market, the Company issued a press release reporting its financial results and performance metrics for the quarter and the year ending December 31, 2016, stating and representing as follows:

- Fourth quarter 2016 total revenue of $101.1 million, a 22 percent increase year-over-year
- Full year 2016 total revenue of $364.7 million
- Fourth quarter 2016 GAAP net income of $5.7 million or $0.15 per diluted share, Non-GAAP net income of $13.6 million or $0.36 per diluted share
- Full year 2016 GAAP net income of $20.2 million or $0.54 per diluted share, Non-GAAP net income of $51.3 million or $1.38 per diluted share
- Fourth quarter 2016 non-GAAP adjusted EBITDA of $28.8 million
- Full year 2016 non-GAAP adjusted EBITDA of $108.0 million

\*\*\*

"2016 was an outstanding year for WageWorks. Our sales team delivered another record performance and we just completed a successful open enrollment season that included on boarding the largest number of participants in our history…. We continue to see positive momentum in all aspects of our business and enter 2017 well positioned to execute on the foundation that we built in 2016," said Joe Jackson, Chief Executive Officer of WageWorks.

\*\*\*

**Full Year 2016 Financial Highlights**

For the full year of 2016, WageWorks reported total revenue of $364.7 million, compared to $334.3 million for the full year of 2015, an increase of nine percent. Healthcare revenue was $202.9 million, compared to $176.6 million for the full year of 2015, an increase of 15 percent.

GAAP operating income was $32.7 million for the full year of 2016, compared to GAAP operating income of $39.9 million for the full year of 2015. On a non-GAAP basis, full year of 2016 operating income was $86.0 million, compared to non-GAAP operating income of $78.2 million for the full year of 2015.

GAAP net income was $20.2 million, or $0.54 per diluted share, for the full year of 2016, compared to GAAP net income of $23.0 million, or $0.63 per diluted share, for the full year of 2015.

On a non-GAAP basis, full year 2016 net income was $51.3 million, or $1.38 per diluted share, compared to non-GAAP net income of $45.8 million, or $1.25 per diluted share, for the full year of 2015. Non-GAAP net income for the full year of 2015 and 2016 excludes expenses related to stock-based compensation, amortization of acquired intangibles, employee termination and other charges, contingent consideration expense, and the related tax impact of these items.

Non-GAAP adjusted EBITDA was $108.0 million for the full year of 2016, an increase of 12 percent as compared to $96.5 million for the full year of 2015.…

37

As of December 31, 2016, WageWorks had cash and cash equivalents totaling $678.3 million. This compares to cash and cash equivalents totaling $500.9 million as of December 31, 2015.

90.    During the Company's follow-on earnings conference call with market analysts on February 23, 2017, which was chaired by CEO Jackson and CFO Callan, the following representations were made by defendant Jackson regarding WageWorks's 2016 results and its important contract with OPM:

- … We continue to see positive momentum in all aspects of our business and enter 2017 well-positioned to execute on the foundation we built in 2016…

- Our investment in customized content and educational materials for the OPM to raise awareness of the convenience and cost savings associated with participation in the federal FSA program resulted in positive increases in participation rates consistent with what we have seen with other large clients during their first open enrollment experience with us…

91.    Thereafter, on February 23, 2017, the Company filed the 2016 Form 10-K with the SEC, which provided the Company's financial results for the fourth quarter and year-end 2016. The 2016 Form 10-K was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

92.    WageWorks's 2016 Form 10-K reported net income of $20,205,000 with "diluted" net income per share of $0.54 and "basic" net income per share ("EPS") of $0.56.  For the year ended December 31, 2015, WageWorks had net income of $22,950,000.  The financial results reported in the 2016 Form 10-K included the improperly recognized "revenue" ostensibly from the OPM Contract, thus materially inflating and falsely skewing WageWorks's 2016 revenue, net income and EPS.

93.    WageWorks's 2016 Form 10-K made the following statements and representations with regard to "revenue recognition":

38

We report revenue for the following product offerings: healthcare, commuter, COBRA and other services. Our revenues are primarily attributable to fees for services we provide to employer clients.

Table of Contents

Healthcare and commuter programs generate revenues from the monthly services we provide in connection with their employees' participation in CDB accounts. COBRA revenue is generated from the administration of continuation of coverage services for participants who are no longer eligible for the employer's health benefits. Other revenue includes services related to enrollment and eligibility, non-healthcare, employee account administration (i.e., tuition and health club reimbursements) and project-related professional fees. Fees associated with services are recognized in the period services are rendered and earned in accordance with service arrangements with clients where fees are fixed or determinable and collectability is reasonably assured. Fees received for the initial setup of clients and annual renewal fees are deferred and recognized ratably over the service period.

There are also revenues generated from fees collected on debit cards used by employee participants, known as interchange, that represent a percentage of the amounts transacted on each card. These cards are offered through our healthcare and commuter solutions. We recognize the fee revenues based on contractual fee rates with third parties when transactions on these cards are completed.

We also receive commissions from transit passes that we purchase from various transit agencies on behalf of employee participants. Due to our significant volume, we receive commissions on these passes which we recognize as vendor commission revenue. In addition, we recognize revenue on our estimate of passes that will expire unused over the estimated useful life of the passes, as the amounts paid for these passes are nonrefundable to both the employer client and the employee participant.

94.     The 2016 Form 10-K included the following graph favorably comparing the cumulative total return of WageWorks common stock with the total return for the New York Stock Exchange Composite Index (the "NYSE Composite") and the Russell 3000 Index (the "Russell 3000") from May 10, 2012 (the date its common stock commenced trading on the NYSE) through December 31, 2016, assuming $100 was invested:



95.     In a section of the 2016 Form 10-K entitled "our clients," and another section entitled "our business," the relationship with OPM was highlighted once again, stating:

> …in March, 2016 we were selected by the United States Office of Personnel Management, or OPM, to administer its Federal Flexible Spending Account Program, or FSAFEDS. This new relationship provides eligible Federal employees access to our advanced technology platform and premium service capabilities. Service to existing participants had started and transition of all participants was completed during the third quarter of 2016. In addition, the United States Postal Service became a member of the OPM contract during the first quarter of 2017.

96.     On February 23, 2017, Jackson and Callan each executed a "Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of Sarbanes-Oxley Act of 2002," which was attached as an exhibit to WageWorks's 2016 Form 10-K, stating:

1.      I have reviewed this Annual Report on Form 10-K of WageWorks, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting….

97.     Each of Jackson's and Callan's SOX Certifications stated and represented the following:

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably

41

likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

98.    In addition, on February 23, 2017, Jackson and Callan jointly executed the following Certification of Principal Executive Officer and Principal Financial Officer as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002; stating:

> Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350), Joseph L. Jackson, Chief Executive Officer and Director (Principal Executive Officer) of WageWorks, Inc. (the "Company"), and Colm Callan, Chief Financial Officer (Principal Financial Officer) of the Company, each hereby certifies that, to the best of his knowledge:
>
> 1. Our Annual Report on Form 10-K for the year ended December 31, 2016, to which this Certification is attached as Exhibit 32.1 (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

99.    WageWorks's 2016 Form 10-K also included the following regarding its internal controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act"), that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that disclosure controls and procedures, no matter how well conceived and operated, can provide

only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met.

Subject to the limitations noted above, based on their evaluation at the end of the period covered by this Annual Report on Form 10-K, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures and have concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act. The Company's internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. In making its assessment of internal control over financial reporting, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) on *Internal Control – Integrated Framework (2013)*. The Company acquired the ADP CHSA/COBRA Business on November 28, 2016, and management excluded from its assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2016, the ADP CHSA/COBRA Business' internal control over financial reporting which represented less than 5% of total assets and

total revenue as of and for the year ended December 31, 2016, after excluding goodwill and intangible assets recorded upon the acquisition of the ADP CHSA/COBRA Business. The recognition of goodwill and intangible assets were subject to management's assessment of internal control over financial reporting. See Note 3-Acquisitions and Channel Partner Arrangements to our consolidated financial statements included in Item-8-Financial Statements and Supplementary Data of this report for pro forma information.  Based on this assessment, our CEO and CFO concluded that our internal control over financial reporting was effective as of December 31, 2016.

The effectiveness of our internal control over financial reporting as of December 31, 2016 has been audited by KPMG LLP, an independent registered public accounting firm, as stated in their report, which appears in Part II, Item 8 of this Form 10-K.

### Changes in Internal Control over Financial Reporting

There was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) or the Exchange Act that occurred during the period covered by this Annual Report on Form 10-K that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

100.    WageWorks's 2016 Form-K did not disclose its existing material weaknesses in its internal controls over financial reporting.  Despite the existence of a severe risk and deficiency that was already occurring, it spoke of "past significant deficiencies" in its internal control over financial reporting, stating:

We have, in the past, experienced issues with our internal control over financial reporting and it is possible that we may discover significant deficiencies or material weaknesses in our internal control over financial reporting in the future. Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could cause us to fail to meet our periodic reporting obligations, or result in material misstatements in our financial information. Any such delays or restatements could cause investors to lose confidence in our reported financial information and lead to a decline in our stock price.

101.    Once again, WageWorks's 2016 Form 10-K spoke about things that had happened years earlier, while failing to disclose events that already existed and that were adversely impacting the reliability of its financial reporting, which was materially false and deceptive.

102.    WageWorks's interim quarterly reports on Form 10-Q issued for the first, second, and third quarters, and its 2016 Form 10-K reporting on the fourth quarter 2016 and the full-year 2016, executed by CEO Jackson and CFO Callan, and its associated press releases and conference calls, contained statements and representations, or made material omissions that were false, deceptive, and misleading because:

(a)    **Material weaknesses** pervaded WageWorks's **internal controls**, rendering its Class Period reported **financial statements unreliable**;

(b)    WageWorks's internal controls lacked adequate safeguards necessary to thwart, expose, and otherwise effectively deter Executive Defendants from overriding them;

(c)    WageWorks's "tone at the top" – its senior management – did not promote an effective control environment or promote a commitment to an atmosphere of ethical behavior and integrity, which, in turn, also caused its reported financial results to be unreliable;

(d)    As the Company ultimately disclosed after the Class Period, "former senior management" – Jackson and Callan – engaged in a practice of overriding internal controls, causing materially false financial reporting; Defendants Jackson and Callan withheld material financial information from certain of WageWorks's independent Audit Committee members and its independent auditor, KPMG, thereby making it appear that the Company was performing better than it really was;

(e)    The '34 Act Defendants failed to disclose that WageWorks was reporting and representing materially false and misleading financial results as a consequence of improper revenue recognition associated with the OPM Contract, in violation of GAAP, in the second and third quarters of 2016, and full-year 2016, thereby artificially inflating its revenues, net income, and EPS;

(f)     As a consequence of its improper revenue recognition associated with the OPM Contract in the second and third quarters of 2016, WageWorks's reported financial results for the second and third quarter of 2016, and full-year 2016 were materially false and misleading, and materially overstated its net income and earnings per share as identified in the chart below:

**Adjustments due to the OPM Contract (net income numbers in thousands):**

|  | Second Quarter - 2016 | | |
|---|---|---|---|
|  | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | $13,300 | $12,585 | -5.38% |
| Diluted EPS | $0.36 | $0.34 | -5.56% |

|  | Third Quarter - 2016 | | |
|---|---|---|---|
|  | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | $12,600 | $11,105 | -11.87% |
| Diluted EPS | $0.34 | $0.30 | -11.76% |

|  | Total 2016 | | |
|---|---|---|---|
|  | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | $51,300 | $48,954 | -4.57% |
| Diluted EPS | $1.38 | $1.32 | -4.35% |

103.    In addition to the falsely stated revenue in material amounts tainting the Company's 2016 Form 10-K and associated quarterly reports on Forms 10-Q for the second and third quarters of 2016, each of those financial reports were rendered false and misleading by virtue of the '34 Act Defendants' delay of taking full amortization on intangible assets in the amount of $3.7 million, skewing WageWorks's reported financial metrics, including falsely inflating its net income and EPS.  WageWorks was required to write-down the fair value of "KP Connector," a software platform developed by the Company.  KP Connector was based on specifications outlined in an agreement with a client, Kaiser Permanente, that had notified the Company during the second

quarter of 2016 that it no longer needed its services.  The amortization associated with the KP Connector was required to be recorded as an increase in operating expenses, which, as a consequence, would materially decrease net income in the second quarter of 2016 and full-year 2016.  The Company was required to write down the entire carrying value of the KP Connector because, given the termination of the Contract, the Company determined, as it now admits, that as of June 30, 2016, the "value" of the KP Connector software platform was "unrecoverable."  The Company's net income and earnings per share for the second quarter and full-year 2016, were also materially overstated as a consequence of the failure to completely write down the fair value of KP Connector, as more fully illustrated in the charts below:

**Adjustments due to KP Connector (net income numbers in thousands):**

|  | Second Quarter - 2016 | | |
|---|---|---|---|
|  | As Previously Reported | As Restated | Adjustment % |
| Net Income | $13,300 | $10,895 | -18.08% |
| Diluted EPS | $0.36 | $0.30 | -16.67% |

|  | Total 2016 | | |
|---|---|---|---|
|  | As Previously Reported | As Restated | Adjustment % |
| Net Income | $51,300 | $49,285 | -3.93% |
| Diluted EPS | $1.38 | $1.32 | -4.35% |

104.    As disclosed and further acknowledged by the Company in its March, 2019 Restatement:

*In 2016*, *the Company re-assessed the fair value of KP Connector* which is an internal use software developed by the Company based on the specifications outlined in a client agreement. *In the second quarter of 2016, the client notified the Company that it no longer required the services provided by the Company. Accordingly, the Company determined that KP Connector's carrying value was considered unrecoverable* as of June 30, 2016, and recorded a $3.7 million impairment charge to amortization, impairment and change in contingent consideration expense in the condensed consolidated statements of income  and a corresponding reduction of property and equipment, net, in the condensed consolidated balance sheets. The Company also reversed previously recorded amortization expenses in each of the third and fourth quarters of 2016. *In addition, the Company*

*accelerated amortization on intangible assets for client contracts and broker relationships of $3.8 million, triggered in the second quarter of 2016, related to the termination of a significant customer relationship in the health insurance exchange business.*

105.   The failure to timely and appropriately write down and fully amortize the valueless KP Connector and the overstatement of revenue materially inflated net income and consequent earnings per share for the second quarter and full-year 2016 as follows:

**Adjustments due to the OPM Contract and KP Connector (net income numbers in thousands):**

| | Second Quarter - 2016 | | |
| --- | --- | --- | --- |
| | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | $13,300 | $10,180 | -23.46% |
| Diluted EPS | $0.36 | $0.28 | -22.22% |

| | Total 2016 | | |
| --- | --- | --- | --- |
| | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | $51,300 | $46,939 | -8.50% |
| Diluted EPS | $1.38 | $1.26 | -8.70% |

106.   But for the false accounting regarding WageWorks's revenue, net income, and related financial results during the '34 Act Class Period, and/or its delayed KP Connector valuation amortization as stated above, WageWorks would not have met its EPS guidance for 2016 reported on February 23, 2017 – a critical time before the June 2017 Offering.  Nor would WageWorks have attained its EPS guidance it had previously provided to the market in its Second Quarter 2016 Conference Call, and its Third Quarter 2016 Conference Call, for the second and third quarters of 2016 respectively.  A disclosure of the truth – that WageWorks materially missed guidance and had weak internal controls – would have caused an immediate and material decline of the trading price of its common stock, rendering it impossible for the Company to engage in a successful public offering in June 2017 at or near its historic trading price high of $69.25 a share.  The

48

following chart reflects, in non-GAAP numbers, the full material change in WageWorks's then-reported EPS versus its guidance for the second and third quarters of 2016 and full-year 2016, and illustrates the material EPS shortfall that the '34 Act Defendants' false accounting concealed from the market:

| Period | EPS Originally Reported | EPS Guidance | Actual Restated OPM EPS[6] | Actual Restated KP EPS | Restated OPM & KP Connector EPS |
|---|---|---|---|---|---|
| Second Quarter 2016 | $0.36 | $0.34-$0.35 | $0.34 | $0.30 | $0.28 |
| Third Quarter 2016 | $0.34 | $0.32-$0.33 | $0.30 | $0.01 | $0.31 |
| Full Year 2016 | $1.38 | $1.35-$1.41 | $1.32 | $1.32 | $1.26 |

107.    On May 4, 2017, the Company hosted an earnings conference call with market analysts ("First Quarter 2017 Earnings Conference Call"), chaired by CEO Jackson and CFO Callan in which they made the following statements and representations in responding to analyst questions, demonstrating their focus in the OPM relationship and related business:

**DAVID MICHAEL GROSSMAN, MD, STIFEL, NICOLAUS & COMPANY, INCORPORATED, RESEARCH DIVISION**: … Colm, is the notion that the OPM doesn't prefund the FSA balance as the way most commercial clients do, is that the reason? And so all the claims coming in get paid?

**COLM M. CALLAN**: Yes, so with most clients we have a prefund and we just basically – as we pay out the claims, we are pulling the funds out of the client bank accounts to top the prefund back up. So you don't see it anywhere near the kind of movement that you'll see on the OPM side. ***On the OPM side, we inherited a big slug of cash in Q3 of last year when that account went live and that's where you would see*** – if you look back at financial statements last year. If we ever get to the point where the claims start to exceed that cash amount, we can go get additional funds from the OPM, so that we're never out-of-pocket. But until that point, you'll see customer obligation decrease and cash decrease consistent with the participant claims. And then as, again, as the participant contributions come in throughout the year, you'll see that build back up over time

**DAVID MICHAEL GROSSMAN**: I see. And just sticking with OPM. My recollection was that obviously, their penetration rate was much lower than your average commercial

---

[6]    Restated EPS calculated using WageWorks's historical tax rate of 35%.

customer. And as I recall they also didn't have – or they weren't offering through you HSA or commuters, so just wondering if you can give us a sense – I know it's still relatively early, but just what you're seeing both on the penetration side as well as the government's willingness to embrace high deductible plans, particularly given with what's going on with all the healthcare stuff in Washington right now?

**JOSEPH L. JACKSON**: I would say, first of all, you're right, it's still probably early. We had our first QBR, quarterly business review, with the OPM, a couple of weeks ago. We got very high marks from the folks that we work with there. The client satisfaction scores were high. The participant sat scores from the call centers are off-the-charts good. So I think – I think they're very pleased with the start really of increasing penetration there. And I would say with regard to them embracing high deductible health plans et cetera, I don't know that, that discussion – what I would call, far along or anything like that yet. But you can imagine it's something that we continue and will continue to talk to them about. And try and create an opportunity there as we go along. I mean – I think they've done a very good job of kind of consolidating the product and the support that we've seen on the FSA side for over 400 agencies that we support through them today.

108.    On May 4, 2017, WageWorks filed a Form 10-Q for the quarter ending March 31, 2017 (the "First Quarter 2017 Form 10-Q"). The First Quarter 2017 10-Q was signed and certified under the Sarbanes Oxley Act of 2002 by the Executive Defendants attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

109.    Under the topic heading "Item 4. Controls and Procedures," the First Quarter 2017 Form 10-Q executed by Jackson and Callan included the following representations regarding the effectiveness of internal controls.

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act"), that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission ("SEC"), and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met.

Subject to the limitation noted above, based on their evaluation at the end of the period covered by this Quarterly Report on Form 10-Q, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures and have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2017.

**Changes in Internal Control over Financial Reporting**

During the quarter ended March 31, 2017, we completed the implementation of a new enterprise resource planning (ERP) system.  The implementation was completed in the normal course of business to increase efficiency and align our processes throughout the organization.  As a result of this implementation, we modified certain existing process controls as well as implemented new process controls to adapt to changes for the new ERP system. Other than the ERP implementation there has been no other significant changes in process controls during the quarter ended March 31, 2017. We will continue to assess our internal controls relating to our business and financial processes.  We believe that we have taken the necessary steps to monitor and maintain appropriate internal controls over financial reporting.

110.    In the First Quarter 2017 10-Q, WageWorks carried as accounts receivable on its Balance Sheet the amount of false revenue it had recorded in connection with the OPM contract, inflating reported accounts receivable by at least $5.1 million.

111.    On June 14, 2017, then-CEO and board chairman Jackson spoke at the William Blair Growth Stock Conference.   During his presentation, Jackson stated with respect to WageWorks that "**unique to us is the earnings visibility that we have** … by the time we run our first invoicing engine the third week of January, we have **about a 95% degree of visibility** in what the upcoming year's top and bottom line looks … a **very visible and predictable financial model** …"

112.    On June 19, 2017, WageWorks issued a press release announcing the June 2017 Offering of 2.5 million shares, priced at $69.25 per share, which was comprised by WageWorks selling 1,954,852 shares of common stock, and certain of WageWorks's existing stockholders selling an aggregate of 545,148 shares of common stock. WageWorks granted underwriters a 30-

day option to purchase up to 375,000 additional shares. WageWorks stated that it intended to use the proceeds of the primary portion of the offering for general corporate purposes, **including strategic acquisitions**, channel partner arrangements, capital expenditures, and operating costs. The Company also announced that it would not receive any proceeds from the sale of shares by the selling stockholders. William Blair & Company, L.L.C. and Stifel, Nicolaus & Company, Incorporated served as joint book-running managers for the offering, with JMP Securities LLC, Needham & Company, LLC, and SunTrust Robinson Humphrey, Inc. acting as co-managers.

113. On June 19, 2017, in connection with the June 2017 Offering, WageWorks filed the Registration Statement with the SEC. Jackson, as CEO and chairman of the board, and Callan, as CFO, along with directors Byerwalter, Bevilacqua, Bodaken, Gramaglia, Larson, and Metzger, duly signed the Registration Statement.

114. WageWorks also filed its Prospectus, dated June 19, 2017, with the SEC in connection with the June 2017 Offering together with an accompanying supplement to the Prospectus (Prospectus Supplement). The following documents were incorporated by reference in both the Prospectus and Prospectus Supplement:

- WageWorks's Annual Report on Form 10-K for the year ended December 31, 2016, filed with the SEC on February 23, 2017;

- The information from WageWorks's definitive proxy statement on Schedule 14A, filed with the SEC on March 17, 2017, to the extent incorporated by reference in our annual report on Form 10-K for the year ended December 31, 2016;

- WageWorks's Quarterly Report on Form 10-Q for the quarter ended March 31, 2017, filed with the SEC on May 4, 2017;

- WageWorks's Current Reports on Form 8-K, filed with the SEC on November 28, 2016 (as amended by that Amendment No. 1 to the Current Report on Form 8-K filed on November 28, 2016, filed with the SEC on February 3, 2017), March 13, 2017, April 5, 2017 (as amended by that Amendment No. 1 to the Current Report on Form 8-K filed on April 5, 2017, filed with the SEC on April 6, 2017), April 21, 2017, May 1, 2017 and June 19, 2017; and

- The description of WageWorks common stock contained in our Registration Statement on Form 8-A (Commission File No. 001-35232), filed with the SEC on July 12, 2011,

including any subsequent amendment or any report filed for the purpose of updating such description.

115.    WageWorks's Prospectus Supplement in connection with the June 2017 Offering of 2.5 million shares of its common stock included a "Summary Consolidated Financial Data" as of December 31, 2016, which stated consolidated revenues for the year ended December 31, 2016 of $364,713,000 and consolidated net income for the same year of $20,205,000.   The incorporated financial results and performance metrics were materially inflated and false, rendering the reported Offering Documents false and misleading, as alleged herein.

116.    Having incorporated WageWorks's 2016 Form 10-K and the interim period Second Quarter 2016 Form 10-Q, Third Quarter 2016 Form 10-Q and First Quarter 2017 Form 10-Q in the Offering Documents, investors were comforted by the continuing assurances and representations regarding the Company's effective internal controls and procedures and the Executive Defendants SOX Certifications attesting to the accuracy of WageWorks's financial statements, effective internal controls and that all fraud was disclosed.

117.    WageWorks's 2.5 million share common stock offering was sold to investors by the following underwriters in the following amounts:

| Underwriter | Number of Shares |
|---|---|
| William Blair & Company, L.L.C. | 1,000,001 |
| Stifel, Nicolaus & Company, Incorporated | 875,000 |
| JMP Securities LLC | 208,333 |
| Needham & Company, LLC | 208,333 |
| SunTrust Robinson Humphrey, Inc. | 208,333 |
| **Total** | **2,500,000** |

118.    In the June 2017 Offering, both the Company and defendant Jackson profited from the inflation embedded in the trading price of WageWorks common stock as a result of the previously issued false and misleading financial statements and Offering Documents.   In addition to the 1,954,852 million shares sold by WageWorks, garnering net proceeds of $130.8 million for

its coffers, defendant Jackson sold a substantial amount of his holdings in WageWorks common stock, selling 495,148 shares after exercising options to purchase more than 400,000 shares at prices between $5.32 and $9.59 per share and garnering personal proceeds of $31.3 million. Defendant Jackson's stock sales were not made pursuant to a 10b5-1 trading plan and were dramatically out of line with past trading practices.

119.    On August 1, 2017, following the issuance of its Second Quarter 2017 Press Release that same day, WageWorks held an earnings conference call with market analysts hosted by CEO Jackson and CFO Callan ("Second Quarter 2017 Earnings Conference Call").  During the question and answer phase of the Second Quarter 2017 Earnings Conference Call, the critically important OPM Contract was, once again, a focus of inquiry and senior managements' attention as reflected in the following colloquy between analyst David Michael Grossman of Stifel Nicolaus & Company, Inc., and CEO Jackson:

> **DAVID MICHAEL GROSSMAN**: … you had really strong kind of double-digit growth for the first half of the year, yet the guidance seems to imply a fairly substantial deceleration in the back half of the year…you've got tougher comps with the OPM coming into the same-store sales base, if you will, in September, but any other reasons that would suggest that growth would decelerate in the back half of the year?

> **JOSEPH L. JACKSON**: … One, OPM, we have 1 month -- we have 1 month of that in the third quarter. And then the fourth quarter, obviously, we have -- there's a grow over there…in December, we had 1 month worth of the ADP acquisition…you've read it pretty well but I think regardless, we'll end this year with north of 30% revenue growth…that's an outstanding year for us…

> **DAVID MICHAEL GROSSMAN**: … just with regard to OPM, and I know you haven't really engaged in Open Enrollment yet, but can you give me or us any sense of kind of how you're thinking about the ability to grow that base, given, again, you talk a lot about how low the penetration rates are and the desire to increase that aspect?...

> **JOSEPH L. JACKSON**: …I look at the OPM obviously, just numbers wise, is obviously a great opportunity. But to date, I don't know that I have seen anything that would cause me to veer from the belief that this business is operating like any other very large entity that we've brought on over the last several years. We got through last year's Open Enrollment in kind of a quick way. We brought them on board pretty quickly around the time that Open Enrollment started…penetration…hard to predict it…they are like many other large clients that we've had over the years, we should continue to see positive

54

penetration in the enrollment numbers, not only this year, but over the next couple of years…

**DAVID MICHAEL GROSSMAN**: …was that just kind of an anomaly that you saw someone deceleration this quarter?

**JOSEPH L. JACKSON**: …We've got a couple of tough comps in the third and fourth quarter…. I think the only reason someone can beat us would be on price…we have a higher penetration of people using these products working with WageWorks, I think than anybody in the industry.…

120.    On August 1, 2017, WageWorks also filed a Form 10-Q for the quarter ending June 30, 2017 ("Second Quarter 2017 Form 10-Q"). The Second Quarter 2017 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting to the accuracy of its financial statements, and making further representations and assurances respecting WageWorks's internal controls and procedures, as discussed below.

121.    In the Second Quarter 2017 10-Q, WageWorks carried as accounts receivable on its Balance Sheet the amount of false revenue it had recorded in connection with the OPM contract, inflating reported accounts receivable by at least $5.1 million.

122.    Then, on or about August 16, 2017, in its continuing effort to mask its improper recognition of revenue reported in its financial results in 2016, WageWorks filed a "certified claim" with the OPM Contracting Officer in the amount of $5,117,856.39 — the same amount as previously invoiced in February 2017 — for unpaid "Base Year 1" services.  The Government did not owe WageWorks the money, nor was it entitled to be paid.  WageWorks's bogus claim was for "FSAFEDS administration" ostensibly covering the period of March 1, 2006 – August 31, 2016, even though it did not undertake administration from ADP for the "Contract Year 1" period prior to September 1, 2016, and despite the "no-cost" Modification 0001.  WageWorks based its bogus claim for payment on an alleged administration of 409,494 accounts, charged at $2.53 per account, per month, for a six-month period of March 1, 2016 through August 31, 2016.   Consistent with the Contract, the claim was denied by the OPM Certified Officer's Final Determination on December 22, 2017.

123.    Meanwhile, on November 8, 2017, after the close of the market, WageWorks issued a press release announcing its financial results and performance for the Company's third quarter of 2017 ("Third Quarter 2017 Press Release").  Following the issuance of its Third Quarter 2017 Press Release, the Company held an earnings conference call with market analysts ("Third Quarter 2017 Conference Call"), at which time CEO Jackson and CEO Callan made the following statements and representations which further highlighted their focus on the critically important OPM Contract:

> **JOSEPH L. JACKSON**: . . . I'm very pleased to announce that in January, we will begin administering the Medicare HRA product for the Blue Cross and Blue Shield Association's federal employee program. ***We are extremely pleased to be partnering with them and look forward to bringing our advanced technology platform and premium service capabilities to approximately 200,000 of the OPM's federal retirees in the new year***.
>
> ***
>
> As previously mentioned, ***Open Enrollment for the OPM's Flexible Spending Account program is set to begin later this month and will run through mid-December***. In support of OPM, we are again making investments in educational materials, enrollment collateral and marketing initiatives targeting non-enrolled eligible employees, existing participants and benefit officers. . . . ***We remain optimistic that our efforts over time will continue to increase OPM's participation rates***.
>
> ***
>
> . . . We're feeling very hopeful from the OPM perspective with the access that we're given to really go out and try and talk to people that don't have the product today, that hopefully we can start to make some movement there.
>
> ***
>
> Our expenses in the fourth quarter normally go up as we get ready and staff for the January 1 call volume that comes on. And if you remember a year ago, ***OPM is a unique customer*** in that we take telephone enrollments for them. So we have to staff up, especially as it gets down to the last couple of weeks of their Open Enrollment business, to be able to take all those calls. So we utilize some outsourcing capability there so our volume can fluctuate. So for example, there's an area, that if I came back to you in February and said, boy, we had a spike in expenses in the fourth quarter related to OPM Open Enrollment, everybody would view that as great news because that means we're getting more enrollment. So I think we've now been through 1 year with them. We kind of understand how the process works, and we'll get smarter after

56

this year, as well, but we're pretty optimistic that we can affect some growth this year so we'll see what happens.

***

. . . you've got to be ready to support clients after Open Enrollment. We got to be ready to answer all those enrollment calls that come from OPM. And then you should start in 2018, although we're not giving guidance yet, you should start to see that acceleration continue.

***

**TOBEY O'BRIEN SOMMER:** With respect to OPM and the expanded relationship there, are there other products that are kind of right down your fairway that could be expanded in the future? And so *is the OPM, perhaps, the gift that could kind of keep giving*?

**JOSEPH L. JACKSON:** Well, I think, *we continue to look into that*. I think there's some business at OPM I know that they offer on the commuter space. They really don't have a consolidated HSA or HRA product from the existing employee basis, but that could change over time. And as an example, when this opportunity on the retiree side came up, I think one of the things that really stood out that advantaged WageWorks more than others, in addition to platform service technology, was the fact that we are equipped on the front end and the back end to be able to support the requirements that are necessary to be able to support the federal government today. So I think the investments that we made in bringing on OPM's FSA business has helped us here and will help us going forward not only with federal programs but state and local programs as well.

124.    On November 8, 2017, WageWorks filed a Form 10-Q for the quarter ending September 30, 2017 (the "Third Quarter 2017 Form 10-Q"). The Third Quarter 2017 Form 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by the Executive Defendants attesting to the accuracy of WageWorks's financial statements and the effectiveness of the Company's internal controls.

125.    In the Third Quarter 2017 10-Q, WageWorks carried as accounts receivable on its Balance Sheet the amount of false revenue it had recorded in connection with the OPM contract, inflating reported accounts receivable by at least $5.1 million.

126.    As before throughout 2016, WageWorks's reports on Form 10-Q for its first, second, and third quarters of 2017 ending March 31, 2017, June 30, 2017, and September 30, 2017, respectively, re-assured investors under the heading "Item 4. Controls and Procedures," that

57

"**information required to be disclosed by us in reports that we file** or submit under the Exchange Act" is "**accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer**, as appropriate to allow timely decisions regarding required disclosure."  Each such report on Form 10-Q for the first, second, and third quarter of 2017 assured investors that **CEO Jackson and CFO Callan "evaluated the effectiveness of the Company's disclosure controls and procedures**," that "based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that … our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms," and "that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures."  Investors were further assured that **WageWorks's CEO and CFO participated in the evaluation of the Company's disclosure controls and procedures** and **found them "effective** at the reasonable assurance level" as of the end of each quarterly reporting period.

127.    Under "Item 4 Controls and Procedures" subtopic entitled "Changes in Internal Control over Financial Reporting," it was represented in each such quarterly report that other than implementing a new enterprise resource planning (ERP) system in the first quarter of 2017, to "increase efficiency" among other things, "there has been no other significant change in process controls," that "we will continue to assess our internal controls relating to our business and financial processes" and that "we have **taken the necessary steps to monitor and maintain appropriate internal controls over financial reporting**."

128.    WageWorks's reported financial results and comforting assurances regarding the effectiveness of its internal controls fortified the impression it created in the market of the reliability of its financial reporting, buoying its stock price and maintaining the artificial inflation

embedded within it as a consequence of defendants' false and misleading statements and material omissions.

129.   Thereafter, on January 17, 2018, defendants CEO Jackson and CFO Callan gave presentations at the Needham Growth Conference at which time they provided comfort and assurance to the market with regard to the reliability of their ability to accurately assess revenue and their metrics of financial performance, their keen awareness of them, and the strength of WageWorks's business, with the following statements and representations:

> **JOSEPH L. JACKSON**: And I've talked about this before and it's worth repeating, that at WageWorks our service every day begins at 8:00 Pacific Time with our daily management huddle. All of our senior staff and all client facing personnel get on a conference call to review a couple of things each day, any client escalations or business issues that occurred the previous day, if there were any we assign ownership and accountability to get those rectified very quickly.
>
> …we manage daily what we commit to our clients both monthly and quarterly on with regard to a set of service levels. And having that kind of singular focus on managing our service levels on a day-to-day basis has really set us apart in the industry and allowed us to exceed the contractual service levels to our employer clients every month since May of 2007...
>
> …we have the highest participation rate in the industry and we see it continuing to grow each year….
>
> …Acquisitions, we have a very highly disciplined approach…
>
> We've just completed a very successful open enrollment season. We've seen growth amongst all of our products. In particular HRAs this year where we saw a significant take-up in some of those accounts with some great wins, one in particular with the OPM to take over their HRA product for retirees which started on January 1. So HRAs were particularly strong this year. HSA is very strong as well…
>
> ***
>
> **COLM CALLAN**: … Why is their business so predictable? It's because for the majority of our business on the healthcare side and the commuter side we charge fees based on a per participant per month basis. So as Joe mentioned, once we get through the January billing engine we have a very good sense of what the participant count is going to be

throughout the rest of the year. And you can do basic math; multiply that by the participant per month fee to get what the revenues are going to look like for the rest of the year.

\*\*\*

… it's not a business that requires a lot of capital. We get paid up front. The majority of our customers on the FSA side will give us a pre-fund that accounts for roughly 5% of what their annual spend is each year. We can use that for whatever purposes we want to; it is not restricted in any way. We just have to have that cash available as and when their claims get paid or come due.

And you'll see that enables us to drive a lot of capital efficiency and cash flow from the business…

130.    WageWorks's interim quarterly reports on Form 10-Q issued for the first, second, and third quarters of 2017, executed by CEO Jackson and CFO Callan, contained statements and representations, or made material omissions that were false, deceptive, and misleading because:

(a)    **Material weaknesses** pervaded WageWorks's **internal controls**, which lacked adequate safeguards necessary to thwart, expose, and otherwise effectively deter Executive Defendants from overriding them;

(b)    WageWorks's "tone at the top" – senior managers Jackson and Callan – did not promote an effective control environment or promote a commitment to an atmosphere of ethical behavior and integrity, which, in turn, also caused its previously reported financial results to be unreliable;

(c)    Defendants Jackson and Callan had designed, maintained, implemented, and were able to exploit internal controls that enabled them to withhold material financial information from WageWorks's independent Audit Committee members and its auditor, KPMG, in order to materially skew and inflate WageWorks's reported financial performance in 2016 to make it appear that the Company was performing better than it really was; and

(d)    On February 15, 2017, and again on August 16, 2017, WageWorks improperly sought payment of over $5.1M for alleged administration during the Contract Base Year 1 period, March 1, 2016 – August 31, 2016, to which it was not entitled under

60

the terms of its Contract and MOD 0001.  This was a bogus claim that OPM had rejected.  But the '34 Act Defendants continued to pursue it as part of their scheme to fool the auditors, including KPMG, and provide them with "cover" by papering the records, albeit falsely.  The '34 Act Defendants concealed the fact that by their actions, they were undermining the strength of WageWorks's relationship with its prized client, and "unique customer," OPM.

**The Truth Begins to Emerge**

131.    By March 1, 2018, it was impossible for WageWorks to hide the truth about its materially weak and inadequate internal controls, its unreliable and false accounting, and its lack of a tone at the top of ethics and integrity. Unable to secure the imprimatur it needed from KPMG in order to file its 2017 Form 10-K, on March 1, 2018, WageWorks was compelled to notify the NYSE that it was going to release significant news about itself, thus requiring a halt of the trading of its stock beforehand. The New York Stock Exchange requires companies to notify it in advance of releasing significant news that would impact the trading price of the company's stock in order to give investors time to review such news.

132.    On March 1, 2018, the trading of WageWorks common stock was halted at approximately 12:35 PM EST by the New York Stock Exchange. Thereafter, WageWorks issued a press release to the public ("March 1, 2018 Press Release") in which it announced that the Company was "delaying its Annual Report on Form 10-K for the year ended December 31, 2017 and its financial results and associated conference call for the fourth quarter of 2017," adding that "the Company expects to provide an update as soon as practicable."  This announcement signaled to the market that the Company's financial results were unreliable and that it was not able to secure a much needed audit opinion from its auditor KPMG due to financial irregularities and associated false accounting.

133.    As a consequence of market recognition that a restatement of prior financial results and associated adverse information was in the offing, the trading price of WageWorks common

stock fell sharply immediately following the March 1, 2018 announcement, from a closing price of $52.45 per share on February 28, 2018 to close at $42.70 on March 1, 2018, a decline of almost 19% on heavy volume of almost 4.3 million shares.  The trading price of WageWorks common stock reached as low as $38.40 per share on that trading day following the initial adverse announcement.

134.    The next day, on March 2, 2018, before trading on the NYSE opened, the Company filed a Form 12b-25 with the SEC in which it revealed more specific corrective adverse information that caused the halt of trading on March 1, 2018, and further acknowledged its inability to file its 2017 Form-K in a timely manner, stating, in pertinent part:

> The Company has **concluded that it has a material weakness in its internal control over financial reporting** as of December 31, 2017 related to managing change and assessing risk in the areas of non-routine and complex transactions. As a result of the material weakness, the Company has concluded that its internal control over financial **reporting and disclosure controls and procedures were ineffective** as of December 31, 2017. The Company is in the process of designing processes and controls to address this material weakness. The Company intends to disclose more detailed description of this weakness, including a plan for remediating this deficiency, in the 2017 Form 10-K.

> The Audit Committee of the Company's Board of Directors is conducting an independent investigation of the Company's internal control over financial reporting in fiscal 2016 and 2017. Among other matters, the investigation consists of a **review of certain issues, including revenue recognition, related to the accounting for a government contract during fiscal 2016 and associated issues with whether there was an open flow of information and appropriate tone at the top for an effective control environment**.

> Additionally, the Audit Committee investigation of accounting and internal control matters is ongoing and may ultimately result in the identification of other accounting issues, further material weaknesses, and/or require the restatement of the Company's financial statements for previous periods.

135.    However, WageWorks's March 2, 2018 filing with the SEC still did not fully and adequately disclose the truth with regard to the material weakness that existed with respect to WageWorks's internal controls over financial reporting and its improper "revenue recognition, related to the accounting for a government contract during fiscal 2016" or "associated issues with

whether there was an open flow of information and appropriate tone at the top for an effective control environment."

136.    By the close of trading on March 2, 2018, and with material adverse information still undisclosed, WageWorks had still not fully or adequately apprised the market of the truth. The trading price of WageWorks common stock remained at levels that were materially below its closing price of $52.45 per share on February 28, 2018, and would decline even further once more of the truth emerged.

137.    On March 19, 2018, WageWorks filed a Form 8-K with the SEC disclosing that it had received the Notice on that day from the New York Stock Exchange indicating that the Company was not in compliance with continued listing requirements as a result of WageWorks's failure to timely file its annual report on Form 10-K for the year ended December 31, 2017. WageWorks's prior extension to file such a report expired on March 16, 2018.  The NYSE informed the Company that it would have six months from March 16, 2018 – until September 18, 2018 – to file the Form 10-K with the SEC, while cautioning that if the Company failed to do so by the six months of the compliance deadline, the NYSE could grant, in its own discretion, another six-month extension, depending on the specific circumstances.

138.    Meanwhile, on March 30, 2018, seven months after filing its initial claim, WageWorks filed yet another claim relating to the OPM Contract, this time seeking $4,044,129.87, ostensibly for costs related to IT changes, including IT security changes required by the "no-cost" Contract.  In its claim, WageWorks **falsely asserted** that OPM made "unlawful unilateral changes to the Contract" and that "on July 5, 2016, [OPM] issued a unilateral modification to the Contract adding new and enhanced security clauses, among other directed changes to the Contract."  This claim was certified by WageWorks's General Counsel, Kim Wilford.  GC Wilford would not have made the claim without the knowledge and approval of the Executive Defendants.  The claim was false.

139.    Jackson and Callan, the Company's senior management, and the designers and implementers of its materially weak and deficient internal controls, were responsible for the "tone at the top" that produced and cultivated an unethical corporate culture, a lack of commitment to integrity, and the Company's resulting false and misleading financial reporting.  They had created an inappropriate "tone at the top" and the lack of an "open flow of information."  In the immediate wake of the March 2018 revelations, independent members of the Company's board of directors swiftly took steps to change the "tone at the top" responsible for the materially deficient and ineffective internal controls and false and misleading financial reporting that the Executive Defendants had engaged in during the '34 Act Class Period.

140.    On April 5, 2018, the Company issued a press release announcement revealing a little bit more of the fraud-related truth.  Jackson, Callan, and Wilford were removed from their executive positions.  The April 5, 2018 press release stated:

> **Company appoints Edgar Montes as Chief Executive Officer; Joe Jackson to Become Executive Chairman; Company Announces Additional Leadership Changes**
>
> *Company to Restate Certain Financial Results; Restatement Not Expected to Affect the Company's Business Operations*
> ***
> WageWorks, Inc. … today announced that it has appointed Edgar Montes, WageWorks's current President and Chief Operating Officer, as President and Chief Executive Officer and a member of the Board, effective April 5, 2018. Mr. Montes has been with the Company since November 2006, serving as President since December 2016 and COO since December 2012.
> ***
> The Company also today announced that Colm Callan will resign as Chief Financial Officer, effective April 5, 2018.
> ***
> Additionally, the Company announced that Kim Wilford will resign as Senior Vice President, General Counsel and Corporate Secretary, effective April 5, 2018.
> ***
>
> **Restatement**
>
> As previously announced, the Audit Committee of the Company's Board of Directors has been conducting an independent investigation of the Company's

internal control over financial reporting in fiscal 2016 and 2017. As previously announced, among other matters, the investigation has included a review of certain issues, including revenue recognition, related to the accounting for a government contract during fiscal 2016 and associated issues with whether there was an open flow of information and appropriate tone at the top for an effective control environment.

***

The Board has concluded that the Company's historical financial statements for the quarterly and year-to-date periods ended June 30 and September 30, 2016, the fiscal year ended December 31, 2016 and the quarterly and year-to-date periods ended March 31, June 30 and September 30, 2017 should be restated and such financial statements and related communications **should no longer be relied upon**. Further, the Company's disclosures related to such financial statements and related communications issued by or on behalf of the Company with respect to the Non-Reliance Periods, including management's assessment of internal controls over financial reporting as of December 31, 2016, should also no longer be relied upon. This determination was made upon the recommendation of the Audit Committee, as a result of its investigation and after consultation with the Company's independent auditors and management team.

***

As previously disclosed in the Form 12b-25 filed on March 2, 2018, the Board, upon recommendation of the Audit Committee, has concluded that the Company has a material weakness in its internal control over financial reporting as of December 31, 2017 related to managing change and assessing risk in the areas of non-routine and complex transactions. As a result of the material weakness, the Board, upon recommendation of the Audit Committee, has concluded that the Company's internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2017. The Company is in the process of addressing this material weakness. The Company intends to disclose a more detailed description of this weakness, including a plan for remediating this deficiency, in its 2017 Form 10-K. The Audit Committee investigation of accounting and internal control matters is ongoing and may ultimately result in the identification of other accounting issues, further material weaknesses, and/or require the restatement of other Company financial statements for previous periods.

***

As a result of the Audit Committee's independent investigation, WageWorks anticipates that the restatement for fiscal year 2016 will result in an estimated aggregate decrease in revenue (which was previously reported as $364.7 million) in the range of $6.5 million to $9.5 million, an estimated aggregate decrease in net income (which was previously reported as $20.2 million) in the range of $3.5

million to $5.5 million, and an estimated aggregate decrease in the non-GAAP financial measure adjusted EBITDA (which was previously reported as $108.0 million) in the approximate range of $6.0 million to $9.0 million. Although the Company's review of 2017 is ongoing, the Company has not identified any adjustments to its financial statements that would be expected to cause revenue for fiscal year 2017 to differ materially from the Company's previous guidance.

141. The WageWorks board effectively cleaned house, ridding it of the top level executives responsible for the misconduct which was only beginning to be revealed. The replacement of CEO Jackson and resignation of CFO Callan – both senior management – and the resignation of General Counsel Wilford, on the heels of the March 1 and 2, 2018 announcements, were, in effect, tantamount to terminations of executive management positions for cause. Fraudulent accounting, violating generally accepted accounting principles, exploiting material weaknesses in internal controls the Executive Defendants designed, and their execution of false and fraudulent SOX certifications throughout the '34 Act Class Period, constituted ample basis to effect a change in the "tone at the top" by excising WageWorks's CEO and CFO. The resignation of WageWorks's General Counsel and Senior Vice President Wilford in such close proximity to the revelations of March 1 and 2, 2018, and the bogus, "paper the file," March 30, 2018 invoice to OPM falsely seeking over $4 million from the Government, was further *indicia* of fraudulent misconduct among the Company's executives.

142. The April 5, 2018 disclosures that: (1) Joe Jackson was no longer the Company's President and Chief Executive Officer; (2) Colm Callan was no longer the Company's Chief Financial Officer; (3) Kim Wilford was no longer the Company's Senior Vice President, General Counsel and Corporate Secretary; (4) it would be necessary to restate its historical financial statements for the quarterly and year-to-date periods ended June 30 and September 30, 2016, the year ended December 31, 2016, and the quarterly and year-to-date periods ended March 31, June 30 and September 30, 2017; and (5) such financial statements and related communications "**should no longer be relied upon**," caused yet another material decline in the trading price of WageWorks common stock. Following the April 5, 2018 announcement after the close of the market, the trading

price of WageWorks common stock fell from $45.05 per share to $43.40 per share by the close of trading on April 6, 2016, on heavy volume of 1.71 million shares, and fell even further to close at $42.45 per share on April 9, 2018.

143.    On June 21, 2018, OPM's Contract Officer rejected WageWorks's March 30, 2018 certified claim on the basis that WageWorks had submitted "**a false claim**," noting that wherein it was represented that "WageWorks did not sign Modification 0001" in truth, it had.  Accordingly, the OPM Contract Officer, Edward DeHarde, referred WageWorks's second claim to OPM's Office of the Inspector General for investigation and evaluation of the possible violation of the False Claims Act, 31 U.S.C. Section 3729.  WageWorks's second claim was thereafter taken under investigation by OPM's Office of Inspector General.  The OIG investigation is currently ongoing.

144.    The Audit Committee investigation itself was suspect.  In August 2018, KPMG raised concerns internally within WageWorks primarily relating to the Audit Committee's lack of communication with respect to allegations from April through May of 2018 made by former management's counsel that the Audit Committee, and the Company's former COO were aware that **information had been withheld from the auditors during 2017**.  This non-public revelation by "former management's counsel" – right after Jackson and Callan were effectively terminated as CEO and CFO – was itself a stunning admission by them of withholding information from KPMG, albeit with the knowledge of WageWorks's Audit Committee and Edgar Montes.

145.    KPMG recommended an independent investigation to specifically address management override of controls, such as, for example, the impairment assessment of the Company's KP connector internal use software, which were not identified in the initial Audit Committee investigation and were subsequently raised in the performance of the 2016 re-audit and completion of the 2017 audit.  KPMG also recommended that the Company replace its Chairman of the Audit Committee, Byerwalter, and that it remove Jackson from his titular position as Executive Chairman of the Company, thereby eliminating him entirely from the Company by stripping him of his remaining, albeit non-managerial, title.

146.    KPMG had notified the Company in August 2018 that:  (1) it could **no longer rely on the representations of the Company's former CEO, CFO, or general counsel**, (2) disagreed with the prior accounting for revenue for the "government contract" referenced above, (3) disagreed with WageWorks's methodology for determining the allowance for doubtful accounts, and (4) that the scope of the 2016 and 2017 audits would need to be increased due to the impact of the misstatements identified and an **inability to rely on** the **Company's system of internal controls over financial reporting**.  By taking the unusual step of calling out Jackson, Callan, and defendant Byerwalter, who served as the Chairman of WageWorks's Audit Committee, and WageWorks General Counsel, Wilford, KPMG was effectively implicating them as playing a significant role in WageWorks's accounting deception and scandal.  These are serious charges and would not have been made if KPMG did not believe, in good faith and based on its experience and knowledge, that former CEO Jackson and CFO Callan had committed financial fraud and deception.

147.    On September 7, 2018, the New York Stock Exchange granted the Company's request to continue its listing on the NYSE through March 19, 2019, subject to ongoing reassessment by the Exchange, and provided that the Company become current with the SEC filings by such date.

148.    On September 12, 2018, WageWorks disclosed that defendant Jackson had resigned as Executive Chairman of the Company and a Director on September 6, 2018, thereby completely excising him from any position on the board. It was also revealed that Mariann Byerwalter resigned as a director, effective September 6, 2018.  These were forced departures, further confirming that KPMG's protests and expressed concerns were valid.  Meanwhile, investors were warned that "while the Audit Committee has concluded its investigation, it may ultimately identify other accounting issues, further material weaknesses, and/or require the restatement of other Company financial statements for previous periods."

149.   Importantly, on September 12, 2018, and for the first time, WageWorks also made the following additional disclosures in its Form 8-K filed with the Securities and Exchange Commission:

> Recently, **KPMG LLP ("KPMG") raised certain issues, primarily relating to lack of communication** concerning **allegations** made by former management's counsel following the completion of the Audit Committee's investigation (described elsewhere herein) regarding **the Audit Committee's awareness that information was withheld from the auditors during 2016 and 2017**, and the response to those allegations… KPMG brought these concerns to the attention of our Lead Independent Director. **In response to the concerns raised by KPMG, the Company and the Board will undertake additional steps, including forming a Special Committee of directors independent from the Audit Committee to carry out an independent investigation** which will review the procedures, scope and findings of the Audit Committee's investigation as well as the additional allegations noted herein with full authority to take whatever follow-up measures it deems appropriate.

150.   The Audit Committee investigation had been revealed to investors as lacking independence and as unreliable.  The September 12, 2018 disclosures of further investigation – which arose from WageWorks's false and fraudulent accounting and the related conduct – further stunned the market. The trading price of WageWorks common stock was slammed. WageWorks shares fell $8.15, or almost 17%, from $49.10 a share at the close of the market on September 12, 2018, to close at $40.95 on September 13, 2018, on volume of almost 3 million shares, more than 10 times the daily trading average. In the wake of this additional fraud related information, San Francisco based JMP Securities Analyst David Scharf lowered his recommendation on WageWorks from "market out-perform" to "market perform."

151.   Signaling that KPMG could not be quieted, that it still had serious concerns regarding WageWorks's financial reporting and deficient internal controls, and that WageWorks could not expect its further cooperation, KPMG was terminated as the Company's independent registered public accounting firm as of October 31, 2018.  By that time, KPMG had already advised the Company that there were disagreements and reportable events that still had not been resolved to KPMG's satisfaction.

**The Restatement's Revelations More Fully Correcting the Fraud**

152.    On March 19, 2019, and in the filing of its 2017 Form 10-K, WageWorks acknowledged and disclosed that its Board concluded that "the Company's financial statements for (i) the quarterly and year-to-date periods ended June 30 and September 30, 2016, (ii) the year ended December 31, 2016 and (iii) the quarterly and year-to-date periods ended March 31, June 30 and September 30, 2017 (collectively, the "Non-Reliance Periods") should be restated and should no longer be relied upon."  It was also disclosed that "the Company's disclosures related to such financial statements and related communications issued by or on behalf of the Company with respect to the Non-Reliance Periods, including management's assessment of internal control over financial reporting as of December 31, 2016, should also no longer be relied upon."

153.    The Company acknowledged that the March 19, 2019 restatement involved the reversal of a total of $3.6 million in revenue in the second and third quarters of 2016 related to the OPM Contract, which **WageWorks admitted "should not have been recognized,"** and its related receivable was required to be reversed. It was also disclosed that in 2016, WageWorks re-assessed the fair value of KP Connector, its internal use software developed specifically based on specifications outline and a client agreement and respecting which in the second quarter 2016, the Company was notified by the client that its services were no longer needed.  Accordingly, it was determined that KP Connector's carrying value was considered unrecoverable as of June 30, 2016. WageWorks was required to record a $3.7 million charge relating to the accelerated amortization in the consolidated statements of income and make a corresponding reduction of property and equipment, net, in the consolidated balance sheets.

154.    The Company admitted in its 2017 Form 10-K that as of December 31, 2017 that, "due to the existence of *unremediated material weakness* in the Company's internal control over financial reporting," its "disclosure controls and procedures were not effective." WageWorks's 2017 Form 10-K also stated:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act.  The Company's internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and overseen by our Board Directors (the "Board"), management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.  Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have material effect on our financial statements.

155.   WageWorks's 2017 Form 10-K then revealed that the Company's management had "concluded that our internal control over financial reporting as of December 31, 2017 was not effective due to the existence of … material weaknesses in internal control over financial reporting…" including that **"there was an inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from former senior management" concerning the OPM Contract** that "contributed to an **ineffective control environment**" that was **"driven by the tone at the top"** and that **"management's failure to timely communicate all pertinent information"** led to false **"financial statements during the years ended December 31, 2017 and December 31, 2016 and the related periods within those years."** The Company further stated in the 2017 Form 10-K:

In addition, we did not maintain effective internal control over financial reporting related to the following areas: Control environment, risk assessment, control activities and monitoring:

- We did not have processes and controls to ensure there were adequate mechanisms and oversight to ensure accountability for the performance of internal control over financial reporting

71

responsibilities and to ensure corrective actions were appropriately prioritized and implemented in a timely manner.

- We did not effectively execute a strategy to attract, develop and retain a sufficient complement of qualified resources with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting.
- There was not an adequate assessment of changes in risks by management that could significantly impact internal control over financial reporting or an adequate determination and prioritization of how those risks should be managed.
- We did not have adequate management oversight of accounting and financial reporting activities in implementing certain accounting practices to conform to the Company's policies and GAAP.
- We did not have adequate management oversight around completeness and accuracy of data material to financial reporting.
- There was a lack of robust, established and documented accounting policies and insufficiently detailed Company procedures to put these policies into effective action.
- We were not focused on a commitment to competency as it relates to creating priorities, allocating adequate resources and establishing cross functional procedures around managing complex contracts and non-routine transactions as well as managing change and attracting, developing and retaining qualified resources.

156.    WageWorks conceded that, with respect to "accounting close and financial reporting," "the Company" had inadequate or ineffective **tone at the top**," and that the Company lacked "robust, established and documented accounting policies."  The host of weaknesses with respect to WageWorks's internal controls while defendants Jackson and Callan were at the helm made it easy for them to exploit the control environment situation in order to fool the auditors and report false, inflated revenues and false, inflated performance metrics, thereby deceiving the market.

157.    In sum, The Company's disclosures were corporate-speak admitting that WageWorks's "former" senior managers, the Executive Defendants, had withheld material information from the auditors.  As the revelations of Restatement evince, Jackson and Callan exploited the lack of effective internal controls they designed and maintained, causing the

reporting of the false financial results amid fostering the atmosphere emanating from their "tone at the top" that lacked an open flow of information and transparency.  In other words, a tone at the top that fostered false and deceptive, rather than reliable, financial reporting.

158.    The improper revenue recognition discussed above, and the failure to take the $3.7 million impairment charge regarding the KP Connector software lost value in the second quarter of 2016, as discussed above, were material and rendered the Company's reported financial results for those interim periods and for 2016 false and misleading, whether viewed independently or in combination.

159.    Had the Company properly accounted for its revenue with respect to the OPM Contract, and/or taken the impairment charge in the second quarter of 2016 with respect to the unrecoverable loss of value of KP Connector software, as was required, the Company would not have met its 2016 EPS guidance, whether such items are considered alone or in combination.

## V.    ADDITIONAL ALLEGATIONS SUPPORTING *SCIENTER* REGARDING '34 ACT CLAIMS

160.    The '34 Act Defendants' material misstatements and omissions, as alleged above, were made intentionally, knowingly, and/or with deliberate recklessness, and had the purpose and effect of concealing the adverse truth about WageWorks's true financial results, performance, and internal controls from the investing public, consequently buoying and artificially inflating the trading price of WageWorks common stock.  In addition to the foregoing, the following facts, when viewed in their *totality*, demonstrate a **strong inference** that the '34 Act Defendants' false statements and material omissions were made with actual knowledge of their falsity or with deliberate recklessness, i.e. *scienter*.

### A.    Inference of Knowledge Re: The Highly Important, Key OPM Contract and Terms

161.   The OPM Contract with WageWorks was a key, important contract that was integral to the Company's success and growth.  OPM was WageWorks's new and formidable client.  The potential pool of participants under the Contract exceeded 2.2 million individuals, vastly exceeding any such employee participation pool of any other single client.  Given its importance to WageWorks's business, the Executive Defendants were necessarily keenly attentive to the OPM relationship with respect to its performance and profitability.  The OPM Contract, its participation rates, and September 1, 2016 implementation date were an important focus of discussion by Jackson with analysts and the market during earnings conference calls and a focus of analyst questions.  The OPM relationship was repeatedly referenced in the Company's SEC filings during the '34 Act Class Period.

162.   As CEO and CFO of WageWorks respectively, defendants Jackson and Callan necessarily approved the terms and conditions of the OPM Contract entered into on March 1, 2016.  Pursuant to, and consistent with, their positions as CEO and CFO respectively, Jackson and Callan were necessarily aware of the bid WageWorks submitted in an effort to secure the OPM Contract, and were required to approve the pricing elements associated with the Company's bid before they were offered and agreed upon.

163.   The OPM Contract participation rates were fundamentally important to profitability, as was the commencement of administering the Contract.  CEO Jackson, in particular, and CFO Callan, would have had to have been aware of the OPM Contract and MOD 0001 terms, and especially the pricing, the ATO from which point administration services under the Contract could commence, the September 1, 2016 implementation date, the fact that it was a "firm-fixed-rate" contract and a "no-cost" modification agreement, and that no money would be due or owing to WageWorks for any work it allegedly performed respecting IT Security prior to September 1, 2016, or costs it absorbed to comply with IT security guidelines imposed by OPM.  It would be illogical for the Executive Defendants to be unaware of such contractual terms, agreements, status, and elements.  Given the critical importance of such a key contract and customer to the Company and investors to whom Jackson spoke, and the straightforward method of determining and

74

calculating revenue as noted below, a strong inference arises that Jackson, in particular, and Callan knew the true revenue WageWorks was entitled to under the OPM Contract, the timing of any revenue entitlement, the date of completion of implementation, the status of receipt of any ATO, the "firm-fixed rate" character of the Contract's terms, and that the Company was falsely reporting revenue to the market in the second and third quarters, and full-year 2016, with regard to OPM Contract administration and related costs, as alleged above.

### B.     Straightforward Revenue Visibility and Calculation Inferring Knowledge

164.    Accurately quantifying actual revenue for WageWorks was straightforward.  Any discrepancy between real versus actual revenue was capable of being readily discovered, as were actual participation rates used to establish or assess revenue.   The ability to assess revenue periodically, and even project revenue with virtual total accuracy, was continually represented by Jackson, in conference call statements boasting and reassuring investors about how WageWorks's business model provided revenue visibility.   The OPM Contract had a price set for services on a per participant, per month basis.   In order to assess revenue, WageWorks necessarily would calculate participation rates.   The process of assessing current and projected revenue was effectively portrayed as straightforward. Jackson assured the market about the accuracy of WageWorks's revenue visibility. Thus, inflated, prematurely, or improperly recognized revenue would be known or readily apparent to the Executive Defendants.  As the Company now concedes, its recognition of revenue on the OPM Contract in the second and third quarters of 2016 was improper.  In fact, ADP, not WageWorks, was administering the Contract prior to September 1, 2016.  WageWorks had no "participants" it could appropriately bill for prior to that time, and prior to achieving ATO.   Executive Defendants knew this and further knew that reporting revenue ostensibly earned prior to September 1, 2016 was bogus.

165.    The Executive Defendants, and especially Jackson, engaged in hands-on day-to-day management as more fully demonstrated by WageWorks's daily management meetings with senior management and constant, daily discussion in such meetings of service performance, clients'

status and servicing, as Jackson himself repeatedly represented in conference calls with investors, as exemplified and alleged above.  Thus, WageWorks's senior management knew about the OPM Contract service status on a continuing, daily basis.  This too informed the Executive Defendants regarding implementation, securing an ATO, Contract service and participation rates, or the lack thereof, enhancing their knowledge of true revenue and revenue visibility, and further supporting a strong inference that they possessed the requisite *scienter*.

### C.     Senior Managements' Vacating Their Executive Positions Following Revelations Demonstrates Fraudulent Misconduct and *Scienter*

166.     The Executive Defendants created a "tone at the top" and cultural environment in which internal controls were materially weak, deficient and could be overridden to unfairly skew financial results.  The practice of overriding internal controls and designing controls with material weakness evinces a "tone at the top" that was unethical and lacked integrity.  KPMG, WageWorks's auditing firm, ultimately refused to sign off in the Company's report on Form 10-K for the year ending December 31, 2017, or provide the comfort of an audit opinion, and demanded that WageWorks take corrective actions.   KPMG's protests and concerns constituted a serious indictment of management's lack of integrity.

167.     KPMG's insistence that Jackson be terminated as Executive Director, even after he was already removed as CEO by April 5, 2018, was also a serious indication that he was untrustworthy, and that the Company needed to rid itself of his influence and clean house of all those who engaged in falsifying WageWorks's financial results.  Tellingly, consistent with a "tone at the top" that lacked their commitment to ethics and integrity, Jackson and Callan were forced to vacate their positions as CEO and CFO shortly after the Company revealed that WageWorks's prior financial results should "no longer be relied upon," and in the wake of the revelations of an accounting scandal at the Company.

168.     Jackson had the most to gain from a scheme to inflate the price of WageWorks common stock.  The removal of Jackson as CEO, and Callan as CFO, in close proximity to the

revolution of an accounting scandal at the Company, is powerful indicia that they were responsible for the Company's false accounting and related misconduct and supports a strong inference of their *scienter*.

> **D.    A Strong Inference of the Executive Defendants' *Scienter* is Further Demonstrated by KPMG's Expressed Concerns and Demands**

169.    It has been acknowledged that information regarding the OPM Contract was withheld from KPMG.  On September 12, 2018 and later, on March 19, 2019, it was revealed and confirmed by WageWorks that material information had not been timely disclosed to its auditors. KPMG would not render a 2017 year-end Audit Report and opinion insulating the Company or its managements from scandal or reporting false financial results, nor place its continuing *imprimatur* on WageWorks's internal controls.  KPMG's refusal to sign off on the 2017 end of year audit constituted an extraordinary step by an independent auditor, signaling the fact that there was a lack of integrity and reliability with respect to the Company's revenue recognition and related accounting practices, and a lack of adequate and effective internal controls. KPMG had also recommended in an August 2018 letter that: (1) an independent investigation by a Special Committee of the Board to address management's override of controls; (2) the Company replace the Chairman of its Audit Committee, Byerwalter; and (3) WageWorks also remove Jackson as Executive Chairman of the Board, even though he had already been removed as CEO as confirmed by his "resignation" on April 5, 2018, at the same time as Defendant Callan's removal by "resignation."

170.    Former senior management's misconduct was so egregious that KPMG, an independent certified public accounting firm that audited WageWorks's financial results through 2016, was compelled to protest and lodge its concerns with the Company's lead independent director, Larson.  KPMG's action, in itself, and its August 2018 letter to the WageWorks Board insisting on various remedial measures, including the complete ouster of Jackson from his remaining position as Executive Director, the removal of Byerwalter, and the removal of COO Montes, serves as strong indicia that the Executive Defendants and others, acting on behalf of

77

WageWorks, engaged in deceptive behavior with respect to WageWorks's accounting for and reporting of its financial results.

171. According to a confidential consulting forensic expert with over 46 years of experience as a certified public accountant and as a member of audit teams working for publicly traded companies ("CW-Expert X"), KPMG's raising its concerns to the Board was an unusual step, and one that auditors are compelled to undertake upon discovering facts that cause the auditor to suspect illegal conduct by management. CW-Expert X notes that subsection (b)(1) of Section 10A of the Securities and Exchange Act of 1934 specifically states, in relevant part, as follows:

> (b) REQUIRED RESPONSE TO AUDIT DISCOVERIES.—
>
> > (1) INVESTIGATION AND REPORT TO MANAGEMENT.—If, in the course of conducting an audit pursuant to this title to which subsection (a) applies, the registered public accounting firm detects or otherwise becomes aware of information indicating that an illegal act (whether or not perceived to have a material effect on the financial statements of the issuer) has or may have occurred, the firm shall, in accordance with generally accepted auditing standards, as may be modified or supplemented from time to time by the Commission—
> >
> > > (A)(i) determine whether it is likely that an illegal act has occurred; and
> > > (ii) if so, determine and consider the possible effect of the illegal act on the financial statements of the issuer, including any contingent monetary effects, such as fines, penalties, and damages; and
> > > (B) as soon as practicable, inform the appropriate level of the management of the issuer and assure that the audit committee of the issuer, or the board of directors of the issuer in the absence of such a committee, is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of such firm in the course of the audit, unless the illegal act is clearly inconsequential.

172. Based on CW-Expert-X's experience, it is reasonable to conclude that the actions of KPMG are indicia that information was concealed from its audit team bearing on the now disclosed improper revenue recognition and fraudulent accounting. The August 2018 letter KPMG sent to the WageWorks's Board demanded an investigation by a Special Committee after "former

management's counsel" had accused members of WageWorks's Audit Committee of knowing that material information was not disclosed to the auditors.  If the Executive Defendants had disclosed to KPMG the March 1, 2016 OPM Contract, the Contract Modification 0001 of July 2016 and that WageWorks was not able to validly commence administration without an ATO and before achieving implementation, KPMG would have been aware that WageWorks was not entitled to receive payment for work it allegedly performed between March 1, 2016 and August 31, 2016, the period before which WageWorks would have secured ATO or reached implementation, and therefore could not recognize any revenue and income associated with the OPM Contract during this time period.  Moreover, because the net income and earnings per share associated with the OPM Contract that WageWorks did recognize was material to its 2016 financial statements, if KPMG had been provided the aforementioned information regarding the OPM Contract, it could not have, in good faith, rendered an unqualified audit opinion on WageWorks's 2016 financial statements in accordance with generally accepted accounting standards.  Further, if KPMG had been armed with such information, the February 15, 2017 invoice from WageWorks to OPM for administration services would have been a huge "red flag," absent being misled, or itself assisting with and engaging in a financial fraud, or failing to secure sufficient evidential matter as required by generally accepted auditing standards to confirm the reasonable likelihood of collectability.

173.    According to CW-Expert X, and based on experience covering over 46 years in the accounting and financial auditing field as a CPA, it is reasonable to conclude that the actions of KPMG are indicia consistent with the notion that KPMG determined that the Executive Defendants and others had acted unlawfully for the following reasons: the obligation to adhere to Section 10A, the fact that KPMG did not certify the 2017 financial results, the ensuing Audit Committee investigation in April-May 2018, KPMG's August 2018 written demand for a Special Committee investigation and the removal of the individuals identified therein, and its termination as WageWorks's auditor as of October 31, 2018.

174.    When KPMG raised its concerns with WageWorks with respect to its highest level officers managing the Company during the '34 Act Class Period, it did so privately, initially

bringing those concerns to WageWorks lead independent Director, John W. Larson.  By October 24, 2018, Mr. Larson resigned from his position as a Director of the Board, thereby distancing himself from the activities associated with the financial scandal at the Company, and ensuring that he would no longer be associated in any way with WageWorks.  Mr. Larson had not sat on WageWorks's Audit Committee.

175.    KPMG's demands that Jackson be removed entirely from the Company, even as Executive Director, and the accusations by counsel for "former management" that the Audit Committee was aware that material information was being concealed, further demonstrates a complete lack of trust, reliability, and integrity on the part of Jackson and Callan, WageWorks's "C-Suite" Executives.

E.    **Strong Inference of *Scienter* Arising from Admission that Former Management Withheld Material Information from Auditors**

176.    Subsequent to the departures of Jackson and Callan, the Company has effectively admitted that information was withheld by "former senior management" (a reference to Jackson and Callan), and acknowledged a lack of an open flow of information and transparency, substantiating accusations by former management's counsel that information was being withheld from auditors.  WageWorks has acknowledged that in August 2018, former auditor KPMG raised concerns internally within the Company relating to its Audit Committee's lack of communication with respect to "former management counsel's" revelation that WageWorks, the Audit Committee, the Company's corporate counsel and the Company's former chief operating officer were aware that information had been withheld from its auditors.  Plaintiffs are informed and believe, and thereupon allege, based on WageWorks's revelations in its Restatement regarding "former senior management," that the "former management" being referred to are ex-CEO Jackson and ex-CFO Callan.  Defendants Jackson and Callan had become "former senior management," by April 2018, and had been effectively removed from or were forced to resign their positions because of their misconduct and accounting falsehoods.  The non-public revelation by "former management's counsel" was on the heels of Jackson and Callan being excised from WageWorks as CEO and

CFO, respectively.  It constituted a non-public admission by them, through their counsel, that while they withheld information from KPMG, it was with the knowledge of WageWorks's Audit Committee, General Counsel Wilford and then-COO Montes.  The revelation and admission, which was intended by "former managements' counsel" to be internal, only reached the light of day because of internal protest by KPMG in August 2018 that was later required to be disclosed in September 2018 by the Company.

F.     **A Strong Inference of *Scienter* Arising from the Design, On-going Maintenance, Implementation and Exploitation of Materially Deficient Internal Controls, and a Culture Emanating from the "Tone at the Top" Lacking Ethics and Integrity**

177.    As WageWorks's new independent, public accounting firm, BDO USA, LLP ("BDO") acknowledged on March 18, 2019, "the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2017," based on the criteria established by the Committee of Sponsoring Organizations of the Treasury Commission ("COSO").  The Company has also admitted that there were material weaknesses with respect to maintaining effective disclosure controls and procedures, and material weaknesses in internal controls over financial reporting associated with the Company's reported financial results during 2016.

178.    The Company has now admitted, both with respect to its internal controls during 2016 and for the year ending December 31, 2017, that there was an "inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from **former senior management**," concerning the OPM contract that "contributed to an **ineffective control environment driven by the tone-at-the-top,**" adding that "management's **failure to timely communicate all pertinent information**" **caused the false financial statements** for the years ending December 31, 2016 and December 31, 2017 and the related interim therein.

179.    WageWorks's former senior management – CEO Jackson and CFO Callan — designed, maintained, and implemented so-called internal controls that, by WageWorks's own

admission, were materially deficient.  The Executive Defendants were able to exploit such ineffective and deficient internal controls, thereby enabling the improper recognition of revenue that was not earned, otherwise not received by the Company, or was improper, thereby overstating the Company's reported financial performance metrics, including revenue, net income, and earnings per share.  By their design, WageWorks's internal controls during the relevant time period not only lacked appropriate transparency and the open flow of communication and dissemination of relevant and pertinent information from senior management — particularly with respect to the OPM Contract — but also lacked processes, controls, adequate mechanisms, and oversight to ensure accountability for the performance of internal control over financial reporting responsibilities, or to ensure that corrective actions were appropriately prioritized and implemented in a timely manner.

180.    Owing to the internal control practices and processes the Executive Defendants designed, implemented and maintained, there was no adequate management oversight of accounting or financial reporting activities in implementing accounting practices to conform to GAAP.  There was a lack of management oversight regarding completeness and accuracy of data that was material to financial reporting.  There was a lack of robust, documented accounting policies.  Beyond these admissions, the Company has further recently admitted that its procedures were insufficiently designed in order to advance accounting policies into effective action.  In sum, and owing to its woefully deficient and essentially lax, ineffective internal controls, the Company's Executive Officers were able to and did withhold information that was critically important to the function of auditors, and corrupted the accuracy and reliability of WageWorks's reported financial results.

181.    WageWorks's ineffective and weak internal controls, established and exploited by its senior management – defendants Jackson and Callan — were symptomatic of a corporate culture emanating from a tone at the top that lacked ethics or integrity, and was not averse to playing with the numbers, or fooling the Company's auditors, further supporting a strong inference

that they acted with the requisite *scienter* with respect to the reporting of materially false and misleading financial results.

182.    In addition to the admissions embodied in the Restatement, as alleged above, WageWorks's corporate culture lacking ethics and integrity is confirmed by a number of confidential former employee sources. For example:

➢ Confidential Witness GGG ("CW-GGG"), was a "Manager of Relationship Management" for WageWorks commencing in the Spring of 2013, until leaving the Company when the OPM Contract was "still being negotiated." According to CW-GGG, CEO Jackson led "with an iron fist" and had a "bully mentality" which "trickled down to all the leadership."

➢ CW-GGG left WageWorks because it "wasn't the right fit with my ethics.  It just didn't sit right with me."  CW-GGG observed "I just had my thoughts that things weren't kosher … it's just a gut feeling."  This is "why I left."  CW-GGG disclosed that it was "the only job in my life that I quit without another job.  I was done," and added, "I was one who always asked questions.  They didn't like that. "

➢ Confidential Witness DDD ("CW-DDD") was employed by WageWorks in the position of Finance Manager – Financial Planning and Analysis from approximately the middle of 2010 to August 2014. CW-DDD was responsible for "rolling-up" forecasting, budgeting, and enrollment numbers for reporting to WageWorks's executive management. According to CW-DDD, CEO Jackson "pushed his way around in the financials a little bit, and it was a tough place to work," CEO Jackson "was a bully, that would be my definition . . . if the number weren't what he wanted, they were 'wrong.'"  CW DDD continued "when they didn't like the results, they tried to alter them or did alter them in presentations," including presentations to the Board of Directors.  According to CW-DDD, WageWorks manipulated customer counts.  "We definitively played with those numbers to make them presentable," adding "I just know the numbers I gave them weren't the same as the numbers that went out the door."

➢ CW-DDD asserted that if WageWorks's management was "not satisfied" with results, "they'd make us go back and try to come up with numbers they preferred … the CEO had something in his head about what the numbers should be … they weren't always happy with the way they were rolled up … they'd say 'we don't believe your numbers' … I'd have to re-work my presentation until we could come up with something we could get them to write."  However, CW-DDD reiterated that "I continued to supply them with the real numbers.  I couldn't make them what he wanted."

➢ CW-DDD's meetings were typically with CEO Jackson and then-current COO Edgar Montes, who was described by CW DDD as "the enforcer," noting that "sometimes the CEO would become so frustrated – he'd leave and hand it off to Edgar."  CW-DDD experienced "more than one conversation" with Montes "about how we had to work with Joe and not necessarily what was the correct way to roll it out."

➢ According to CW-DDD, WageWorks's "Director of Finance for Business Strategy" was "well aware of the situation.  We were both having to deal with it … we were both in distress." CW-DDD further reports that then – CFO Rich Green "knew there was disagreement on the numbers" and believes that this is what led to Green's resignation, after which, according to CW-DDD "everything went to pot."

➢ According to CW-DDD, accounting plugged numbers regarding revenue recognition and timing into company databases. CW-DDD pulled them off without any further analytical work.  In this context, CW DDD's basis for disagreements with CEO Jackson was discussed.  There were two principal concerns according to CW-DDD: first "I would come to him with expense numbers and he wouldn't believe them.  It's a system function I can't change." The second related to customer accounts:  "whether we met certain targets in terms of re-enrollment and rollovers that was one place they could fudge them."

➢ CW-DDD "would provide numbers to the executive team."  While CW-DDD personally did not alter any data, CW-DDD stated "the one item I do know was the

executive compensation.  I saw that they didn't meet the target and I'm pretty sure they presented it differently to the board of directors," adding "at the same time, they cut our bonuses because internally they didn't make it – but the board of directors got different numbers so they got their bonuses."  It would have been CEO Jackson or WageWorks's General Counsel Kim Wilford, or possibly Rich Green who made the presentation to the board.

➢ Based on experience working at WageWorks for a period of no less than 4 years, CW DDD opined that "Joe got in there to milk the Company for as much as he could." CW-DDD left the Company after CFO Rich Green left and defendant Callan took Green's place as CFO.  According to CW-DDD, the entire finance team was discharged – reportedly because Callan wanted to bring on his own team, although CW-DDD wondered whether it was "because we weren't producing the numbers they wanted to see," adding "I think we, as a team, were somewhat protected while Rich was there, and when he left we were left hanging high and dry."  According to CW-DDD, the achievement of enrollment numbers guidance, as reported in conference calls, "didn't always tie out in the numbers I got."  Referring to CEO Jackson, CW-DDD concluded that "the fear factor of working with a bully would carry across the Company."

➢ Confidential Witness Z ("CW-Z"), worked for WageWorks in the capacity of IT Release Manager prior to and throughout the implementation of the OPM Contract. CW-Z was also responsible for Sarbanes-Oxley auditing with KPMG. CW-Z oversaw a team of release engineers. CW-Z was responsible for overseeing the release of new code, a position that required that he ensure the code was SOX-compliant. Referring to an emphasis on a segregation of duties between the person who writes code and those able to deploy or test it, CW-Z explained that "my job, as Release Manager, is designed to make sure there's an appropriate segregation of these duties."  CW Z explained that anybody with the word "developer" in his or her title could not have direct "rights access" to a server, adding, however, that "there are times where developers need direct

access" which "is typically done by approval on a timed basis."  Independent auditors of WageWorks could check access to servers by looking at screenshots.  According to CW-Z, "we played kinda loose with that" and "frequently had to delete" developers from access lists."  In other words, WageWorks had provided too easy an access to servers without adequate controls.

➢ According to CW-Z, doing so was the only way WageWorks would pass its audit.  CW-Z further explained that Vice President of IT – Trent York - would have given "explicit approval" to add developers to the servers in the first place.  CW-Z explained "every time you have a production server, you have a list of people who can access it."  Adding "No end-users, certainly, should have access to a production server and access to an operating system or be able to see code."  Reporting that "when the auditors came, they checked access," CW-Z would enter the system in advance of the auditors' bi-annual visits and delete inappropriate users.  CW Z also disclosed that "with executive knowledge, they had me fudge" data.  CW-Z reports that if CW-Z did not take the action, Company auditor KPMG would have found that WageWorks's internal controls were deficient during its bi-annual audits of the Company.

➢ CW-Z reported another scheme.  According to CW-Z, companies are supposed to show certain work-flow through log-in tickets, that auditors check during their bi-annual visits.  WageWorks had a manual system called the "Emergency Change Request Process" that by-passed the normal check. This is meant to "get something fixed right away." According to CW-Z, "that's typically done on an executive level."  According to CW-Z these "emergency change requests," "are supposed to happen in real time – it's not something you should be back filling three months later."  CW-Z noted that while "some fudging is not unusual in the industry at all," it occurred at notable levels at WageWorks and that, to the extent CW-Z initiated such action, it was so that the Company's internal controls would not be found deficient during KPMG's audits.  However, the action could only be completed upon express approval from the Vice

President of IT. CW-Z stated that WageWorks was "straight up not being honest with the auditors."

### G. Jackson's and Callan's Weaponizing False SOX Certifications Despite Exploiting the Ineffective Internal Controls They Designed, Support an Inference of *Scienter*

183.    The Executive Defendants established, implemented, and maintained a control environment that enabled their accounting manipulations and false financial reporting. **Books do not cook themselves**. WageWorks's system of internal controls over financial reporting was a constant and continuing focus of defendants' communications with the market in SEC filings. The Executive Defendants were keenly aware of the fact that WageWorks's internal controls over financial reporting had been materially deficient in the past, and were unremediated, as more fully alleged above. They acknowledge in the Company's SEC filings, which they executed, the importance of adequate and effective internal controls to the market given their connection to rendering reliable financial results.

184.    As more fully discussed above, the Executive Defendants executed SEC filings representing that prior internal control weaknesses were "remediated." However, as recent revelations discussed above reflect, they failed to design safeguards against their overriding internal controls or otherwise withholding information from auditors. They withheld information, while creating a "tone at the top" that lacked integrity. WageWorks's internal controls were materially weak, and violated accounting standards, as the Company's new management has recently admitted.

185.    The Executive Defendants designed and implemented weak controls, exploited their weakness, and then exploited their own certifications required by the Sarbanes-Oxley Act of 2002, misleading the market by falsely declaring them to be effective and adequate, and WageWorks's financial accounting free of fraud. The salutary intent and goals of SOX certifications intended by Congress to safeguard investors from fraud, were, instead, weaponized by the Executive Defendants to deceive. Their public SOX certifications, falsely conveying a

representation and impression that WageWorks's financial results were reliable, raise a strong inference that they acted with an intent to deceive, all the while internally withholding information that should have flowed to auditors, but did not, consequently inflating reported revenues that WageWorks did not earn or was not entitled to under the OPM Contract, and deceptively skewing financial results.

      **H.**      **Jackson's Insider Selling, Dramatically Out of Line with His Prior Trading History, Demonstrates a Strong Inference of *Scienter***

186.    During the '34 Act Class Period, defendant Jackson engaged in stock sales that were suspiciously timed and dramatically out of line with his pre-Class Period trading history. These sales by Jackson constituted a substantial percentage of his holdings in WageWorks stock and options. Through this insider trading, defendant Jackson reaped substantial profits from artificial inflation imbedded in the trading price of WageWorks common stock as a result of the '34 Act Defendants' materially false and misleading public statements and omissions. Defendant Jackson's trading in WageWorks stock at an enormous profit, while investors were being deceived regarding the Company's financial results and internal controls, in and of itself, demonstrates a strong inference of his *scienter*.

187.    Defendant Jackson sold a total of 678,978 shares during the '34 Act Class Period. When accounting for the vesting of stock options throughout the '34 Act Class Period, these sales equate to approximately 63.2% of the shares and vested options that were either held by Jackson at the beginning of the '34 Act Class Period or vested in the course of the '34 Act Class Period. Jackson realized net proceeds of $41,692,239 from these sales, including a total of $31,367,749 realized from shares sold in the June 2017 Offering in which he sold 495,148 shares priced at $69.25 per share after exercising options to purchase more than 400,000 shares at prices of between $5.32 and $9.59 per share.[7] By comparison, during the 664 days prior to the '34 Act Class Period (July 11, 2014-May 5, 2016) (the "pre-class period"), Jackson sold a total of 173,919 shares for

---

[7]    The calculation of stock sales excludes shares sold for the purpose of satisfying tax obligations arising from stock grants.

net proceeds of $7,471,521. When accounting for the vesting of stock options throughout the pre-class period, these sales equate to approximately 24.4% of the shares and vested options that were either held by Jackson at the beginning of the pre-class period or vested in the course of the pre-class period.  By all measures, Defendant Jackson's sales, none of which were made pursuant to a Rule 10b-5 trading plan, were inconsistent with his trading history during the pre-class period.

188.    For the purpose of identifying historic trading patterns, the table below compares the total market value and volume of '34 Act Class Period sales by the defendant Jackson, versus the total market value and volume of sales by Defendant Jackson during the Pre-Class Period. As indicated in the table below, defendant Jackson's sales during the Pre-Class Period were a fraction of his Class Period Sales.

|  | Proceeds from Class Period Sales | Proceeds from Pre-Class Period Sales | Shares Sold During the Class Period | Shares sold during the Pre-Class Period |
|---|---|---|---|---|
| Jackson | $41,692,239 | $7,471,521 | 678,978 | 173,919 |

189.    The charts below illustrate, based both on net proceeds and shares sold, defendant Jackson's '34 Act Class Period and pre-class period stock sales, measured both by net proceeds and the number of shares sold.





190.    As the chart demonstrates, Jackson's trades during the '34 Act Class Period, both in value and in share size, dwarf his sales during the Pre-Class Period.

191.    The table identifying each of defendant Jackson's stock sales, excluding sales made to cover taxes or grants of stock, during the pre-Class Period is set forth below:

| Date | Shares | Proceeds |
|------|--------|----------|
| 3/13/2015 | 95,095 | $4,478,622.65 |
| 3/8/2016 | 6,791 | $265,431.67 |
| 3/9/2016 | 58,394 | $2,220,110.68 |
| 3/14/2016 | 13,639 | $507,355.80 |
| | | |
| **Total:** | **173,919** | **$7,471,520.80** |

192.    A table identifying each of defendant Jackson's '34 Act Class Period sales, excluding sales made to satisfy tax obligations arising from stock grants, is set forth below:

| Date | Shares Sold | Net Proceeds |
|------|-------------|--------------|
| 5/20/2016 | 50,000 | $2,279,000.00 |
| 5/23/2016 | 21,198 | $986,130.96 |
| 5/24/2016 | 24,883 | $1,165,022.06 |
| 12/13/2016 | 54,929 | $3,707,707.50 |
| 12/14/2016 | 32,820 | $2,186,629.60 |
| 6/19/2017 | 495,148 | $31,367,749.00 |
| | | |
| **Total:** | **678,978** | **$41,692,239.12** |

193.    The chart below reflects the fact that the vast majority of defendant Jackson's trades occurred while WageWorks stock was selling at unusually high trading prices during the '34 Act Class Period.



194.    The Class Period sales by defendant Jackson are also highly suspicious given the fact that Jackson was, at all times material, the CEO of the Company who, despite his many positive statements to the market, including the annual reports filed with the SEC on Forms 10-K, elected to sell substantial percentages of his holdings rather than continue to hold WageWorks stock in order to ostensibly enjoy the further appreciation in its stock trading price. The insider sales perpetrated by Jackson were in flagrant violation of Jackson's duty under the federal securities laws to "abstain or disclose." Those sales also constitute significant evidence demonstrating that Jackson acted with actual acknowledge or deliberate recklessness: indeed, he had a powerful motive to buoy or inflate the price of WageWorks stock by making or otherwise rendering false statements and financial results to the market to increase or buoy the trading price of WageWorks stock in advance of the June 2017 Offering.

195.    Defendant Jackson's Class Period sales are also inconsistent with his sales following the end of the Class Period. **Between March 1, 2018 and his removal from the Board,**

**Jackson sold no WageWorks stock.** Finally, defendant Jackson did not engage in any substantial purchases of WageWorks common stock during the Class Period. Indeed, his only stock purchases during the Class Period, totaling less than 250 shares, were purchases made pursuant to an Employee Stock Purchase Plan that appears to have been in place long before the Class Period and provides for the purchase of WageWorks stock at below-market prices.

## VI.   VIOLATIONS OF GAAP AND SEC RULES

### A.   Generally Accepting Accounting Principles and SEC Rules

196.   As more fully alleged below, WageWorks, Jackson, and Callan violated generally accepted accounting principles ("GAAP") and SEC rules, with respect to the Company's issued financial statements and reports.   GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate, despite footnote or other disclosures. SEC Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying the most recent annual financial statements. 17 C.F.R. § 210.10-01(a)(5). Additionally, SEC registrants are required under SEC rules to maintain sufficient systems of internal controls to ensure fair reporting in conformity with GAAP.

197.   Item 303 of SEC Regulation S-K requires the disclosure of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), in both annual and quarterly financial statements, to provide information "***necessary to an understanding*** of [the registrant's] financial condition, changes in financial condition and results of operations." 17 C.F.R. § 229.303(a). In 1989, the SEC issued an interpretation providing guidance regarding

MD&A, stating that the SEC had long recognized a "…need for narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance." This interpretation also stated that the general purpose of MD&A requirements is "…to give investors an opportunity to look at the registrant through the eyes of management…[,]" particularly with emphasis on the registrant's prospects for the future.[8]  The SEC again, in December 2003, issued an interpretation that provided additional guidance regarding MD&A, stating that the MD&A requirements are intended to meet three principal objectives:

> *[T]o provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;*
>
> [T]o enhance the overall financial disclosure and *provide the context within which financial information should be analyzed*; and
>
> [T]o provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

198.    Regulation S-K speaks to the importance of disclosures in a company's public filings and provides specific guidance on what the SEC expects to see in such filings. It requires the MD&A to include the following with respect to a company's results of operations, in relevant part:

> Describe any *known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact* on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues…, the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii); *see also* 17 C.F.R. § 229.303(a)(1).

---

[8]     SEC Interpretation: *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures,* dated May 18, 1989.

199.    For most businesses that intend to earn a profit from their operations, revenue is a critical measure. Specifically, revenue measures, in the most basic sense, the amounts received by or promised to an entity for having sold goods and/or performed services. Statement of Financial Accounting Concepts ("FASCON") No. 5 ("FASCON 5") states that in order for revenue to be recognized, it must be "earned" and "realized or realizable."[9] FASCON 5 also provides the following regarding the concept of "earning" revenue, in relevant part:

> Revenues are not recognized until earned. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.[10]

200.    Revenue is "realized" or "realizable" when assets related to the revenue-earning activity are readily convertible to cash or claims to cash.

201.    In December 2003, the Staff of the SEC issued Staff Accounting Bulletin No. ("SAB") 104, *Revenue Recognition in Financial Statements* ("SAB 104"), to discuss the application of existing accounting literature, including FASCON 5, by SEC registrants. SAB 104 provides:

> … revenue generally is realized or realizable and earned when all of the following criteria are met:
>
> - Persuasive evidence of an arrangement exists,
> - Delivery has occurred or services have been rendered,
> - The seller's price to the buyer is fixed or determinable, and
> - Collectability is reasonably assured.[11]

202.    GAAP provides that, when misstatements in previously-issued financial statements are identified, they must be assessed to determine whether the affected financial statements are materially misstated. The determination regarding whether a financial reporting

---

[9]     FASCON 5, ¶ 83. Also codified in Accounting Standards Codification ("ASC") No. 605 ("ASC 605").

[10]    FASCON 5, ¶ 83; footnote omitted. Also codified in ASC 605.

[11]    SAB 104, §A(1); footnotes removed.

item is material to a reporting entity's financial statements depends upon whether its omission or misstatement would impact the decision-making of a user of such financial statements. (See FASCON 8, para. QC1).

203.   In addition to FASCON 8, SEC Staff Accounting Bulletin ("SAB") No. 99, Materiality ("SAB 99"), expresses the SEC Staff's guidance on applying materiality thresholds to the preparation of financial statements filed with the SEC.  Deviance from such guidance by nongovernmental agencies is in violation of GAAP.  SAB 99 similarly defines materiality of an item as being relative to its significance to users of a registrant's financial statements.

204.   If previously-issued financial statements are found to be materially misstated, GAAP requires prompt correction.  Corrective measures include an entity's need to determine the appropriate steps and timing for providing notice that the materially-misstated financial statements should no longer be relied upon.

205.   GAAP governs the circumstances under which an entity should or must correct and/or amend previously issued financial statements, as reflected primarily in ASC 250, *Accounting Changes and Error Corrections,* ASC 250 defines an error in previously-issued financial statements as:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. (ASC 250-10-20).

206.   The Financial Accounting Standards Board ("FASB") defines a restatement as a revision of a previously issued financial statement to correct an error. The determination of whether a prior period error will result in a restatement hinges on **materiality**. SEC Statement of Accounting Bulletin (SAB) 108 explains that correcting prior year financial statements for immaterial errors would not require previously filed reports to be amended.  WageWorks was required to issue the Restatement because WageWorks's financial results were materially false and

misleading.   Since WageWorks is restating financial statements, the "errors" leading to such restatements are material.

207.    GAAP in the form of ASC 250-10-45-23 provides that a restatement requires the following:

> The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.
>
> An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.
>
> Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

208.    There is a rebuttable presumption that a restatement results from one or more material weaknesses in internal control over financial reporting ("ICFR") for the reporting periods that will be restated.

209.    WageWorks announced and admitted that it had material weaknesses in its ICFR as of December 31, 2017 "related to managing change and assessing risk in the areas of non-routine and complex transactions."   Additionally, the Company admitted that it likely had additional material weaknesses in its ICFR as of December 31, 2017 due to an inappropriate "tone at the top," as well as an inadequate "commitment to competencies in the areas of non-routine and complex transactions."

### B.    Improper Revenue Recognition and Falsely Stated Financial Results

210.    In a Form 8-K issued on April 5, 2018, WageWorks announced that it had identified "error(s)" which required the Company to restate its financial statements for the second and third quarter of 2016, the year ended December 31, 2016, and the first three quarters of 2017.  Further, WageWorks stated that these financial statements should no longer be relied upon.

211.    According to the April 5, 2018 Form 8-K, the "error(s)" stemmed from the company's improper revenue recognition related to the accounting for a government contract. This was the OPM Contract. Further, WageWorks stated that it had "associated issues with whether there was an open flow of information and appropriate tone at the top for an effective control environment."

212.    According to its 2016 Form 10-K, WageWorks recognizes revenue for its different product lines in the following manner:

- Healthcare and Commuter include revenues generated from benefit service fees based on employee participant levels and interchange and other commission revenues are based on percentage of total healthcare and commuter dollars transacted pursuant to written purchase agreements with certain vendors and banks.

- COBRA revenue is generated from the administration of continuation of coverage services for participants who are no longer eligible for their employer's health benefits, such as medical, dental, vision and for the continued administration of employee participants' Health Reimbursement Arrangements ("HRAs"), and certain healthcare Flexible Spending Accounts ("FSAs").
- Other revenue includes services related to enrollment and eligibility, non-healthcare, and employee account administration (i.e., tuition and health club reimbursements) and project-related professional services.

213.    The Company expanded on the accounting for benefit services by stating the following:

Benefit service fees are recognized on a monthly basis as services are rendered and earned under service arrangements where fees and commissions are fixed or determinable and collectability is reasonably assured. Benefit service fees are based on a fee for service model (e.g., monthly fee per participant) in which revenue is recognized on a monthly basis as services are rendered under price quotations or service agreements having stipulated terms and conditions, which do not require management to make any significant judgments or assumptions regarding any potential uncertainties. Fees received for initial setup of clients and renewal fees are deferred and recognized on a monthly basis as services are rendered over the agreed benefit period. Contracts with initial setup fees generally have an initial term of one year. The agreed benefit period means the length of

the benefit plan year, which is one year.  The initial setup fees and annual renewal fees are not considered separable from the ongoing services provided for which benefit service fees are earned.

214.    WageWorks also represented during the Class Period that it recognizes revenue when collectability is reasonably assured, service has been performed, persuasive evidence of an arrangement exists, and there is a fixed or determinable fee.  These criteria were not satisfied when WageWorks recognized "revenue" in the second and third quarters, and full-year 2016, ostensibly from OPM, as more fully alleged above.

215.    Upon disclosing the need to restate its financial results, WageWorks has admitted that it improperly recognized revenue in amounts that were material during certain periods, which resulted in the previously discussed material accounting misstatement.  By falsely and materially overstating its revenues, WageWorks over-reported its net income and earnings per share in material amounts in violation of GAAP, as a consequence of which its financial statements and reporting did not accurately, fairly and truthfully represent its true financial results and performance.

216.    Every corporate CEO and CFO knows, fundamentally, that a company must properly account for its revenues and cannot recognize unrealized revenue based on estimates that do not comport with reality.  Defendants prematurely and improperly recognized revenue that had not yet been received and for which they had no reasonable basis to estimate at the time.

217.    Defendants' improper recognition of revenue practices, by prematurely recognizing revenue that had not yet even earned or received and without a reasonable basis for estimating with regard to the OPM Contract, created a corresponding duty to set adequate reserves for doubtful accounts.  Defendants failed to set adequate reserves for doubtful accounts, thus further skewing the reported financial results that appear to be more favorable than they really were.

218.    Defendants' improper and premature recognition of revenue, and failure to establish an adequate reserve for doubtful accounts, falsely and deceptively inflated WageWorks's reported revenues, net income and earnings per share.  These false financial results, upon being

disseminated, inflated WageWorks's stock price in advance of the anticipated June 2017 Offering in which Jackson intended to sell, and did sell, a substantial quantity of his shareholdings at historically high share prices.

### C.    Knowingly Failing to Record Impairment Charge for KP Connector

219.    Prior to the Class Period, WageWorks developed software, referred to as "KP Connector," for the benefit of, and based on specifications outlined in an agreement with, one specific client, Kaiser Permanente. In view of its narrow purpose, the KP Connector software had value to WageWorks only as long as this one client continued to require its use.

220.    To account for the costs associated with the development of the KP Connector software in accordance with GAAP, WageWorks capitalized the costs it incurred to develop the software and reported such costs in the *Property and Equipment* line item on its balance sheet. Additionally, WageWorks amortized such costs over KP Connector's estimated useful life, and reported such periodic amortized costs in the *Amortization, impairment and change in contingent consideration* line item on its income statement.  Prior to WageWorks's Restatement, the carrying value of KP Connector as of June 30, 2016, was $3.7 million.

221.    Accounting Standards Codification ("ASC") 350-30, *General Intangibles Other Than Goodwill* ("ASC 350-30"), states that intangible assets that are subject to amortization, such as KP Connector, shall be reviewed for impairment in accordance with ASC 360, *Property, Plant, and Equipment* ("ASC 360"). (ASC 350-30-35-14.)  ASC 360 states that a long-lived asset, such as KP Connector, must be "tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable." (ASC 360-10-35-21.) If events or changes in circumstances do indicate that a long-lived asset or group of assets is not recoverable, an entity must compare the carrying value of such asset(s) to its fair value at the date it is tested for recoverability.  If, through this comparison, an asset's fair value is deemed to be below its carrying value, the difference between the two is considered an impairment loss which shall be

recognized by writing down the carrying value of the asset to its fair value and concurrently recognizing such impairment loss in an entity's income statement. (ASC 360-10-35-17.)

222. According to its 2016 Form 10-K, WageWorks disclosed that it did perform such assessments of impairment with respect to the carrying value of its long-lived assets by stating the following:

> We review our long-lived assets for indicators of impairment whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Long-lived assets consist primarily of software and software development costs, acquired intangible assets, computers and equipment, leasehold improvements, and furniture and fixtures.

223. ASC 360 requires that, to perform the aforementioned assessments of the recoverability of carrying value of long-lived assets, commonly referred to as impairment tests, "a long-lived asset or assets shall be grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities." (ASC 360-10-35-23.)   As KP Connector was developed by WageWorks for one specific client, the expected cash flows associated with KP Connector were identifiable and independent of the cash flows of WageWorks's other assets and liabilities.   Therefore, if events or changes in circumstances indicated that the carrying value of KP Connector may not have been recoverable at a specific point in time, WageWorks was required to perform an impairment test of the carrying value of KP Connector in accordance with ASC 360 without considering the fair value or carrying value of any other asset and liability.

224. By its Restatement, WageWorks admits that in the second quarter of 2016, the client notified the Company that it no longer required KP Connector and that WageWorks did indeed perform a re-assessment of value.   In accordance with GAAP, such change in circumstances meant that, by June 30, 2016, WageWorks was required to assess the recoverability of KP Connector by comparing the software's fair value to its carrying value of $3.7 million as of that date, and, assuming its fair value was below its carrying value, recording the difference between

the two as a loss in its income statement for the quarter.  As KP Connector was developed for one specific client which, as of June 30, 2016, no longer required the use of the software, its fair value was zero on that date.  As part of its Restatement, WageWorks came to the same conclusion and reported that it "determined that KP Connector's carrying value was considered unrecoverable as of June 30, 2016."

225.    In view of the foregoing, ASC 360 required WageWorks to write-down the carrying value of KP Connector on June 30, 2016, from $3.7 million to zero, and recognize the corresponding $3.7 million as an impairment loss in the income statement of the Form 10-Q for the second quarter of 2016.

226.    Prior to the Restatement, however, even though "KP Connector's carrying value was considered unrecoverable," WageWorks did not record an impairment loss of $3.7 million with respect to KP Connector, but instead improperly amortized only $0.6 million during the third and fourth quarters of 2016.[12]  Therefore, prior to the Restatement, WageWorks understated its expenses, and overstated its income before taxes for 2016 by approximately $3.1 million with respect to KP Connector.

227.    In its Restatement, WageWorks reported that in 2016 it "re-assessed the fair value of KP Connector" and that "in the second quarter of 2016, the client notified the Company that it no longer required the services provided by" WageWorks, adding that "accordingly, the Company determined that KP Connector's carrying value was considered unrecoverable as of June 30, 2016." Although the '34 Act Defendants failed to write down the full $3.7 million in the second quarter of 2016, WageWorks has now "recorded a $3.7 million impairment charge to amortization, impairment and change in contingent consideration expense in the consolidated statements of income and a corresponding reduction of property and equipment, net, in the consolidated balance sheets."  WageWorks also reversed amortization expenses of $0.6 million in 2016 and $0.9 million in the first three quarters of 2017 that it improperly recognized previously.

---

[12]     Prior to the Restatement, the Company also improperly amortized an additional $0.9 million during the first three quarters of 2017 with respect to KP Connector.

**D.    Materially Weak and Ineffective Disclosure Controls over Financial Reporting and False SOX Certifications**

228.    Throughout the Class Period, the Company lacked adequate disclosure controls and procedures over, and with respect to, financial reporting, despite the Executive Defendants' certifications and other statements to the contrary.  Material weaknesses in WageWorks's internal controls facilitated the improper and premature recognition of revenue and Defendants' false accounting.

229.    The Exchange Act requires a company to maintain effective disclosure control and procedures, and effective internal control over financial reporting.  Company management, including its principal executive and financial officers, must evaluate (a) the effectiveness of its disclosure controls and procedures as of the end of each fiscal quarter-end; (b) the effectiveness of its internal control over financial reporting as of the end of each fiscal year-end; and (c) any changes in its internal control over financial reporting that occurred during each fiscal quarter that materially affected, or were reasonably likely to materially affect, its internal control over financial reporting.  17 C.F.R. § 240.13a-15, 240.15d-15.  SEC Regulation S-K requires the Company's principal executive and financial officers to quarterly and annually, as applicable, disclose the conclusions of such evaluations.  17 C.F.R. § 229.307, 229.308.

230.    Further, in connection with the Sarbanes Oxley Act of 2002, the tenets of which have now been incorporated into Regulation S-K, management of public companies is required to report, at least annually, on the effectiveness of the company's internal controls over financial reporting.  The ultimate goal of this process is for company management to represent the effectiveness of the company's internal control over financial reporting because a company's internal control cannot be considered effective if one or more material weaknesses exist.  17 C.F.R. § 229.308.

231.    Many U.S. public companies, including WageWorks (as expressly stated in its financial statements during, and prior to, the Class Period), adopted the integrated framework for establishing and maintaining a system of internal controls (originally published and) established

by COSO in 1992 and updated in 2013 (the "COSO Integrated Framework").   The integrated framework assists management, boards of directors, external stakeholders, and others interacting with the entity in their respective duties as they relate to the establishment and maintenance of internal controls, without being overly prescriptive (recognizing that the size and operations of subject entities may differ).   It does so by providing both an understanding of what constitutes a system of internal controls and insight into when internal controls are being applied effectively.

232.    The COSO Integrated Framework stipulates that:

an effective system of internal control reduces, to an acceptable level, the risk of not achieving an objective relating to one, two, or all three categories of objectives – that is, operations, reporting, and compliance. It requires that (i) each of the five components of internal control and relevant principles is present and functioning, and that (ii) the five components are operating together in an integrated manner.[13]

233.    The five integrated components of internal control outlined in the COSO Integrated Framework are:

- Control Environment,
- Risk Assessment,
- Control Activities,
- Information and Communication, and
- Monitoring.

234.    For management to conclude that its system of internal control is effective, all five components of internal control must be present and functioning.   The Company's internal control over financial reporting was not effective throughout the Class Period because of the existing material weaknesses described below.

235.    The Company's control environment was not effective during the Class Period due to an inadequate tone at the top, specifically the lack of leadership of WageWorks's senior management (including the Company's Audit Committee and corporate counsel – see November

---

[13]     COSO Internal Control-Integrated Framework Frequently Asked Questions (May 2013).

6, 2018 Form 8-K), and its inadequate commitment towards openness, honesty, integrity, and ethical behavior.  As an example, WageWorks's senior management withheld critical information from the auditors that was required to be provided in 2016 and 2017.

236.    In addition to the material weakness in WageWorks's control environment, the Company also had material weaknesses in other components outlined in the COSO Integrated Framework noted above, specifically in its risk assessment, information and communication, and monitoring components as of December 31, 2017, related to the OPM Contract, which was entered into in 2016.  This same material weakness was also present as of December 31, 2016.

237.    With respect to the other two components of internal control, the Company's failure to communicate critical information in 2016 and 2017 to its auditors indicates that it had material weaknesses in both information and communication as well as the monitoring components of internal control.  The foregoing suggests that the Company had material weaknesses in at least four of the five integrated components of internal control outlined in the COSO Integrated Framework that the Company had reportedly adopted throughout the Class Period.

238.    For the foregoing reasons, the Executive Defendants, who designed, implemented, and oversaw WageWorks's internal controls, caused the Company's financial statements, including the related footnote disclosures thereto, as of and for the year ended December 31, 2016 and related 2016 Form 10-K (the relevant annual financial statement), as well as interim financial statements as of and for the quarterly periods ended June 30, 2016, and September 30, 2016, and their related Forms 10-Q (the "relevant interim financial statements" and, collectively, the "relevant financial statements") to not present fairly, in conformity with GAAP and SEC rules, the Company's financial position and results of operations.  The financial statements for those reporting periods, and the Company's reports on Form 10-Q for the first, second, and third quarters of 2017, and the Executive Defendants SOX certifications are also false with respect to the effectiveness of WageWorks's internal control over financial reporting and accounting close.

239.    Throughout the Class Period, the Executive Defendants signed certifications as required by the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), the Executive Defendants'

SOX Certifications accompanied WageWorks's quarterly reports on Forms 10-Q, and WageWorks's 2016 Annual Report on Forms 10-K.  SOX requires certifying officers to effectively vouch for the reliability of corporate financial reporting.

240.    Defendants Jackson and Callan were ultimately responsible for adopting, implementing, and enforcing sound accounting policies and for establishing and maintaining a system of internal controls sufficient to result in accurate and reliable recording of transactions and the fair presentation of the Company's financial results, including its revenues and expenses, assets and liabilities, and cash flows, in the books and records of the Company. This responsibility included adequately supporting the journal entries recording, *inter alia*, WageWorks's revenues, its accounts payables and receivables, and its allowance for doubtful accounts.

241.    Defendants Jackson and Callan undertook and bore responsibility for designing, developing, evaluating, and disclosing effective internal controls over financial reporting and related procedures and, making a good faith, informed determination that the Company's reports on Form 10-Q and Form 10-K did not contain any untrue statements of material fact, or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading, with respect to the period covered by the report. It was entirely incumbent upon CEO Jackson and CFO Callan, to thoroughly vet the Company's reports with regard to its operations and financial results before allowing them to be issued to the public and the investment community in general. It was their duty and responsibility to cause WageWorks's to file financial reports that were reliable and complied with GAAP.  It was also their duty to truthfully and accurately certify and represent the effectiveness of WageWorks's internal controls so that investors would be informed with regard to the reliability of the Company's financial reporting and related risk.

242.    Throughout the Class Period, CEO Jackson and CFO Callan collectively executed and rendered SOX Certifications, attesting with words such as "***based on my knowledge***" that among other things: (a) WageWorks's financial statements did not contain untrue statements of material fact or omit to state material facts necessary to make the statements made not misleading;

(b) the financial statements fairly presented in all material respects the financial condition, results and operations and cash flows of WageWorks; (c) they had designed and evaluated the effectiveness of the Company's disclosure controls and controls over financial reporting and had disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," and (d) that they had also disclosed, based on their most recent evaluation of controls over financial reporting, "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants internal control over financial reporting."

243.    Each time CEO Jackson and CFO Callan signed a SOX Certification, and did so "***based on my knowledge***," throughout the entirety of the Class Period, they affirmed and certified that WageWorks's financial misstatements were true, not misleading, fairly presented in all material respects the financial condition, results of operation and cash flows of the Company and that they had designed and evaluated the Company's disclosure controls to ensure that material information "is ***made known to us*** by others within those entities, particularly during the period in which this report is being prepared" and "***designed such internal control*** over financial reporting" in order to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Each such certification was false.

244.    The Executive Defendants exploited their SOX certifications in order to deceive, not protect, investors. WageWorks's internal controls were ineffective and contained material weaknesses. WageWorks's internal controls did not prevent or guard against their being overridden by the Executive Defendants', who, in fact, did override internal controls and exploit the material weaknesses that they designed into them. Among other things, the **Executive Defendants' SOX certifications demonstrate that they knew** that their conduct respecting WageWorks's financial reporting presented a **significant risk of misleading investors** as to the Company's true financial condition.

## VII.    CLASS ACTION ALLEGATIONS

245.    Lead Plaintiffs MPERS and GERS bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all individuals and entities who purchased or otherwise acquired WageWorks common stock on the open market during the period May 6, 2016 through March 1, 2018 inclusive and were damaged thereby (the "'34 Act Class"). Excluded from the '34 Act Class are the '34 Act Defendants, directors and officers of the Company, their immediate family members, and their affiliates.

246.    Lead Plaintiff PERA brings this class action on behalf of all individuals and entities who purchased or otherwise acquired WageWorks common stock pursuant and/or traceable to the Offering Documents in connection with WageWorks's June 2017 Offering, conducted on or about June 19, 2017, and were damaged thereby (the "'33 Act Class").  Excluded from the '33 Act Class are the '33 Act Defendants, their affiliates, directors and officers, and their immediate family members.

247.    The respective members of the separate and distinct '34 Act Class and '33 Act Class are so numerous that joinder of all members is impracticable. The disposition of their respective and separate claims via a class action will provide substantial benefits to the respective parties and the Court. As of October 31, 2017, WageWorks had 39,636,536 shares of common stock outstanding, WageWorks offered and sold 2.5 million shares of its common stock in the June 2017 Offering.  Each of the separate and distinct classes defined above has thousands of respective class members.

248.    There is a well-defined community of interest in the questions of law and fact involved in this case with respect to each of the respective classes, as defined above.

249.    Questions of law and fact common to the members of the '34 Act Class that predominate over questions that may affect its individual class members include:

      a.    whether the '34 Act Defendants violated the Exchange Act;

      b.    whether the '34 Act Defendants omitted and/or misrepresented material facts;

    c.    whether the '34 Act Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    whether the '34 Act Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.    whether the prices of WageWorks common stock were artificially inflated; and

    f.    the extent of damage sustained by the '34 Act Class members and the appropriate measure of damages.

250.    Questions of law and fact common to the members of the '33 Act Class that predominate over questions that may affect its individual class members include:

    a.    Whether the '33 Act Defendants violated the Securities Act;

    b.    Whether the Offering Documents were negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein;

    c.    To what extent the members of the '33 Act Class have sustained damages and the proper measure of damages.

251.    The separate and respective '33 Act Class and '34 Act Class claims are typical of those of their respective '33 Act Class members and '34 Act Class members because their respective plaintiff(s) and respective Class sustained damages from their respective defendants' alleged conduct.

252.    Each of the respective Lead Plaintiffs will adequately protect the interests of its respective Class and has retained counsel who are experienced in class action securities litigation. Each of the respective Lead Plaintiffs has no interests that conflict with those of their respective Class.

253.    A class action on behalf of the '33 Act Class and a class action on behalf of the '34 Act Class is superior to other available methods for the fair and efficient adjudication of their alleged claims and controversy. Furthermore, as the damages suffered by individual respective

class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the '33 Act Class or the '34 Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   LOSS CAUSATION RESPECTING '34 ACT CLAIMS

254.   The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by the '34 Act Lead Plaintiffs and the '34 Act Class members they represent.

255.   During the '34 Act Class Period, Lead Plaintiffs MPERS and GERS, and the '34 Act Class members, purchased WageWorks securities at artificially inflated prices and were damaged thereby.   The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

256.   During the '34 Act Class Period, the '34 Act Defendants materially misled the investing public, thereby inflating the price of WageWorks securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about WageWorks's business, operations, financial performance, and adequacy of its internal controls, as alleged herein.

257.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the '34 Act Lead Plaintiffs and other members of the '34 Act Class.   The Defendants made or caused to be made materially false and/or misleading statements about WageWorks's financial results, internal controls and related financial metrics and the reliability of their reported results. These material misstatements and/or omissions had the cause and effect of

creating in the market a false positive assessment of the Company and its financial performance, internal controls and related well-being, thus causing the Company's securities to be overvalued and the price of its common stock to be artificially inflated at all relevant times. The '34 Act Defendants' materially false and/or misleading statements, as alleged herein, resulted in the '34 Act Lead Plaintiffs and other members of the '34 Act Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed in a series of corrective disclosures including those on March 1, 2018 and March 2, 2018, April 5, 2018, September 12, 2018, and March 19, 2018, causing the trading price of WageWorks common stock to materially decline, and removing the previously embedded artificial inflation.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

258.     The market for WageWorks securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, WageWorks securities traded at artificially inflated prices at all times material.  The respective '34 Act Lead Plaintiffs and other members of the '34 Act Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of WageWorks securities and market information relating to WageWorks, and have been damaged thereby.

259.     During the Class Period, the artificial inflation of WageWorks stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by the respective Lead Plaintiffs and other members of their respective Class. The material misstatements and/or omissions by the Defendants, as alleged above, created a false positive assessment of WageWorks's financial performance and results, business, operations and, internal controls, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  These materially false and/or misleading statements resulted in the respective '34 Act Lead Plaintiffs and

other members of the '34 Act Class in purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

260.    At all relevant times, the market for WageWorks securities was an efficient market for the following reasons, among others:

- WageWorks was listed and actively traded on the NYSE, a highly efficient and automated market;

- As a regulated issuer, WageWorks filed periodic public reports with the SEC and/or the NYSE;

- WageWorks regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

- WageWorks was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

261.    As a result of the foregoing, the market for WageWorks securities promptly digested current information regarding WageWorks from all publicly available sources and reflected such information in WageWorks's stock price. Under these circumstances, all '34 Act Class members who purchased or acquired WageWorks securities during the Class Period suffered similar respective injury through their purchase of WageWorks securities at artificially inflated prices and a presumption of reliance applies.

262.    A respective class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the '34 Act Class claims are, in large part, grounded upon Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose

112

material adverse information and the truth regarding the Company's financial results and performance, internal controls, and business operations — information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## X.   NO SAFE HARBOR

263.   The **statutory safe harbor** provided for forward-looking statements under certain circumstances **does not apply** to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions, especially with respect to financial reports, reported quarterly and annual financial results and statements, and internal controls. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements of the '34 Act Class claims pleaded herein, the '34 Act Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of WageWorks who knew that the statement was false when made.

## COUNT I

**Violation of Section 10(b) of the Exchange Act of 1934 and
Rule 10b-5 Promulgated Thereunder: Lead Plaintiffs MPERS and GERS, individually and
on behalf of the '34 Act Class versus Defendants WageWorks, Jackson and Callan**

264.     Lead Plaintiffs MPERS and GERS incorporate by reference and re-allege each and every allegation set forth above, except the allegations of ¶¶24-25, 32, and 38-42, as though fully set forth herein.

265.     During the '34 Act Class Period, the '34 Act Defendants carried out a course of conduct throughout the Class Period that: (1) deceived the investing public, including Lead Plaintiffs MPERS and GERS and other Class members, as alleged herein; and (2) caused said Lead Plaintiffs and other members of the '34 Act Class to purchase WageWorks securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the '34 Act Defendants took the actions set forth herein.

266.     The '34 Act Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for WageWorks common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All '34 Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

267.     The '34 Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of WageWorks as specified herein.

268.     The '34 Act Defendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made about WageWorks and its business, operations, financial results and internal controls, in the light of the circumstances under

which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of WageWorks common stock during the Class Period.

269.  The '34 Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing WageWorks's true revenues, earnings per share, operating condition and materially weak internal controls, from the investing public, and to support the artificially inflated price of its securities.  As demonstrated by '34 Act Defendants' overstatements and misstatements of the Company's financial results, performance, and internal controls throughout the Class Period, such Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

270.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of WageWorks securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of WageWorks publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the '34 Act Defendants, the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by such Defendants but not disclosed in public statements by them during the Class Period, Lead Plaintiffs MPERS and GERS, and the other members of the '34 Act Class, acquired WageWorks common stock during the Class Period at artificially high prices and were damaged thereby.

271.  At the time of said misrepresentations and omissions, Lead Plaintiffs MPERS and GERS and other members of the '34 Act Class were ignorant of their falsity, and believed them to

be true. Had said Lead Plaintiffs and the other members of the '34 Act Class and the marketplace known the truth regarding WageWorks's financial results, financial metrics of performance and internal controls, which was not disclosed by the '34 Act Defendants, said Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their WageWorks common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

272.     By virtue of the foregoing, the '34 Act Defendants – WageWorks, Jackson and Callan – have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

273.     As a direct and proximate result of the '34 Act Defendants' wrongful conduct, Lead Plaintiffs MPERS and GERS, and the other members of the '34 Act Class, suffered damages in connection with their respective purchases and sales of the Company's common stock during the '34 Act Class Period.

274.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II
**Violation of Section 20(a) of the Securities Exchange Act of 1934: Lead Plaintiffs MPERS and GERS Individually and on behalf of the '34 Act Class versus the Executive Defendants**

275.     Lead Plaintiffs MPERS and GERS incorporate by reference and re-allege each and every allegation set forth above, except the allegations of paragraphs 24-25, 32, and 38-42, as though fully set forth herein.

276.     The Executive Defendants acted as controlling persons of WageWorks within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and participation in and/or awareness of the Company's operations, internal controls and false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

dissemination of the various statements that Lead Plaintiffs contend are false and misleading. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Executive Defendants signed the false financial statements and their SOX certifications.

277. In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular acts and transactions giving rise to the securities violations as alleged herein, and exercised the same.

278. As set forth above, WageWorks and the Executive Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

279. By virtue of their positions as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act jointly and severally with the '34 Act Defendants. As a direct and proximate result of Executive Defendants' wrongful conduct, Lead Plaintiffs MPERS and GERS and other members of the '34 Act Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

280. This action was filed within two years of discovery of the fraud and within five years of each '34 Act Class Lead Plaintiffs' purchases of securities giving rise to the cause of action.

**COUNT III**
**Violation of Section 11 of the Securities Act of 1933:  Lead Plaintiff PERA**
**Individually and on behalf of the '33 Act Class versus the Securities Act of 1933**
**Defendants - WageWorks, Jackson, Callan the Director**
**Defendants and the Underwriter Defendants**

281. Lead Plaintiff PERA repeats and incorporates ¶¶ 24-28, 32-35, 37-45, 49-50, 52-57, 59-60, 67-68, 72-23, 76, 78, 81-82, 86-87, 91-93, 95-101, 102(a), (b), (e), and (f) (chart

included), 103-105 (charts included), 108-110, 113-115, 117, 126-128, 130(a) (respecting the First Quarter 2017 Form 10-Q which was incorporated into the Offering Documents), 131-134, 136, 152-155, 158-159, 196-215, 217, 219-227, 229-234, 236-241, 246-248 (as to the '33 Act Class only) 250, 251-253 (as to the '33 Act Class only), and 263, as if fully set forth herein, only to the extent that such allegations do not allege fraud, scheme, motive, scienter, or intentional conduct by the '34 Act Defendants.  This Section 11 claim does not sound in fraud and does not rely on fraudulent misconduct to support the claim under the Securities Act of 1933.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter, or intentional conduct to defraud Lead Plaintiff PERA or members of the '33 Act Class.  This count is predicated upon the Securities Act of 1933 Defendants' liability for making untrue statements and omissions of material fact in the Offering Documents.

282.    This claim is brought against WageWorks, Jackson, Callan, the Director Defendants, and the Underwriter Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all proposed '33 Act Class Members who purchased or otherwise acquired WageWorks common stock pursuant to or traceable to the Registration Statement for the June 2017 Offering, and were damaged thereby.  The Executive Defendants and the Director Defendant each executed the Company's Offering Documents for the June 2017 Offering.

283.    At the time of the June 2017 Offering, its applicable Offering Documents contained untrue statements of material fact, omitted facts necessary to make the statements made therein not misleading, and failed to disclose required material information, as set forth above. Additionally, and as the Restatement acknowledges, WageWorks's financial results for the second and third quarters of 2016, and the full-year 2016, were materially false and misleading beyond the OPM Contract and KP Connector materially false items.  The impact of the full Restatement is illustrated in the charts below with respect to net income and diluted GAAP EPS:

**Impact of Full Restatement (all net income amounts in thousands):**

| | Second Quarter - 2016 | | |
|---|---|---|---|
| | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | $2,853 | $(120) | -104.21% |
| Diluted GAAP EPS | $0.08 | - | -100.00% |

| | Third Quarter - 2016 | | |
|---|---|---|---|
| | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | $5,894 | $5,230 | -11.27% |
| Diluted GAAP EPS | $0.16 | $0.14 | -12.50% |

| | Total 2016 | | |
|---|---|---|---|
| | **As Previously Reported** | **As Restated** | **Adjustment %** |
| Net Income | 20,205 | 15,902 | -21.30% |
| Diluted GAAP EPS | 0.54 | 0.43 | -22.22% |

284. WageWorks is strictly liable for its violations of the '33 Act. Each of the '33 Act Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Documents. Alternatively, and without prejudice to the foregoing, none of the '33 Act Defendants herein made a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Materials were true and not misleading, and that there were no omissions of any material fact. Accordingly, the Executive Defendants, the Director Defendants and the Underwriter Defendants acted negligently, and all of the '33 Act Defendants are liable to Lead Plaintiff PERA and the other members of the '33 Act Class who purchased or otherwise acquired the common stock in or traceable to the Offering Documents issued in relation to the June 2017 Offering.

285.    Lead Plaintiff PERA and other members of the '33 Act Class purchased WageWorks common stock issued pursuant to or traceable to said Offering Documents at prices that were artificially inflated by the false and misleading statements and omissions contained therein.

286.    Lead Plaintiff PERA and members of the '33 Act Class did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained in the Offering Documents when they purchased or otherwise acquired the common stock of WageWorks.

287.    Lead Plaintiff PERA and other members of the '33 Act Class who purchased the common stock pursuant to the Offering Documents suffered substantial damages as a result of the untrue statements and omissions of material facts in the Offering Documents, as they either sold these shares at prices below the June 2017 Offering prices, or still hold shares as of when the prices and trading value of the common stock they purchased were below said Offering prices and values at the filing of this Complaint.

288.    By reason of the foregoing, the '33 Act Defendants named in this Count have violated Section 11 of the Securities Act. The '33 Act claims asserted herein are not barred by any applicable statute of limitations respecting each such claim.


<u>**COUNT IV**</u>
**Violation of Section 12(a)(2) of the Securities**
**Act of 1933: Lead Plaintiff PERA individually and on behalf of the**
**'33 Act Class versus the Underwriter Defendants**

289.    Lead Plaintiff PERA repeats and re-alleges ¶¶281-288 (including all incorporated paragraphs as identified therein) as if fully set forth herein, only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct by the '33 Act Defendants to defraud Plaintiffs or members of the Class.  This Section 12 (a)(2) claim arising under the Securities Act of 1933 does not sound in fraud.  This '33 Act claim on behalf of PERA and the '33 Act Class under Section 12(a)(2) does not have *scienter* or fraudulent intent as required elements.

To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Lead Plaintiffs or members of the Class. This count is predicated upon liability for making false and materially misleading statements in the Offering Documents.

290.    This claim is brought by Lead Plaintiff PERA against the Underwriter Defendants pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff PERA and all other members of the '33 Act Class who purchased WageWorks common stock in the June 2017 Offering.

291.    Each of the Underwriter Defendants was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant to the Offering Documents in or traceable to the June 2017 Offering.

292.    The Underwriter Defendants sold WageWorks common stock pursuant to the Offering Documents directly to Lead Plaintiff and/or members of the Class.

293.    The Underwriter Defendants transferred title to WageWorks stock to Lead Plaintiff PERA and/or members of the '33 Act Class who purchased such securities in the June 2017 Offering, and transferred title of such WageWorks securities to other underwriters and/ or broker-dealers that sold those securities as agents for the Underwriter Defendants.  The Underwriter Defendants also solicited the purchase of WageWorks common stock in the June 2017 Offering Documents by Lead Plaintiff and/or members of the '33 Act Class who purchased in said Offering by means of the Prospectus/Offering Documents, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interest of WageWorks, including but not limited to earning commissions on the sale of WageWorks stock in said Offering.

294.    The Offering Documents contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

295.    Lead Plaintiff PERA and/or members of the '33 Act Class who purchased WageWorks common stock from the Underwriter Defendants and/or their duly authorized agents in said Offering made such purchases pursuant to the materially untrue and misleading Offering Documents, and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

296.    Lead Plaintiff PERA and/or members of the '33 Act Class who purchased WageWorks common stock in the June 2017 Offering from the Underwriter Defendants and/or their duly authorized agents pursuant to the Offering Documents suffered substantial damages as a result of the untrue statements and omissions of material facts therein, as they either sold these shares at prices below said Offering price or still held securities as of the date this Complaint, when the prices and trading value of the common stock are below the said Offering price.

297.    Lead Plaintiff PERA and/or members of the '33 Act Class who purchased WageWorks common stock pursuant to the Offering Documents and still hold those securities have sustained substantial damages as a result of the untrue statements of material facts and omissions contained therein, for which they hereby elect to rescind and tender said common stock to the Underwriter Defendants in return for the consideration paid with interest.  Those members of the '33 Act Class who have already sold their stock acquired in said Offering pursuant to the materially untrue and misleading Offering Documents are entitled to damages from the Underwriter Defendants.

298.    By virtue of the foregoing, the Underwriter Defendants violated Sections 12(a)(2) of the Securities Act.

## COUNT V
### Violation of Section 15 of the Securities Act of 1933: Lead Plaintiff PERA individually and on behalf of the'33 Act Class versus the Executive Defendants and the Director Defendants

299.    Lead Plaintiff PERA incorporates the paragraphs of Count III, including all paragraphs incorporated as identified therein, as though fully set forth herein.

122

300.    By reason of their control over WageWorks, the Executive Defendants and the Director Defendants were able to: (i) gain access to all WageWorks reports, agendas and other information available to them as C-Suite Executives and/or members of the WageWorks Board of Directors;  (ii) participate in the preparation and dissemination of the materially misstated Offering Documents which they executed; and (iii) otherwise exercise control over WageWorks's public filings and Offering.

301.    The Executive Defendants and Director Defendants conducted and participated, directly and indirectly, in the conduct of WageWorks's business affairs, including said Offering.

302.    As officers and/or directors of a company engaging in offerings of its securities, the Executive Defendants and the Director Defendants had a duty to disseminate accurate and truthful information with respect to WageWorks's business, financial condition, results of operations and internal controls.  These Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct said Offering. Because of their positions of control and authority as senior officers and/or directors of WageWorks, these Defendants were able to, and did, control the contents of the Offering Documents, which they each signed, including the SEC filings such as the above alleged 2016 Form 10-K incorporated with them, which contained materially untrue information and failed to disclose material facts.

303.    By reason of the aforementioned conduct, the Executive Defendants and the Director Defendants are liable under Section 15 of the Securities Act of 1933, jointly and severally, with, and to the same extent as WageWorks.  Jackson, Callan, the Director Defendants and the Underwriter Defendants are liable under Section 11 of the Securities Act, to Lead Plaintiff PERA and members of the '33 Act Class who purchased or otherwise acquired the common stock of WageWorks issued pursuant to the Offering Documents in connection with the June 2017 Offering.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment as follows:

a.  Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.  Awarding the respective Lead Plaintiffs and the other members of their respective '33 Act Class and '34 Act Class damages in an amount which may be proven at trial, together with interest thereon;

c.  Awarding the respective Lead Plaintiffs and the other members of their respective '33 Act Class and '34 Act Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d.  Awarding such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury as to their respective claims and causes of action.

DATED:  May 16, 2019

Respectfully submitted,

BARRACK, RODOS & BACINE
STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)

/s/STEPHEN R. BASSER
STEPHEN R. BASSER

One America Plaza
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone: (619) 230-0800
Facsimile:  (619) 230-1874

JEFFREY A. BARRACK *(admitted pro hac)*
3300 Two Commerce Square

124

2001 Market Street
Philadelphia, PA 19103
E-mail:  lbarrack@barrack.com
Telephone: (215) 963-0600
Facsimile:  (215) 963-0838

*Attorneys for Lead Plaintiffs the Public Employees' Retirement System of Mississippi, the Public Employees Retirement Association of New Mexico and the Government Employees' Retirement System of the Virgin Islands*