CAZ HASHEMI, State Bar No. 210239
IGNACIO E. SALCEDA, State Bar No. 164017
BETTY CHANG ROWE, State Bar No. 214068
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100
Email: chashemi@wsgr.com
        isalceda@wsgr.com
        browe@wsgr.com

Attorneys for Defendant
WageWorks, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| IN RE WAGEWORKS, INC. SECURITIES LITIGATION | CASE NO.:  4:18-CV-01523-JSW |
|  | **DEFENDANT WAGEWORKS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISSS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
|  | Hearing Date:  November 22, 2019<br>Hearing Time: 9:00 a.m.<br>Courtroom:    5, 2d floor<br>Judge:        Hon. Jeffrey S. White |

# TABLE OF CONTENTS

**Page**

**NOTICE OF MOTION AND MOTION** .............................................................................. v

**STATEMENT OF ISSUES (CIVIL L.R. 7-4(A)(3))** ..................................................... v

**SUMMARY OF ARGUMENT (STANDING ORDER, ¶ 7)** ........................................... v

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................................. 1

**INTRODUCTION** ....................................................................................................... 1

**STATEMENT OF FACTS** ............................................................................................ 1

**THE STANDARD APPLICABLE TO THIS REFORM ACT CASE** .......................... 4

**ARGUMENT** .................................................................................................................. 5

I.  THE CAC FAILS TO STATE A SECTION 10(B) CLAIM BECAUSE IT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ................................................ 5

    A.  Plaintiffs Do Not Allege Particularized Facts Showing Defendants' Knowledge of Any Misrepresentation ................................................................. 5

    B.  Inadequate Internal Controls and "Tone at the Top" Do Not Support Scienter ........................................................................................................ 9

    C.  The Confidential Witness Allegations are Insufficient and Do Not Supply the Missing Support for Plaintiffs' Scienter Allegations .............................. 10

    D.  The Other Allegations Do Not Rectify Plaintiffs' Failure to Plead Particularized Facts Supporting Scienter .......................................................... 13

    E.  The Post-Class Events Do Not Support Scienter ............................................. 15

    F.  Considered Holistically, the More Plausible Inference is the Defendants Acted in Good Faith ............................................................................................ 16

II.  THE CAC DOES NOT STATE A SECTION 10(B) CLAIM BECAUSE IT FAILS TO SUFFICIENTLY ALLEGE LOSS CAUSATION ..................................... 17

III. THE CAC DOES NOT STATE A SECTION 11 CLAIM BECAUSE PLAINTIFF PERA LACKS STANDING ............................................................................. 18

**CONCLUSION** ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbey v. Comput. Memories, Inc.*,
    634 F. Supp. 870 (N.D. Cal. 1986) ........................................................................18

*Applestein v. Medivation, Inc.*,
    561 F. App'x 598 (9th Cir. 2014)..........................................................10, 11, 14

*Biotechnology Value Fund, L.P. v. Celera Corp.*,
    12 F. Supp. 3d 1194 (N.D. Cal. 2013) .....................................................................6

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) .........................................................15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017).........................................................................15, 16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    65 F. Supp. 3d 840 (N.D. Cal. 2014) .......................................................................7

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ..........11

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    2013 WL 2156358 (N.D. Cal, May 17, 2013) ......................................................10

*Costabile v. Natus Med. Inc.*,
    293 F. Supp. 3d 994 (N. D. Cal. 2018) ....................................................6, 8, 13, 17

*DSAM Global Value Fund v. Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002)...................................................................................8

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008).................................................................................15

*Hemmer Grp. v. Sw. Water Co.*,
    663 Fed. App'x 496 (9th Cir. 2016)................................................................. vi, 19

*In re Bus. Objects S.A. Sec. Litig.*,
    2005 WL 1787860 (N.D. Cal. July 27, 2005) .................................................10, 12

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013)......................................................................... vi, 19, 20

*In re Hansen Nat'l Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007)......................................................18

*In re Hertz Global Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018).......................................................................9, 10, 15

*In re Hypercom Corp. Sec. Litig.*,
    2006 WL 1836181 (D. Ariz. July 5, 2006) .....................................................14, 18

*In re Immersion Corp. Sec. Litig.*,
    2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ...............................................................14, 16

*In re LendingClub Sec. Litig.*,
    282 F. Supp. 3d 1171 (N.D. Cal. 2017) ........................................................................19

*In re LifeLock, Inc. Sec. Litig.*,
    690 Fed. App'x 947 (9th Cir. 2017)...............................................................................5

*In re Loudeye Corp. Sec. Litig.*,
    2007 WL 2404626 (W.D. Wash. Aug. 17, 2007) .........................................................10

*In re Netflix, Inc. Sec. Litig.*,
    964 F. Supp. 2d 1188 (N.D. Cal. 2013), *aff'd*, 647 Fed. App'x 813 (9th Cir. 2016).........11

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014)...........................................................................5, 8, 15

*In re Puda Coal Sec. Inc. Litig.*,
    2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013) ...............................................................20

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)........................................................................................4

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999).......................................................................................10

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002).......................................................................................6

*In re Watchguard Sec. Litig.*,
    2006 WL 2038656 (W.D. Wash. April 21, 2006) .........................................................9

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994).........................................................................................9

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014)........................................................................ vi, 17, 18

*Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009).......................................................................................10

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008)............................................................................ *passim*

*Morgan v. AXT, Inc.*,
    2005 WL 2347125 (N.D. Cal. Sept. 23, 2005)..............................................................6

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
    50 F. Supp. 3d 1328 (C.D. Cal. 2014)........................................................................8, 9

*Perrin v. Sw. Water Co*,
    2014 WL 10979865 (C.D. Cal. July 2, 2014) ..............................................................19

*Philco Invs., Ltd. v. Martin*,
    2011 WL 4595247 (N.D. Cal. Oct. 4, 2011) ..................................................................7

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    2012 WL 1868874 (N.D. Cal. May 22, 2012) .......................................................11, 12, 13

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ................................................................................12, 13

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001).........................................................................................6, 8

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998).........................................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................................................................5, 16

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................... vi, 19, 20

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018)................................................................................. *passim*

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 167708 (N.D. Cal. Jan. 17, 2017),
    *aff'd*, 765 Fed. App'x 239 (9th Cir. 2019) ...................................................................19, 20

*Zamir v. Bridgepoint Educ., Inc.*,
    2018 WL 1258108 (S.D. Cal. March 12, 2018) ...........................................................8, 9, 16

*Zucco Partners LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)................................................................................. *passim*

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 77k ..........................................................................................................................v

15 U.S.C. § 78j(b) ......................................................................................................................v

15 U.S.C. § 78u-4(a) et seq. ......................................................................................................v

15 U.S.C. § 78u-4(b)(2)(A) .......................................................................................................5

15 U.S.C. § 78u-4(b)(3)(A) .......................................................................................................5

17 C.F.R. § 240.10b-5 ...............................................................................................................v

Fed. R. Civ. P. 9(b) ....................................................................................................................v

Fed. R. Civ. P. 12(b)(6) .............................................................................................................v

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on November 22, 2019 at 9:00 a.m., before the Honorable Jeffery S. White, United States District Court, Courtroom 5, 2d floor, Oakland Courthouse, 1301 Clay Street, Oakland, CA  94612, Defendant WageWorks, Inc. ("WageWorks" or the "Company") will move to dismiss the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ("CAC") pursuant to the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), 15 U.S.C. § 78u-4(a) et seq., and Fed. R. Civ. P.  9(b) and 12(b)(6).  This Motion is based on this Notice of Motion and Motion; Memorandum of Points and Authorities; Defendant WageWorks' Request for Judicial Notice and Notice of Incorporation by Reference; the Declaration of Betty Chang Rowe and accompanying exhibits; the [Proposed] Orders; the pleadings, records and papers on file; oral argument; and any other matters properly before the Court.

**STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))**

1.     Should the claim asserted under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, respectively) be dismissed for failure to plead sufficiently scienter on the part of WageWorks?

2.     Should the claim asserted under Section 10(b) of the Exchange Act and SEC Rule 10b-5 be dismissed for failure to plead sufficiently loss causation?

3.     Should the claim asserted under Section 11 of the Securities Act of 1933 (the '33 Act"), 15 U.S.C. § 77k, be dismissed for lack of standing?

**SUMMARY OF ARGUMENT (STANDING ORDER, ¶ 7)**

Plaintiffs' Section 10(b) and Rule 10b-5 claim should be dismissed for failure to plead particularized facts that give rise to a strong inference of scienter.  *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009).  The CAC pleads no facts regarding any defendant's knowledge of the alleged wrongdoing.  The plain language of the contract on which the CAC relies refutes Plaintiffs' bald scienter allegations and, at a minimum, belies any notion that the Company's interpretation of its contractual right to payment and subsequent recognition of revenue were "highly unreasonable . . . involving not merely simple, or even inexcusable

1    negligence, but an extreme departure from the standards of ordinary care." *Id.* at 991 (citation

2    omitted).  Lacking direct evidence of scienter, the CAC offers a slew of allegations to infer

3    scienter:  the restatement, the "core operations" theory, weaknesses in internal control and

4    confidential witnesses statements on corporate culture, the Secondary Offering, signatures on

5    Sarbanes-Oxley certifications, corporate leadership changes, and auditors' concerns.  The CAC's

6    generic allegations, however, lack particularized facts and do not suggest an inference of scienter

7    that is at least as compelling as an inference of nonfraudulent intent.  *See Webb v. SolarCity*

8    *Corp.*, 884 F.3d 844 (9th Cir. 2018); *Zucco*, 552 F.3d at 995-1004.

9         Plaintiffs' Section 10(b) and Rule 10b-5 claim also should be dismissed for failure to

10   plead loss causation.  Plaintiffs fail to plead any facts showing that the relevant stock price

11   declines were caused by revelation of the delay in recognizing an asset impairment.  *See Loos v.*

12   *Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014).  None of the disclosures immediately preceding

13   the stock price declines revealed the allegedly fraudulent delay, and when that "fraud" was

14   revealed, the stock price *increased*.  Plaintiffs' claims based on the recognition of revenue fail to

15   the extent their alleged losses stem from stock price declines from the Company's March 1,

16   2018, March 2, 2018 and September 12, 2018 announcements, none of which revealed that

17   alleged fraud.  *Id.* at 887.

18        Finally, plaintiff Public Employees Retirement Association's ("PERA") Section 11 claim

19   should be dismissed for lack of standing for failure to sufficiently plead that its WageWorks

20   shares are traceable to the challenged Secondary Offering.  *Hemmer Grp. v. Sw. Water Co.*, 663

21   Fed. App'x 496 (9th Cir. 2016); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir.

22   2013); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029 (N.D. Cal. 2016).

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**INTRODUCTION**

3      This case arises from the government's refusal to pay WageWorks for services rendered

4  during the first six months of a multi-year contract.  From that unresolved contract dispute and

5  the Company's restatement of certain financial statements, Plaintiffs proclaim fraud.  Their

6  overarching theory is that WageWorks intended to defraud investors when it recognized six-

7  months of revenue to which it was not entitled – an amount totaling less than one percent of the

8  Company's 2016 revenue.  Fatally, the CAC pleads no facts (let alone particularized facts)

9  regarding Defendants' contemporaneous knowledge of the Company's non-entitlement to

10  payment – or that the related accounting treatment was in error.  Instead, the CAC relies entirely

11  on the contractual documents, which contradict Plaintiffs' bare scienter allegations, and, instead,

12  strongly support the inference that in 2016 WageWorks honestly and reasonably interpreted them

13  as requiring payment by the government.  This belief continues to this day, as evidenced by

14  WageWorks' ongoing suit against the government for failure to pay the very revenue at the

15  center of this case.  That the Company's contractual interpretation turned out to be incorrect from

16  an accounting perspective is not tantamount to an intent to deceive investors.

17      Plaintiffs also have failed to sufficiently plead loss causation for their Rule 10b-5 claim

18  and the Section 11 claim fails for lack of standing.  In short, alleging in substance that the

19  Company misinterpreted its right to payment during the first six months of a multi-year contract

20  does not make out a fraud case.  The CAC should be dismissed.

21

**STATEMENT OF FACTS**

22      **WageWorks' Business.**  WageWorks is a leader in administering Consumer-Directed

23  Benefits ("CDBs").  CAC ¶ 43.  CDBs programs include pre-tax spending accounts such as

24  Health Savings Account, health and dependent care Flexible Spending Accounts ("FSAs"),

25  Health Reimbursement Arrangements, commuter benefits and other employee benefits.  *Id.*

26  CDB programs assist employees and their families in saving money by using pre-tax dollars to

27  pay for certain expenses related to their healthcare, dependent care and commuter expenses. *Id.*

28

**The OPM Contract.**  On March 1, 2016, the Company entered into a contract with the United States Office of Personnel Management ("OPM") to administer OPM's FSA program, the Federal Flexible Spending Account Program ("FSAFEDS").  *Id.* ¶ 60; Ex. A.  The OPM Contract provided that WageWorks shall perform "FSAFEDS Administration" services beginning in "Base Year 1," defined as "March 1, 2016–August 31, 2016," for at least four years at a fixed price for each Base Year.[1]  Ex. A at 4.[2]  The types of professional services considered "FSAFED Administration" were identical for each Base Year.[3]  *Id.* at 4-8.  Transition from the former administrator's platform to WageWorks' platform was to be completed by September 1, 2016.  CAC ¶ 60; Ex. A at 40.  Upon execution of the Contract, WageWorks began providing FSAFEDS Administration services.  *See* Ex. B at 68.  In July 2016, OPM modified the Contract, adding heightened security and IT requirements.  CAC ¶¶ 72-73; Ex. C.  Nowhere did the Modification provide that any services rendered by WageWorks would be at "no cost."  *See* Ex. C.  The Company satisfied the additional requirements and, by September 1, 2016, successfully transitioned OPM's FSAFEDS to the Company's platform.  *See* CAC ¶¶ 80, 83.

In February 2017, the Company submitted an invoice to OPM that included $5.1M for professional services performed during the first six months (Base Year 1).  *Id.* ¶ 86.  When the invoice was still outstanding in August 2017, the Company filed a certified claim with OPM, which was denied on December 22, 2017.  *Id.* ¶ 122.  WageWorks' appeal of the denial is currently pending before the United States Civilian Board of Contract Appeals.  *See* Ex. B at 28.

---

[1] The periods of service specified in the OPM Contract are:  "Base Year 1 (March 1, 2016 – August 31, 2016)," "Base Year 2 (September 1, 2016 – August 31, 2017)," "Base Year 3 (September 1, 2017 – August 31, 2018)," "Base Year 4 (September 1, 2018 – August 31, 2019)," and "Option Year (September 1, 2019 – August 31, 2020)."  Ex. A at 4-8.

[2] All exhibits referenced herein are attached to the Declaration of Betty Chang Rowe in Support of WageWorks' Request for Judicial Notice, filed concurrently herewith.

[3] "FSAFEDS Administration" was defined as "includ[ing] all costs to perform" the deliverables including but not limited to "Development and Maintenance of Website," "Development and Production of Enrollment Portal," "Development, Production, and Distribution of Marketing/Educational Materials" and other enumerated services.  Ex. A at 4-8.

1    **Secondary Offering in June 2017.**  On June 19, 2017, the Company conducted the

2   Secondary Offering of 2.5M shares of common stock.  CAC ¶¶ 112-15.  WageWorks had

3   outstanding 37,132,382 shares of common stock as of March 31, 2017.  Ex. D at S-12.

4    **Announcement of Delay in Filing 2017 Form 10-K and Audit Committee**

5   **Investigation.**  On March 1, 2018, WageWorks announced a delay in the filing of its Form 10-K

6   for the year ended December 31, 2017.  CAC ¶ 132.  The stock price fell about 19% from $52.45

7   at the close of February 28, 2018 to close at $42.70 on March 1, 2018.  *Id.* ¶ 133.  The next day,

8   the Company announced it was unable to timely file the 2017 Form 10-K.  *Id.* ¶ 134.  It

9   explained that it has a material weakness in its internal control over financial reporting as of

10   December 31, 2017 "related to managing change and assessing risk in the areas of non-routine

11   and complex transactions."  *Id.*  It also reported that the Audit Committee of its Board of

12   Directors was conducting an independent investigation of internal controls, which would include

13   a review of "revenue recognition related to the accounting for a government contract during

14   fiscal 2016 and associated issues with whether there was an open flow of information and

15   appropriate tone at the top for an effective control environment."  *Id*.  Upon this news, the stock

16   price *increased* 8.9% from $42.70 on March 1 to close at $46.50 on March 2, 2018. Ex. E at 11.

17    **Announcement of a Restatement and Change of Corporate Leadership.**  On April 5,

18   2018, WageWorks announced that its financial statements for the second and third quarters of

19   2016, year-end 2016, and first, second and third quarters of 2017 would be restated. CAC ¶ 140.

20   In addition, it announced the resignations of Mr. Joseph Jackson as CEO, Mr. Colm Callan as

21   CFO, and the then General Counsel, as well as the appointment of Mr. Jackson as Executive

22   Chairman of the Board.  *Id*.  Upon this disclosure, the stock price declined 3.66%, from $45.05 at

23   the close of April 5 to $43.40 at the close of April 6, 2018.  *Id.* ¶ 142.

24    On March 18, 2019, WageWorks filed its 2017 Form 10-K and restated financial

25   statements for the periods previously announced in April 2018.  *Id.* ¶ 152.  The Company

26   explained that in 2016, it had improperly recognized revenue for professional services performed

27   under the OPM Contract which it "believed were within the scope of the agreement."  Ex. B at

28   68.  The Restatement reversed $3.6M in OPM revenue and related receivable for fiscal 2016.  *Id.*

1    at 68.  Previously reported total revenue for fiscal 2016 was $364,713,000.  *Id.* at 71.  The

2    reversal of $3.6M in OPM revenue thus represented 0.98% – *less than one percent* – of the

3    previously reported total revenue.  The Company also recorded a $3.7M impairment charge

4    related to internal software developed for a client (KP Connector), the value of which was

5    considered unrecoverable in Q2 2016 when the client notified the Company that it would no

6    longer require the Company's services.  *Id.* at 69; CAC ¶ 5. The stock price rose from $37.72 at

7    the close of March 15 (prior business day) to $39.58 at the close of March 18, 2019.  Ex. E at 16.

8          **The Allegations in the CAC.**  The CAC alleges a class period from May 6, 2016 to

9    March 1, 2018.  CAC ¶ 2.  It claims that the Company and Executive Defendants made false and

10   misleading statements and omissions in WageWorks' 2016 Form 10-K, Form 10-Qs for Q2 and

11   Q3 2016 and Q1, Q2 and Q3 2017, related Sarbanes-Oxley (SOX) certifications, press releases

12   and analyst conference calls concerning financial results and internal controls.  *Id.* ¶¶ 2-4.  The

13   gravamen of the CAC is that the Company recognized revenue under the OPM Contract to which

14   it was not entitled.  *Id.* ¶ 5.  Plaintiffs also contend the Company failed to write down the value

15   of the KP Connector in 2016.  *Id.*  Plaintiff PERA asserts a claim under Section 11 of the '33 Act

16   against all Defendants based on the Secondary Offering, the registration statement for which

17   incorporated by reference certain of the allegedly false SEC filings.[4]  *Id.* ¶¶ 281-82.

18          **THE STANDARD APPLICABLE TO THIS REFORM ACT CASE**

19         To state a claim under Rule 10b-5, Plaintiffs must plead specific facts showing: "(1) a

20   material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

21   the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

22   misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Webb v. SolarCity*

23   *Corp.*, 884 F.3d 844, 850 (9th Cir. 2018) (citation omitted).  Under the Reform Act, a securities

24   _____

25         [4] The CAC also asserts a claim under Section 20(a) of the Exchange Act against the
     Executive Defendants (Count II); a claim against the Underwriter Defendants under Section
26   12(a)(2) of the '33 Act (Count IV); and a claim against the Executive Defendants and Director
     Defendants under Section 15 of the '33 Act (Count V).  Section 20(a) and Section 15 claims are
27   derivative of Section 10(b) and Section 11 claims, respectively.  *In re Rigel Pharms., Inc. Sec.
     Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).  Because Plaintiffs have failed to adequately plead a
28   Section 10(b) or Section 11 claim, "it follows that Plaintiff[s] also ha[ve] failed to adequately
     plead violations of [S]ection 20(a) and [S]ection 15."  *Id.*

1    fraud complaint must "plead with particularity both falsity and scienter." *Zucco Partners LLC v.*

2    *Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted).  These requirements are

3    "formidable," *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir.

4    2008), and "exacting."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14

5    (2007).

6         Plaintiffs must "state with particularity facts giving rise to a *strong inference*" of scienter.

7    15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  Scienter "refers to a mental state embracing

8    intent to deceive, manipulate, or defraud."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053

9    (9th Cir. 2014) (citation omitted).  Scienter requires deliberate recklessness or conscious

10   misconduct.  *Id.*  "Mere recklessness or a motive to commit fraud and opportunity to do so" are

11   insufficient.  *Zucco*, 552 F.3d at 991.  Rather, deliberate recklessness "is an *extreme* departure

12   from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers

13   that is either known to the defendant or is so *obvious* that the actor must have been aware of it."

14   *Webb*, 884 F.2d at 851 (emphasis in original) (citation omitted).

15        In weighing scienter, courts must "consider plausible, nonculpable explanations for the

16   defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs,* 551 U.S. at 323-24.

17   Courts consider scienter allegations holistically.  *Id.* at 323.  "A complaint will survive . . . only

18   if a reasonable person would deem the inference of scienter cogent and at least as compelling as

19   any opposing inference one could draw from the facts alleged."  *Id.* at 324.  This "bar set by

20   *Tellabs* is not easy to satisfy."  *Webb*, 884 F.3d at 855.  A complaint not meeting these high

21   pleading requirements "shall" be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).  As shown below,

22   despite its length, the CAC fails to meet these exacting requirements.  *See In re LifeLock, Inc.*

23   *Sec. Litig.*, 690 Fed. App'x 947, 950 (9th Cir. 2017) ("The various [PSLRA pleading]

24   requirements are not satisfied merely by making a complaint long") (citation omitted).

25                                    **ARGUMENT**

26   **I.    THE CAC FAILS TO STATE A SECTION 10(B) CLAIM BECAUSE IT FAILS
            TO PLEAD A STRONG INFERENCE OF SCIENTER**

27
         **A.    Plaintiffs Do Not Allege Particularized Facts Showing Defendants'
28              Knowledge of Any Misrepresentation**

1     To establish scienter, "the complaint must contain allegations of specific

2 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately

3 reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d

4 423, 432 (9th Cir. 2001) (citation omitted).  Plaintiffs are required to plead with particularity that

5 "the defendants knew specific facts at the time that rendered their accounting determinations

6 fraudulent." *Morgan v. AXT, Inc.*, 2005 WL 2347125, at *14 (N.D. Cal. Sept. 23, 2005).

7     Plaintiffs' claims rest on its mantra that the Company "was not entitled to be paid" for

8 Base Year 1 services under the OPM Contract.  CAC ¶¶ 5-6, 60, 77, 86-87, 122, 130(d), 172,

9 185.  Despite its verbosity, the 125-page CAC is devoid of facts regarding Defendants' – or

10 *anyone* at WageWorks – knowledge at the time that the Company "was not entitled" to such

11 payment.  Plaintiffs plead not a single statement by, conversation with, or document provided to

12 the Executive Defendants showing their contemporaneous knowledge of the contract terms.  *See*

13 *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1089 (9th Cir. 2002) ("there is a total absence of

14 factual allegations that would permit a strong inference that the defendants knew that their

15 representations were false or misleading when made, if they were so, or that the defendants acted

16 in deliberately reckless disregard of their truth or falsity"); *Costabile v. Natus Med. Inc.*, 293 F.

17 Supp. 3d 994, 1018-19 (N. D. Cal. 2018) (no strong inference of fraudulent intent where

18 executive's statements could reflect then-held belief about when payments would be received

19 under a contract).  This absence of factual allegations is significant and leaves only the Contract

20 and Modification as sources of Defendants' alleged knowledge.[5] *See* CAC ¶¶ 162-63.

21     Equally problematic is that the plain language of these documents does not say what

22 Plaintiffs claim. The Court is "not required to accept as true conclusory allegations which are

23 contradicted by documents referred to in the complaint."  *Steckman v. Hart Brewing, Inc.*, 143

24 F.3d 1293, 1295-96 (9th Cir. 1998); *see Biotechnology Value Fund, L.P. v. Celera Corp.*, 12 F.

25 Supp. 3d 1194, 1201 (N.D. Cal. 2013) (finding the contents of an email "is *not* as plaintiffs

26

27     [5] Although Plaintiffs did not attach a copy of the Contract or Modification to the CAC, those documents are essential to their claims and are referred to in the CAC no less than 135 times within its 125 pages.  The Court thus may consider these documents in adjudicating this motion. *See* Defendant WageWorks' Request for Judicial Notice, filed concurrently herewith.

28

1   claim") (emphasis in original); *Philco Invs., Ltd. v. Martin*, 2011 WL 4595247, at *7 n.9 (N.D.

2   Cal. Oct. 4, 2011) (not accepting as true allegations that are contradicted by conference call

3   transcript).  Here, Plaintiffs' reading of the Contract and Modification does not hold up.

4          First, the Contract plainly shows a unit price for services provided in "*Base Year 1*

5   *(March 1, 2016 – Aug. 31, 2016)*."  Ex. A at 4 (emphasis added).  Second, the Modification did

6   not include a "no cost" provision, as Plaintiffs insist.  CAC ¶¶ 72, 88, 122, 163.  It did not

7   concern payments to the Company at all but simply added enhanced security and information

8   technology requirements.  *See* Ex. C.  Third, Plaintiffs admit the Company *was* entitled to

9   payment for Base Year 1 services no later than September 1, 2016.  *See* CAC ¶ 6 (the Company

10  "was not entitled to be paid . . . until WageWorks began administering the OPM Contract . . . on

11  its 'implementation date' of September 1, 2016");[6] *id.* ¶ 84 (noting the Company *met* the

12  September 1 deadline).  Fourth, unable to dispute the Company's actual performance, Plaintiffs

13  suggest that Base Year 1 services were for "start-up" services, not included in the Contract.

14  CAC ¶ 87.  Yet the Contract mentions "start-up" costs only once, in the context of sharing ideas:

15  "we are interested in your innovative ideas and proposals on how to limit start-up costs."[7]  Ex. A

16  at 40.  Finally, the Company's ongoing legal action against OPM for OPM's failure to pay (Ex.

17  B at 28) demonstrates its then and now belief that it is legally entitled to such payment.

18         In short, the plain language of the Contract fully supports the Company's reasonable

19  belief that it would be paid for the services provided from March 1, 2016 to August 31, 2016

20  (Base Year 1).  Ex. A at 4.  The CAC fails to plead particularized facts showing otherwise.  *See*

21  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d

22  840, 860 (N.D. Cal. 2014) (plaintiffs failed to pled with "specificity Defendants' 'actual

23  ───────────────

24         [6] This allegation, which seems only to dispute payment *timing*, misconstrues the Contract.
    The Contract stated "the Contractor must be ready for implementation services by September 1,
25  2016."  Ex. A at 40.  It did not specify a relationship between that date and payment.

26         [7] Moreover, the Contract provided a uniform definition of compensable "FSAFEDS
    Administration" services applicable to all time periods of the Contract, beginning on March 1,
27  2016.  Ex. A at 4-8 (showing identical non-exhaustive list of tasks deemed FSAFEDS
    Administration services for all Base Years).  The definition included services reasonably
28  considered as "start up," such as the development of a website and enrollment portal.  *See id.*

knowledge that the . . . assumptions about goodwill was unreasonable' and that 'the defendants knew or believed that their goodwill numbers were inaccurate.'") (citations omitted).  At the very least, the plain language of the Contract refutes any notion that the Company's contemporaneous belief was "highly unreasonable . . . involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care."  *Zucco*, 552 F.3d at 991 (citation omitted).  In the words of the Ninth Circuit, the Company's "[h]onest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Ronconi*, 253 F.3d at 432; *see Costabile*, 293 F. Supp. 3d at 1018-19.

Plaintiffs also fail to plead particularized facts regarding what the Executive Defendants knew of the accounting for the OPM revenue or KP Connector, relying instead on the fact of the Restatement and GAAP violations.  CAC ¶¶ 196-227.  A mere restatement or GAAP violations, however, are insufficient to raise an inference of scienter.[8]  Plaintiffs' conclusory allegation that the OPM revenue was "straightforward" (CAC ¶ 164) is equally unavailing.  *See NVIDIA*, 768 F.3d at 1059 ("But even if GPU failures are easily identifiable, it does not necessarily follow that NVIDIA would be responsible for those failures or should have known that it would be responsible."); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1363 (C.D. Cal. 2014) (rejecting suggestion that the reporting of deferred revenue was "so basic that a court can infer scienter from the mere fact it was reported improperly").

To infer scienter from a restatement or GAAP violation, Plaintiffs must allege specific facts showing that Defendants "knowingly and recklessly engaged in an improper accounting practice."  *Metzler*, 540 F.3d at 1068-69; *Zamir v. Bridgepoint Educ., Inc.*, 2018 WL 1258108, at *7 (S.D. Cal. March 12, 2018) ("Violations of GAAP, 'even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state.'") (citation omitted).  Plaintiffs must plead particularized facts showing "that the defendant was aware of the relevant GAAP principle and that this

---

[8] *Zucco*, 552 F.3d at 1000 ("the mere publication of a restatement is not enough to create a strong inference of scienter"); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) ("the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter") (citation omitted).

1   defendant knew how that principle was being interpreted." *Zamir*, 2018 WL 1258108, at *6

2   (citation omitted).  Plaintiffs must then plead specific facts "explaining how the defendant's

3   incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an

4   inference of deliberate wrongdoing." *Id.*  Plaintiffs fail both requirements.

5          The CAC fails to allege particularized facts showing what the Executive Defendants

6   knew about the accounting treatment of the OPM revenue or KP Connector.  *See In re*

7   *Watchguard Sec. Litig.*, 2006 WL 2038656, at *8 (W.D. Wash. April 21, 2006) ("Plaintiffs'

8   allegations reveal problems in revenue recognition, but they do not show that any Defendant

9   knew about those problems or was deliberately reckless in avoiding such knowledge"); *Ixia*, 50

10  F. Supp. 3d at 1362 ("Plaintiffs cite allegedly applicable GAAP principles [regarding revenue

11  recognition], but do not plead facts demonstrating that defendants knew of the principles or knew

12  they were being incorrectly interpreted and applied.").  At most, Plaintiffs' generic and

13  conclusory allegations suggest a "misapplication of accounting principles." *Zamir*, 2018 WL

14  1258108, at *7-8 ((company's failure to make a revenue collectability assessment at the time

15  revenue was recorded "represents a 'misapplication of accounting principles'") (quoting *In re*

16  *Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)).  "[S]cienter requires more

17  than a misapplication of accounting principles." *Ixia*, 50 F. Supp. 3d at 1363 (citation omitted).

18        **B.      Inadequate Internal Controls and "Tone at the Top" Do Not Support**
                    **Scienter**
19

20         Plaintiffs ask the Court to infer scienter from the Restatement's conclusion of inadequate

21  internal controls that "contributed to an ineffective control environment driven by the tone at the

22  top." CAC ¶ 178; Ex. B at 112.  But a "Restatement's admissions of material weaknesses in

23  [company's] internal controls, including its admission of an 'inappropriate tone at the top,' do

24  not weigh in favor of inferring scienter." *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 118

25  (3d Cir. 2018); *see also Ixia*, 50 F. Supp. 3d at 1364 ("Mere allegations that Ixia had deficient

26  internal controls are insufficient to give rise to a strong inference of scienter.") (collecting cases).

27  Deficient internal controls "is perhaps an indication of incompetence, but incompetence, even

28

1  gross incompetence, is no basis for a securities fraud claim." *In re Loudeye Corp. Sec. Litig.*,

2  2007 WL 2404626, at *7-8 (W.D. Wash. Aug. 17, 2007) (citation omitted).

3       The claim of an inappropriate "tone at top" of the Company is not enough.  *See Matrix*

4  *Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) (admission of

5  deficient "tone at the top" "fails to suggest that defendants acted with scienter").  Plaintiffs do

6  not point to any conclusion of wrongdoing.  As in *Hertz*, "the more plausible inference from the

7  Restatement's use of the word 'tone' is that the Restatement is referring to management style and

8  not to misconduct."  *Hertz*, 905 F.3d at 117.  Such allegations are probative of "mismanagement,

9  not of affirmative misconduct."  *Id.*; *see Webb*, 884 F.3d at 856 ("At best, [the] allegations paint

10  a picture of a mismanaged organization in need of closer financial oversight").

11       **C.      The Confidential Witness Allegations are Insufficient and Do Not Supply the
             Missing Support for Plaintiffs' Scienter Allegations**

12

13       In an attempt to bolster their inadequate scienter allegations, Plaintiffs cite a number of

14  supposed "confidential witnesses."  CAC ¶¶ 171-73, 182.  "The Ninth Circuit has warned against

15  the use of unnamed sources,"[9] who face a two-step test:  (1) they "must be described with

16  sufficient particularity to establish their reliability and personal knowledge," and (2) their

17  statements "must themselves be indicative of scienter."  *Zucco*, 552 F.3d at 995.  Plaintiffs' CW

18  allegations fail this test for a number of reasons, the most fundamental of which is that not a

19  single CW alleges that any Executive Defendant – or indeed, anyone at WageWorks – believed

20  there was anything incorrect with the Company's accounting for the OPM Contract or KP

21  Connector.  In fact, not a single fact CW is alleged to be involved in the accounting of revenue or

22  asset impairment, or with the OPM Contract.  *See, e.g., id.* at 996 ("CW4 was a human-resources

23  employee who . . . had no firsthand knowledge of the workings of the finance or corporate

24  department").[10]  In sum, the conspicuous absence of any CW support for Plaintiffs' theory

25  _____

26       [9] *In re Bus. Objects S.A. Sec. Litig.*, 2005 WL 1787860, at *5 (N.D. Cal. July 27, 2005),
     citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999).

27

28       [10] The one CW alleged to be an accountant is a purported expert whose "opinions cannot
     substitute for facts under the PSLRA."  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
     2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (citation omitted); *see also Applestein v.*

(continued...)

1   undermines any claim that the Executive Defendants knew of the alleged accounting errors.  *See*

2   *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash.

3   2013) ("No confidential witness has come forward to say that Defendants were aware of secret,

4   adverse financial information and failed to disclose it, much less that such adverse information

5   contradicted Defendants' public representations"), *aff'd*, 691 F. App'x 393 (9th Cir. 2017);

6   *Applestein*, 561 Fed. App'x at 600-01 (rejecting scienter; "there is no allegation that any CW

7   relayed [that the drug study was unblinded] to any defendant").

8            In addition to failing to raise an inference of scienter at this basic level, the CW

9   allegations are riddled with other deficiencies.  Two of the three CWs (CW-GGG and CW-DDD)

10  were not even employed at the Company during the alleged wrongdoing.  Both left before the

11  Class Period began, CW-DDD by over eighteen months.[11]  Thus, all of their statements should

12  be rejected as unreliable for lack of personal knowledge.  *See Zucco*, 552 F.3d at 996 (rejecting

13  allegations of two CWs; they "were not employed by Digimarc during the time period in

14  question").[12]  Only CW-Z was employed for a short portion of the Class Period but his/her

15  statements too lack reliability and are not indicative of scienter.  CW-Z's statements should be

16  afforded "little weight" because CW-Z was not employed during the entire Class Period.[13]

17  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May

18  22, 2012) (statements of witnesses "not employed . . . during the entire Class Period . . . are

19

20            (...continued from previous page)
    *Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) (expert opinion held insufficient to

21  plead falsity "because he has no personal knowledge of the facts on which he bases his
    conclusion").  CW-Expert X's statements also are not indicative of scienter because they concern

22  KPMG's actions, not the Executive Defendants' mental state.  *See* CAC ¶¶ 171-75.

23       [11] CW-DDD left in August 2014.  CAC ¶ 182 at 83.  CW-GGG left "when the OPM Contract
    was 'still being negotiated'" (*id.*), which would have been prior to March 2016.

24

25       [12] *See also City of Roseville*, 963 F. Supp. 2d at 1135 ("none of these CWs were actually
    employed by Sterling during the Class Period . . . [and] lack personal knowledge about Sterling's
    practices during the Class Period"); *In re Netflix, Inc. Sec. Litig.*, 964 F. Supp. 2d 1188, 1198

26  (N.D. Cal. 2013) (CWs "do not support Plaintiffs' claims" where they "were not employed by
    Netflix at a relevant time"), *aff'd*, 647 Fed. App'x 813 (9th Cir. 2016).

27

28       [13] Alleged to have stayed only "throughout the implementation of the OPM Contract" (CAC
    ¶ 182 at 85), CW-Z presumably left shortly after the September 1, 2016 implementation.

1   entitled to little weight."), *aff'd*, 759 F.3d 1051(9th Cir. 2014).  The substance of the CW

2   allegations also do not add to the scienter analysis.  The CW's impressions about Mr. Jackson's

3   management style[14] say nothing about Mr. Jackson's mental state and are not probative of

4   scienter.  Indeed, they are the very kind of impressionistic allegations that the Ninth Circuit has

5   repeatedly rejected.  *See Intuitive Surgical*, 759 F.3d at 1063 ("impression of a low-level

6   employee is just that – an unsubstantiated statement without substance or context"); *Metzler*, 540

7   F.3d at 1058, 1068 (rejecting inference that management "must have known" based on "hands

8   on" style and access to information system).

9        Even where Plaintiffs attempt to convert the CWs impressionistic views into more

10   details, they are so vague and conclusory that they do not speak to the Executive Defendants'

11   state of mind.  For example, CW-Z states "we played kinda loose with that" [referring to "rights

12   access" to server(s)] (CAC ¶ 182 at 86), without identifying the servers, the meaning of "played

13   kinda loose," specific dates and another relevant details.  Likewise, CW-Z's assertion that "'with

14   executive knowledge, they had me fudge' data" (*id.*) fails to specify the "data" or "executive,"

15   who "they" are, how data was "fudged," when, and other relevant details.  *See Bus. Objects*,

16   2005 WL 1787860, at *6-7 (CW's statements about "product integration problems," "customer

17   confusion" and "sales were not recorded in the quarter in which they were made" were "vague

18   and conclusory" and "not pled with sufficient specificity.").  CW-DDD's general allegations

19   about "disagreements" with Mr. Jackson on "expense numbers" and "customer accounts" (CAC

20   ¶ 182 at 84) are equally unspecific, unreliable and lacking in any indicia of scienter.  *See Zucco*,

21   552 F.3d at 997 (CW's claim that expenses unrelated to a program were being charged to that

22   program and employee time was being changed "lack[s] of detail," "fails to provide specifics or

23   dates for these activities" and "further support[s] the conclusion that [CW's] allegations are not

24   reliable enough to support the SAC's allegations of scienter."); *see also id.* (allegation that

25   defendant ordered controller to make last-minute journal entries that improperly increased the

26

27   _____

        [14] *See* CAC ¶ 182 at 83 (Mr. Jackson "led 'with an iron fist' and had a 'bully mentality'"
28   (CW-GGG) and "pushed his way around in the financials a little bit" and "was a bully" (CW-
     DDD)).  In fact, CW-GGG speaks only to Mr. Jackson's management style and CW-GGG's
     reason for leaving the Company (*id.*), none of which are probative of scienter.

1   amount of payroll capitalized "includes no details specifying the nature of these entries" and are

2   "vague and unreliable"); *Costabile*, 293 F. Supp. 3d at 1015 (lack of specific facts about CW's

3   knowledge leaves the court "unable to determine whether Defendants' representations regarding

4   the prior contract were false or misleading (let alone in a material sense)."

5       In sum, vague CW allegations are no substitute for specific facts alleging scienter.

6       **D.    The Other Allegations Do Not Rectify Plaintiffs' Failure to Plead
            Particularized Facts Supporting Scienter**

7

8       **Core Operations**.  Lacking factual allegations of the Defendants' knowledge of the

9   alleged wrongdoing, Plaintiffs resort to the "core operations" theory, speculating that because the

10  OPM Contract "was a key, important contract that was integral" to the Company, the Executive

11  Defendants, based on "their positions as CEO and CFO," "would have had to have been aware"

12  of the contractual terms "and that no money would be due or owing" for Base Year 1.  CAC ¶¶

13  161-63.  Under the core operations theory, a court may "infer 'that facts critical to a business's

14  'core operations' or an important transaction are known to a company's key officers,'" *Webb*,

15  884 F.3d at 854 (citation omitted), but this case is hardly the "'exceedingly rare'" case where

16  scienter would be found under this theory.  *See Intuitive Surgical*, 2012 WL 1868874, at *18

17  (citation omitted); *Intuitive Surgical*, 759 F.3d at 1062 ("Proof under this theory is not easy.").

18      Allegations regarding management's role may help to allege scienter (1) "where they are

19  particular and suggest that defendants had actual access to the disputed information," or (2) "in

20  rare circumstances where the nature of the relevant fact is of such prominence that it would be

21  'absurd' to suggest that management was without knowledge of the matter."  *Webb*, 884 F.3d at

22  854 (citation omitted).  The total absence of allegations relating to the Executive Defendants (*see*

23  Section I.A.-C. *supra*) renders the first circumstance inapplicable.  *See Intuitive Surgical*, 2012

24  WL 1868874, at *19 ("Plaintiffs' failure to include any specific internal tracking data, let alone

25  particularized allegations about each Defendants' access to this data, is fatal to their core

26  operations theory."); *Webb*, 884 F.3d at 857 (rejecting core operations theory; plaintiff "has not

27

28

1   alleged that Defendants . . . had actual access to the accounting formula, but only generalized

2   access to reports that may have documented its application").[15]

3        The second circumstance also is inapplicable.  The CAC pleads no "rare circumstances"

4   showing that it would be "absurd" for the Executive Defendants to believe that the Company was

5   entitled to Base Year 1 revenue.  The plain language of the Contract dispels any notion of

6   absurdity.  *See* Section I.A., *supra.* Moreover, the amount of revenue reversed in the Restatement

7   *was less than one percent* of the previously reported total revenue for fiscal 2016 (*see* Ex. B at

8   68, 71) – hardly "of such prominence" to support a finding of "absurdity."  *See In re Immersion*

9   *Corp. Sec. Litig.*, 2011 WL 871650, at *5 (N.D. Cal. Mar. 11, 2011) (restatement of reported

10  revenue by 15.3%, *inter alia*, is "not of such 'unusual' nature as to give rise to an inference of

11  scienter").  And, the reason for the revenue reversal "was not due to clearly obvious facts . . . but,

12  rather, to . . . lack of probability of collection," which is not of "unusual nature."  *Id.*

13       **Allegations Based on Motive**.  Next on Plaintiffs' laundry list of scienter allegations is

14  the generic claim that Defendants were motivated to inflate the Company's trading price in

15  advance of the Secondary Offering.  CAC ¶¶ 7, 194.  Such motive theory is "unhelpful" and "not

16  'specific' or 'particularized.'"  *Webb*, 884 F.3d at 856.  The Ninth Circuit has repeatedly held

17  that allegations to boost the company's profitability and stock prices in advance of a public

18  offering "speak to precisely the 'routine corporate objectives such as the desire to obtain good

19  financing and expand' that we have rejected in the past."  *Id*. (citations omitted).  As for

20  allegations of stock sales, there are no allegations that Mr. Callan sold any of his WageWorks

21  stock and allegations relating to Mr. Jackson are addressed in his separate motion to dismiss.

22       **SOX Certifications**.  Equally unavailing are the Executive Defendants' signatures on

23  SOX Certifications. CAC ¶¶ 183-85.  The Ninth Circuit routinely rejects such scienter

24  allegations. They "add nothing substantial to the scienter calculus" and "do not make ...otherwise

25  _____

26       [15] That the OPM Contract was important is not enough.  *See In re Hypercom Corp. Sec.*
    *Litig.*, 2006 WL 1836181, at *8 (D. Ariz. July 5, 2006) ("it requires a big inference to conclude
27  that knowledge of a 'core' product includes knowledge of how that product is classified for
    accounting purposes"). And, an inference based on corporate positions is "entirely speculative
28  and does not give rise to the required strong inference."  *Applestein*, 561 Fed. App'x at 601.

1   insufficient allegations more compelling by their presence in the same complaint." *Zucco*, 552

2   F.3d at 1004; *see Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (SOX

3   "certifications are not sufficient, without more, to raise a strong inference of scienter").

4          **E.     The Post-Class Events Do Not Support Scienter**

5          **Executive Resignations.**  Plaintiffs base scienter on the resignations of the Executive

6   Defendants (CAC ¶167) yet the "bare fact" of a "resignation cannot support a strong inference of

7   scienter."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013

8   WL 6441843, at *14 (N.D. Cal. Dec. 9, 2013), *aff'd*, 856 F.3d 605 (9th Cir. 2017).  As the Third

9   Circuit explained in affirming the dismissal of a complaint filed after a financial restatement:

10           Changes in leadership are only to be expected when leadership fails. That is not, in
             itself, a symbol of fraud.  Corporate resignations do not strengthen an inference of
11           scienter, when, as here, the allegations do not cogently suggest that the resignations
             resulted from the relevant executives' knowing or reckless involvement in a fraud.
12

13   *Hertz*, 905 F.3d at 119; *accord Zucco*, 552 F.3d at 1002 ("allegations that a financial manager

14   resigns or retires during the class period or shortly before the corporation issues its restatement,

15   without more, cannot support a strong inference of scienter").

16          Plaintiffs have failed to plead facts regarding the Executive Defendants' alleged knowing

17   or reckless involvement in a fraud.  And, that Mr. Jackson remained as Executive Chairman of

18   the Board (CAC ¶ 140) "diminishes any inference of scienter based on his resignation."  *City of

19   Dearborn,* 856 F.3d at 622 ("that [CFO] remained an employee . . . for an additional six months

20   after the first goodwill impairment announcement was made further diminishes any inference of

21   scienter based on his resignation"); *see NVIDIA*, 768 F.3d at 1062-63 ("detrimental" to scienter

22   allegations is that some executives "remained at NVIDIA in some type of advisory role").

23   Plaintiffs' "corporate reshuffling" allegations are "unpersuasive."  *Webb*, 884 F.3d at 857.

24          **Independent Auditors.**  Plaintiffs seek to squeeze an inference of scienter from concerns

25   raised by KPMG in August 2018 and the Company's "admission" that information was withheld

26   from the auditors.  CAC ¶¶ 169, 176.  However, "post-Class Period statements do not rectify the

27   lack of scienter pled elsewhere."  *Metzler*, 540 F.3d at 1068 n.12.  Moreover, the issues raised by

28   KPMG were not about the alleged 2016 misconduct that gave rise to the Restatement; they

1   pertained to how the Audit Committee communicated concerns of prior management's counsel

2   that were raised only *after* the Committee had completed its investigation.  *See* CAC ¶ 149.  The

3   Audit Committee's interaction with KPMG during its 2018 independent investigation into

4   internal controls simply is not probative of the Executive Defendants' state of mind in 2016

5   regarding the OPM Contract and KP Connector.

6          Moreover, the CAC fails to specify the dates that information was allegedly withheld and

7   by whom.  Nor did the Company "admit" that information was withheld.  The CAC alleges that

8   in response to KPMG's concerns, the Company formed a Special Committee to investigate.  *Id.*

9   Courts consistently refuse to infer scienter from the existence of an investigation.  *See Zamir*,

10  2018 WL 1258108, at *17 (refusing to find scienter from SEC, DOJ and DOE investigations;

11  "several district court have found the existence of an investigation, standing alone, insufficient to

12  support scienter"); *Immersion*, 2011 WL 871650, at *6 ("the mere existence of [an] investigation

13  cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or

14  its senior management") (citation omitted).  Once that investigation was completed, the

15  Company disclosed the findings, including the finding that the Audit Committee's investigation

16  was adequate and that none of the Audit Committee members had knowledge that information

17  about the OPM Contract had not been timely disclosed to KPMG.  *See* Ex. F at 101.

18         **F.     Considered Holistically, the More Plausible Inference is the Defendants**
                    **Acted in Good Faith**
19

20         In conducting a holistic review of scienter, courts must consider *all* inferences, including

21  those "that could weigh against a finding of scienter."  *Zucco*, 552 F.3d at 1006 (quoting *Tellabs*,

22  551 U.S. at 323).  Here, the more plausible inference is the Company honestly interpreted the

23  Contract as providing for payments for the first six months of services and, as a result of that

24  interpretation, recorded revenue.  *See Webb*, 884 F.3d at 856 ("these facts do not give rise to an

25  inference of scienter that is at least as compelling as the inference of an honest mistake"); *City of*

26  *Dearborn,* 856 F.3d at 621 ("the more compelling inference is that Defendants made a good faith

27  but mistaken determination in its goodwill valuations").  Plaintiffs plead no particularized facts

28  showing anything nefarious in the Company's contractual interpretation or in the accounting

1   error.  Once the Company determined its accounting for the revenue might be incorrect, its Audit

2   Committee promptly commenced an investigation and ultimately corrected the error.  Taken as a

3   whole, the scienter allegations in the CAC fall far short of pleading an intent to defraud investors

4   or an "extreme departure from the standards of ordinary care."  *Webb*, 884 F.3d at 851;

5   *Costabile*, 293 F. Supp. 3d at 1020 ("Plaintiff has not demonstrated that the 'malicious inference

6   is at least as compelling as any opposing innocent inference.'") (citation omitted).

7   **II.    THE CAC DOES NOT STATE A SECTION 10(B) CLAIM BECAUSE IT FAILS
        TO SUFFICIENTLY ALLEGE LOSS CAUSATION**

8

9          To plead loss causation, Plaintiffs must allege more than simply a stock price decline.

10  *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  They must allege that "the decline

11  in the defendant's stock price was proximately caused by a revelation of fraudulent activity

12  rather than by changing market conditions, changing investor expectations, or other unrelated

13  factors."  *Id.*  Plaintiffs "must plausibly allege that the defendant's fraud was *revealed* to the

14  market and *caused* the resulting losses.'"  *Id.* (emphasis in original) (citation omitted).

15         **KP Connector.**  Plaintiffs have not plausibly pled that their losses were caused by the

16  alleged KP Connector fraud.  They point to four stock price declines in 2018 but none of the

17  associated disclosures mentioned the KP Connector.  *See* CAC ¶¶ 131-32 (March 1 press release

18  disclosing a delay in the 2017 Form 10-K filing); *id.* ¶ 142 (April 5 press release of a

19  Restatement and executive resignations); *id.* (April 9 stock price decline presumably tied to the

20  April 5 news); *id.* ¶ 150 (September 12 announcement of Special Committee investigation).

21  These disclosures thus could not have "revealed" the alleged asset impairment fraud.  And, when

22  that "fraud" was first revealed in the Restatement on March 18, 2019[16] (Ex. B at 4, 69), the stock

23  price *increased* 4.69% from the previous business day's (March 15) close price of $37.72 to

24  close at $39.58 on March 18, 2019.  Ex. E at 16.  Thus, Plaintiffs suffered no losses.

25         **Revenue Recognition.**  Similarly, Plaintiffs have failed to plead loss causation based on

26  the revenue recognition "fraud" to the extent their alleged losses stem from the March 1, March

27  _____

28       [16] Plaintiffs erroneously allege the restatement date as March 19, 2019.  CAC ¶ 153.

1   2 or September 12 announcements because none of those disclosures revealed the alleged fraud.

2   The March 1 press release revealed a delay in the filing of the 2017 Form 10-K and Q4 2017

3   financial results but did not provide a reason for the delay.  CAC ¶¶ 132-33.  That press release

4   thus is not a corrective disclosure.  *See Metzler*, 540 F.3d at 1063 (loss causation not sufficiently

5   pled; complaint did not allege that announcements "disclosed – or even suggested – to the

6   market that Corinthian was manipulating student enrollment figures company-wide . . . which is

7   the fraudulent activity that Metzler contends forced down the stock that cause its losses"); *In re*

8   *Hansen Nat'l Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (press release

9   announcing delay in 10-Q filing due to Special Committee investigation was not corrective

10   disclosure because it did not disclose wrongdoing).

11       The March 2, 2018 announcement of a material weakness in internal controls (CAC ¶

12   134) also did not mention the allegedly fraudulent recognition of OPM revenue.  As the Ninth

13   Circuit has counseled, "our precedent requires a securities fraud plaintiff to allege that the market

14   'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's

15   poor financial health generally."  *Loos*, 762 F.3d at 887-88 (citation omitted); *see Hypercom*,

16   2006 WL 1836181, at *9 ("the fact that Hypercom issued a press release recognizing a lack of

17   effective internal controls, is not overly probative as to whether Smolak intentionally

18   misclassified the leases").  The March 2 revelation of an Audit Committee investigation and the

19   September 12, 2018 announcement of a Special Committee investigation did not reveal fraud

20   either.  *See Loos*, 762 F.3d at 890 ("The announcement of an investigation does not 'reveal'

21   fraudulent practices to the market.").  Such disclosure "simply puts investors on notice of a

22   *potential* future disclosure of fraudulent conduct."  *Id.* (emphasis in original).

23   **III.    THE CAC DOES NOT STATE A SECTION 11 CLAIM BECAUSE PLAINTIFF
          PERA LACKS STANDING**

24

25       "In order to have a valid § 11 cause of action, [a plaintiff] must plead and prove that his

26   stock was issued pursuant to the particular registration statement alleged to be defective."  *Abbey*

27   *v. Comput. Memories, Inc.*, 634 F. Supp. 870, 872 (N.D. Cal. 1986) (citation omitted).  In other

28   words, the plaintiff "must have purchased a security issued under that, rather than some other,

1    registration statement." *Perrin v. Sw. Water Co*, 2014 WL 10979865, at *7 (C.D. Cal. July 2,

2    2014) (citation omitted).  To satisfy this standing requirement, plaintiffs must "trace their shares

3    back to the relevant offering." *Hemmer Grp. v. Sw. Water Co.*, 663 Fed. App'x 496, 497 (9th

4    Cir. 2016) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).

5    When, as here, a company has issued shares under more than one registration statement, the

6    tracing requirement is "difficult" and "often impossible" for a plaintiff to satisfy.  *Century*

7    *Aluminum*, 729 F.3d at 1107.  Nonetheless, the requirement is "strict[ly] appli[ed]."  *In re*

8    *LendingClub Sec. Litig.*, 282 F. Supp. 3d 1171, 1180 (N.D. Cal. 2017).

9         The CAC attempts to allege a claim under Section 11 via Plaintiff PERA (CAC ¶¶ 32,

10   281) who does not claim that it purchased WageWorks stock *directly in* the Secondary Offering.

11   Instead, it generally avers that it purchased 8,500 shares of WageWorks stock issued "pursuant

12   and traceable to" the Secondary Offering.  *Id.* ¶ 32.  Courts have rejected this exact allegation.

13   *See Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *15 (N.D. Cal. Jan. 17, 2017) (allegation

14   that plaintiffs bought stock "pursuant to and traceable to the Second Offering" held insufficient

15   to plead statutory standing), *aff'd*, 765 Fed. App'x 239 (9th Cir. 2019); *Thomas v. Magnachip*

16   *Semiconductor Corp*., 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016) (same where plaintiff

17   purchased stock "pursuant and/or traceable to the Registration Statement for the 2/13 Offering").

18        As the Ninth Circuit held in *Century Aluminum*, conclusory allegations that shares are

19   "traceable" to a challenged registration statement are insufficient.  729 F.3d at 1107.  There,

20   allegations that a plaintiff purchased common stock "directly traceable to the Company's

21   Secondary Offering" coupled with the dates and the prices of the purchases were insufficient to

22   plead standing.  *Id.* at 1108 (citation omitted).  The Ninth Circuit explained that such allegations,

23   taken as true, were "consistent with" shares having come from either the secondary offering or

24   from the pool of previously issued shares.  *Id.* "When faced with two possible explanations . . .

25   plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but

26   are also consistent with the alternative explanation."  *Id.* (citation omitted).  Instead, "facts

27   tending to exclude the possibility that the alternative explanation is true" are required.  *Id.*  Here,

28

1    WageWorks stock had been publicly traded since the Company's IPO in 2012, and there were

2    over 37 million shares of stock outstanding at the time of the Secondary Offering.  Ex. D at S-12.

3         PERA's allegations of purchases on the day of the Secondary Offering and for the

4    offering price (CAC ¶ 32 (incorporating certification, Dkt. No. 34-4)) do not save its defective

5    pleading.  As the Ninth Circuit has found, allegations regarding "the dates on which and the

6    prices at which" a plaintiff purchased its shares do not give rise to a reasonable inference that the

7    shares are traceable to the secondary offering.  *Century Aluminum*, 729 F.3d at 1108; *see also In*

8    *re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *7 (S.D.N.Y. Oct. 1, 2013) ("It is simply not

9    enough to . . . rely on the similarity of date and share price to demonstrate that the shares were

10   issued pursuant to, or were traceable to, the December 2010 Offering.").  This is true even where

11   shares were purchased "on the day of" the offering and "for the same offering price."  *Thomas*,

12   167 F. Supp. 3d at 1055; *accord Century Aluminum*, 729 F.3d at 1106, 1108 (purchase date the

13   same as offering date).  Such allegations are "'merely consistent with' [plaintiffs'] assertion that

14   their shares were traceable to the secondary offering."  *Thomas*, 167 F. Supp. 3d at 1055 (citation

15   omitted).  "Something more is needed."  *Century Aluminum*, 729 F.3d at 1108.  Because PERA

16   has not alleged specific facts that "exclude the possibility that [its] stock came from the pool of

17   previously issued shares" (*id.*), PERA lacks standing and its Section 11 claim should be

18   dismissed.  *See id.* at 1109 (the "failure to allege statutory standing results in failure to state a

19   claim on which relief can be granted"); *Welgus*, 2017 WL 167708, at *15 (dismissing Section 11

20   claim for failure to sufficiently allege standing); *Thomas*, 167 F. Supp. 3d at 1056-57 (same).

21                                          **CONCLUSION**

22        For the foregoing reasons, the CAC should be dismissed.

23   Dated:  July 26, 2019                         Respectfully submitted,

24                                                 WILSON SONSINI GOODRICH & ROSATI
                                                   Professional Corporation
25

26                                                 By:_____/s/ Ignacio E. Salceda_____
                                                        Ignacio E. Salceda
27

28

Def. Wageworks' Not. of Mot. & Mot. to
Dismiss Consol. Am. Complaint & MPA ISO
Thereof; Case No. 4:18-cv-01523-JSW

-20-