UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE WAGEWORKS, INC., SECURITIES LITIGATION

Case No. 18-cv-01523-JSW

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**

Re: Dkt. Nos. 108, 110

Now before the Court is the motion to dismiss the consolidated amended class action complaint ("CAC"), filed by defendant WageWorks, Inc. ("WageWorks"). (Dkt. No. 87 (CAC), 108 ("Motion").) Defendant Joseph L. Jackson joins WageWorks' motion to dismiss and writes separately to address plaintiffs' scienter allegations and "control person" claims.[1] (Dkt. No. 110.) The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the motion suitable for disposition without oral argument. See N.D. Civ. L.R. 7-1(b). The Court DENIES defendants' motions to dismiss.

## BACKGROUND

Lead Plaintiffs, the Public Employees' Retirement System of Mississippi ("MPERS") and the Government Employees' Retirement System of the Virgin Islands ("GEWRS"), bring this federal securities class action against WageWorks, WageWorks' former CEO, Mr. Jackson, and WageWorks' former CFO, Colm Callan, for violation of the Securities Exchange Act of 1934. Plaintiffs allege violations of Sections 10(b) and 20(a) of that Act and Rule 10b-5 promulgated thereunder, on behalf of investors who acquired WageWorks' common stock between May 6,

---

[1] The remaining defendants join the two motions to dismiss. (Dkt. Nos. 113, 115.)

1

2016 and March 1, 2018.

Additionally, Lead Plaintiff, the Public Employees Retirement Association of New Mexico ("PERA"), joins the lawsuit, alleging that the above listed defendants and certain underwriters of WageWorks' secondary offering and members of its Board of Directors violated the Securities Exchange Act of 1933. PERA alleges violations of Sections 11, 12(a)(2), and 15 of that Act, on behalf of all those who purchased WageWorks' common stock traceable to WageWorks' June 2017 offering statements and disclosures.

The underlying allegations are straightforward. WageWorks is an administrator of Consumer-Directed Benefits ("CDBs"), such as health savings accounts, commuter benefit services, and pre-tax spending accounts. (CACA ¶ 43.) In March 2016, WageWorks won an important contract to administer the Federal Flexible Spending Account Program ("FSAFEDS") of the United States Office of Personnel Management ("OPM"). (*Id.* ¶ 52.) Under the contract, WageWorks was obligated to develop and establish the website and processing system for the program at no cost to OPM. (*Id.* ¶ 60.) Then, once development was completed and OPM granted authorization to operate, WageWorks could begin administering benefits on September 1, 2016. (*Id.*) Because the contract was "firm fixed price," WageWorks would be paid for administering the FSAFEDS benefits only—but not for the preliminary setup. (*Id.* ¶¶ 60, 88.) The contract was modified in July 2016 to add additional requirements at no cost to OPM. (*Id.* ¶ 73.)

Between August 2016 and February 2017, WageWorks improperly recognized revenue from the OPM contract, even though administration of benefits had not begun. (*Id.* ¶¶ 76-101.) WageWorks also failed to write down the value of the "KP Connector"—a software platform developed for a client who no longer needed it. (*Id.* ¶ 103.) In connection with the SEC filings recognizing the revenue, Mr. Jackson and Mr. Colm made statements highlighting the benefits of the OPM contract and certifying that WageWorks' financial reporting controls were adequate. (*Id.* ¶¶ 76-101.) WageWorks later incorporated the same improper financial data in its June 2017 secondary offering documents. (*Id.* ¶¶ 114-19.) The statements and reporting caused WageWorks' stock price to rise from around $50 to almost $70. (¶¶ 64-71, 106.)

To justify the reported revenue, WageWorks sent an invoice to OPM for services between

2

March and August 2016. (*Id*. ¶¶ 85-87.) OPM denied the invoice, stating that WageWorks is responsible for funding and accounting "its start up cost." (*Id*.) WageWorks then filed a "certified claim" in August 2016. (*Id*. ¶ 122.) It filed another claim in March 2018, asserting that OPM made a unilateral change to the contract. (*Id*. ¶ 138.) The invoice allowed WageWorks' accounting firm, KPMG, to certify its 2016 Annual Report. (*See id*. ¶ 85.)

However, in March 2018, KPMG balked at certifying WageWorks' 2017 Annual Report. (*Id*. ¶ 131.) WageWorks had no choice but to issue a press release stating that the Annual Report was delayed, causing its stock price to drop from $52.45 to $42.70. (*Id*. ¶¶ 131-33.) WageWorks acknowledged "material weakness in its internal control over financial reporting," which required it to review revenue "related to the accounting for a government contract during fiscal 2016," as well as "associated issues" concerning "an open flow of information and appropriate tone at the top for an effective control environment." (*Id*. ¶ 134.) A month later, in April 2018, WageWorks issued another press release announcing Mr. Jackson's replacement as CEO and Mr. Callan's resignation. (*Id*. ¶ 140.) The press release reiterated that WageWorks' previous controls were inadequate due to the "tone at the top" and that previous financial statements "should no longer be relied upon." (*Id*.) The announcement caused a further stock price drop. (*Id*. ¶ 142.)

Meanwhile, OPM determined that WageWorks had made a false claim and referred the matter to the Office of Inspector General for investigation. (*Id*. ¶ 143.) WageWorks continued to have trouble with information transparency. In August 2018, KPMG raised concerns over lack of communication about allegations that the company's Audit Committee and former COO were "aware that information had been withheld from the auditors during 2017." (*Id*. ¶ 144.) KPMG recommended an independent investigation into management override of controls, as well as removal of the Audit Committee Chairman and Mr. Jackson as Executive Chairman. (*Id*. ¶ 145.) Further, KPMG notified the company that it could no longer rely on representations of its former CEO, CFO, and general counsel—meaning, Mr. Jackson and Mr. Callan—or its system of internal controls over financial reporting. (*Id*. ¶ 146.) Mr. Jackson resigned as Executive Chairman and Director in September 2018. (*Id*. ¶ 148.) KPMG was terminated as WageWorks' auditor in October 2018. (*Id*. ¶ 151.)

1  In March 2019, WageWorks acknowledged that the revenue related to the OPM contract should not have been recognized and that the KP Connector should have been written off. (*Id*. ¶ 153.) As part of its 2017 Form 10-K, the company acknowledged "material weaknesses in internal controls" due to "inadequate open flow, transparency, communication and dissemination of relevant and pertinent information from senior management" and that "management's failure to timely communicate all pertinent information" led to false material statements in 2016 and 2017. (*Id*. ¶ 155.) The company also acknowledged that "[i]n the second quarter of 2016, the client notified the Company that it no longer required the services," which rendered the KP Connector's value "unrecoverable." (*Id*. ¶ 104.)

Overall, the inflated revenue reporting had a significant impact on WageWorks' prospects. The combined revenue adjustment from the OPM contract and KP Connector amounted to more than 20% of WageWorks' reported revenue in Q2 FY16 and around 8% of its total 2016 revenue. (*Id*. ¶ 105.) But for the improperly reported revenue, WageWorks would have missed its EPS guidance for 2016—a critical time before its 2017 offering. (*Id*. ¶ 106.) WageWorks would have also missed its guidance for Q2 and Q3 FY 16 quarters. (*Id*.) The resulting stock price decline may have impacted WageWorks' June 2017 secondary offering. (*Id*.)

The Court shall address additional facts as necessary in the analysis.

## ANALYSIS

**A.  Legal Standard.**

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal under Rule 12(b)(6) is granted when the pleadings fail to state a claim upon which relief can be granted. Pursuant to *Bell Atlantic v. Twombly*, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

Where a plaintiff alleges fraud, Rule 9(b) requires the plaintiff to state the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b). Particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged. *See Kearns v. v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The Rule 9(b) requirement "has long been applied to securities complaints." *Zucco P'ners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). However, for claims under Section 10(b) and Rule 10b-5, the complaint must also satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Id*. The PSLRA requires that "a complaint 'plead with particularity both falsity and scienter.'" *Id.* (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002)).

Under the PSLRA, a plaintiff pleading falsity must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to adequately plead scienter, the PSLRA requires that the plaintiff "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco*, 552 F.3d at 991 (quoting 15 U.S.C. § 78u-4(b)(2)). An inference of scienter is "strong" for purposes of dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

To assist the Court in determining whether a plaintiff has satisfied this heightened pleading standard, "the Supreme Court has provided three points of instruction: (1) 'courts must, as with any [12(b)(6)] motion to dismiss . . ., accept all factual allegations in the complaint as true'; (2) 'courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss'; and (3) 'in determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inference.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citing *Tellabs*, 551 U.S. at 322-23).

//

**B.     Request for Judicial Notice.**

WageWorks seeks judicial notice of certain documents in support of its motion to dismiss. (Dkt. No. 109.) Mr. Jackson seeks additional judicial notice of five documents. (Dkt. No. 112.) Defendants rely on the incorporation by reference doctrine, as well as Federal Rule of Evidence 201. Plaintiffs do not oppose defendants' requests.

Incorporation by reference prevents plaintiffs from "selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir 2018) (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)). Incorporation by reference is proper where plaintiff "refers extensively to the document" or "the document forms the basis of plaintiff's claim." *Id*. (quoting *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). The court may assume the truth of the incorporated documents "as though they are part of the complaint itself." *Id*. at 1003. However, it is improper to assume the truth of an incorporated document only "to dispute facts stated in a well-pleaded complaint." *Id*.

Here, WageWorks seeks to incorporate the OPM contract and its modification, which is cited extensively in the complaint. (*See, e.g.*, CAC ¶¶ 7, 20, 88.) WageWorks also seeks to incorporate its SEC filings, including 2017 Form 10-K and prospectus supplement. These documents are integral to plaintiffs' claims because plaintiffs allege that they contain material misrepresentations or omissions. Additionally, plaintiffs contend that the 2017 Form 10-K was a corrective disclosure for purposes of loss causation. (*Id*. ¶ 132-33.) Accordingly, the Court finds incorporation by reference proper for these documents.

Turning to judicial notice, Federal Rule of Evidence 201 allows courts to consider "adjudicative fact[s]" that are "not subject to reasonable dispute." Facts are not subject to reasonable dispute if they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). As with incorporation by reference, "a court cannot take judicial notice of *disputed* facts contained in" judicially noticed documents. *Khoja*, 899 F.3d at 999 (emphasis added).

WageWorks seeks judicial notice of WageWorks' stock price history, 2018 Form 10-K,

6

1  and a FOIA order in another litigation. Mr. Jackson seeks judicial notice of additional SEC
2  filings. Courts routinely take judicial notice of SEC filings, whose accuracy cannot reasonably be
3  questioned. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *In re Extreme
4  Networks, Inc. S'holder Derivative Litig.*, 573 F. Supp. 2d 1228, 1231 n.2 (N.D. Cal. 2008) (citing
5  cases). Additionally, courts regularly take notice of historical stock prices because they can be
6  readily and accurately ascertained. *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d
7  1328, 1349 (C. D. Cal. 2014). Finally, documents on file in federal or state courts are considered
8  undisputed matters of public record. *See Harris v. Cty. Of Orange*, 682 F.3d 1126, 1132 (9th. Cir.
9  2012). Accordingly, the Court takes judicial notice of these documents.

**C.    1934 Exchange Act Claims.**

Plaintiffs contend that defendants violated Sections 10(b) of the 1934 Exchange Act, and Rule 10b-5 promulgated thereunder, by "cooking the books" and then covering up the deceit through misleading statements. Defendants move to dismiss on the grounds that plaintiffs fail to plead facts demonstrating a strong inference of scienter and fail to allege that stock price declined as the result. Defendants also move to dismiss plaintiffs' Section 20(a) claims for failure to plead a predicate violation under Section 10(b). The Court first provides an overview of the legal framework and then addresses each element in turn.

**1.    Overview.**

Section 10(b) of the 1934 Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. Section 20(a) creates joint and several liability for the "control

person" who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or any rule or regulation thereunder . . . to the same extent as such controlled person to any person to whom such controlled personal is liable . . . ." 15 U.S.C. § 78t(a).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts that show: (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). To act with scienter, defendant must have "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (internal quotation marks omitted). Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

The scienter inquiry is "inherently comparative." *Tellabs*, 551 U.S. at 323. Thus, in evaluating scienter, the court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint" and only allow the claims "if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991 (citing *Tellabs*, 551 U.S. at 323). The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted). Rather, a complaint survives if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. In evaluating scienter, the court adopts a holistic view and "a

practical and common-sense perspective." *S. Ferry*, 542 F.3d at 784.

Loss causation "is simply 'a causal connection between the material misrepresentation and the loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted). To satisfy the loss causation requirement, "the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id*. (citation omitted). Disclosure of fraud "is not a sine qua non of loss causation." *Id*. Instead, under a "materialization of the risk" theory, plaintiff may allege that "the very facts about which defendant lied" caused the injuries. *Id*. Any kind of proximate cause satisfies this requirement. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F. 3d 750, 753-54 (9th Cir. 2018).

**2.  Scienter.**

Defendants fundamentally disagree that they have done anything wrong. According to defendants, WageWorks engaged in a good faith dispute with OPM over contract interpretation, which continues to be litigated to this day. Because of the ambiguity in the contract, defendants genuinely believed that they were entitled to "base year 1" payment under the OPM contract when they made the allegedly false statements.[2] Defendants also contend that plaintiffs fail to allege scienter for the KP Connector statements.

Plaintiffs cite nine factors to support their scienter allegations. The Ninth Circuit has approved of a two-step analysis, where the court first determines "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference," and then conducts a "holistic" review if no individual allegation is sufficient. *Zucco*, 552 F.3d at 992. Because the Court finds that plaintiffs' post-class allegations regarding Mr. Jackson's and Mr. Callan's resignations and statements by WageWorks and KPMG are sufficient to raise a strong inference of scienter, it does not address the remaining factors.

As an initial matter, the Ninth Circuit has cautioned that "[a]lthough resignations,

---

[2] Defendants seek to have the Court interpret the OPM contract and modification to find that it does not include a no-cost provision. Defendants' point is well-taken: the contract lacks clear terms regarding payment. However, defendants' innocent inference of a good faith contract dispute is undermined by WageWorks' post-class admissions, as described in more detail below.

9

terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter," where the resignations occur before or after a restatement of financial reports, plaintiff must "plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself." *Id.* at 1002. In other words, plaintiff must provide facts weighing in favor of scienter compared to the "reasonable assumption that [the employee] was fired simply because the errors that led to the restatement occurred on his watch or because he failed adequately to supervise his department." *See id.* (quoting *In re U.S. Aggrefates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002)). Thus, the resignations at issue must be "uncharacteristic" or "accompanied by suspicious circumstances," so as to lead to the inference that "defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations."[3] *Id.*

Plaintiff's allegations meet this standard. First, WageWorks announced Mr. Jackson's and Mr. Callan's resignations in the same press release that reiterated that the company's financial statements are unreliable and need to be restated. (CAC ¶ 140.) The use of the same statement and the close temporal proximity to the initial revelations weigh against an innocent inference that defendants resigned for "unrelated personal or business reasons." *Zucco*, 552 F.3d at 1002. Second, the press release identified specific "issues" connected to the improper accounting of the "government contract," including "an open flow of information" and "appropriate tone at the top for an effective control environment." (CAC ¶ 140.) Although "tone on the top" could suggest mere management issues, "open flow of information" raises an inference that improperly stated revenue arose from withheld information. WageWorks' March 2019 statement is even clearer, admitting that "material weaknesses in internal control" were due to "inadequate open flow, transparency, communication and dissemination of relevant and pertinent information *from senior management*."[4] (*Id.* ¶ 155 (emphasis added).) The March 2019 statement expressly identifies

---

[3] The interpretation adopted in *Zucco* is consistent with rules adopted in other circuits. *See, e.g.*, *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) (finding that resignations "can strengthen the inference of scienter" where plaintiff pleads "particularized allegations connecting the departures to the alleged fraud").

[4] WageWorks argues that because its press release does not identify the specific information

"management's failure to timely communicate all pertinent information" as the cause of the false financial statements. (*Id.*)

To be sure, failure to communicate information does not by itself suggest intent to defraud. But it does suggest deliberate recklessness because it indicates that senior management possessed information that, had it been communicated, would have indicated that the financial reporting was false. *See Oracle*, 627 F.3d at 390 (finding deliberate recklessness where defendants "had reasonable grounds to believe material facts existed that were misstated or omitted" but "failed to obtain and disclose such facts"). WageWorks' announcement of the resignations in the same initial press release—a mere month after WageWorks admitted the errors—leaves little doubt that Mr. Jackson and Mr. Callan were part of the "senior management" that failed to communicate key information.[5] Had the reporting error stemmed from a mere contract dispute or failure at oversight, WageWorks would not have identified management's failure to communicate information as a key reason for the false financial reports.

Third, KPMG's repeated, strident, and unusual calling out of Mr. Jackson, including calling for his resignation, in connection with the restatements creates a strong inference of scienter. As an initial matter, "former management's counsel" had apparently alleged that WageWorks' former COO withheld information from auditors in 2017. (*Id.* ¶ 144.) The COO presumably reported to Mr. Jackson, which in itself raises an inference of scienter for persons controlled by Mr. Jackson. Moreover, after learning of the allegations, KPMG recommended an independent investigation "to specifically address management override of controls." (*Id.* ¶ 145.) KPMG's concern about "management override of controls"—not "contract interpretation" or oversight failures—suggests that WageWorks' management was not merely negligent, but actively

---

withheld, and because the company set up an investigation, this statement is not an admission. However, read in context, the withheld information clearly relates to the "government contract," and WageWorks continued to cite information flow issues after the investigation was complete.

[5] The fact that Mr. Jackson had initially stayed on as Executive Chairman may suggest an innocent inference. *See NVIDIA*, 768 F.3d at 1062-63. However, that innocent inference is undermined by allegations that WageWorks continued to struggle with transparency after the initial resignations in March 2018. (*See, e.g.*, *id.* ¶¶ 144, 150.)

overrode financial reporting controls. Read in context, KPMG's concurrent recommendation that Mr. Jackson be removed from his titular position as Executive Chairman strongly implicates him in the "management override of controls" and withholding of information from auditors.[6] (*See id.*)

Fourth, following Mr. Callan's and Mr. Jackson's resignations as CFO and CEO, KPMG expressly stated that it can no longer rely on the representations of the Mr. Jackson, Mr. Callan, or the general counsel. (*Id.* ¶ 146.) Although less probative than the other factors, had Mr. Jackson and Mr. Callan been merely negligent in failing to supervise reporting controls, KPMG would have had little reason to discount their statements all together. And if the improper accounting stemmed from a good-faith contract dispute with OPM, there would have been even less reason to discredit defendants' former statements.[7]

In short, viewed with a "practical and common-sense perspective," the facts surrounding Mr. Jackson's and Mr. Callan's resignations strongly suggest scienter. The inference of scienter is cogent and at least as compelling as any innocent inference. Finding otherwise would require the Court to "close [its] eyes" to the circumstances of those resignations, as well as to WageWorks' own post-mortem diagnosis of the problems that led to false financial statements. The Court therefore finds that plaintiffs adequately pled scienter for the OPM contract allegations.

As for the KP Connector statements, the allegations present a closer case. While the "government contract" was directly identified in the initial press release reporting misstatements, the KP Connector was not apparently identified until later. (*See id.* ¶¶ 104, 140.) Nevertheless, the Court finds an inference of scienter at least as strong as any innocent inference based on two facts. First, WageWorks admitted in 2019 that "[i]n 2016, the Company re-assessed the fair value of KP Connector" and "determined that KP Connector's carrying value was considered unrecoverable." (*Id.* ¶ 104.) Although no individual is implicated, this admission shows that "the

---

[6] WageWorks argues that KPMG's statements arose from the later investigation, not the class period. However, KPMG raised its concerns in relation to allegations of withheld information in 2017 and the investigation as a whole concerned the 2016 restated revenue.

[7] The OPM's finding of a "false claim" further lays doubt to WageWorks' "good faith contract dispute" theory. According to the CAC, WageWorks falsely claimed that it did not sign the OPM contract modification. (CAC ¶ 143.) If the language of the modification already supported WageWorks, there would have been no need to claim that WageWorks never signed it.

1    Company" knew that the KP Connector's value was unrecoverable in 2016—several years before
2    that value was restated. Second, KPMG identified the KP Connector value in connection with
3    "management override of controls," which, for the reasons stated above, creates a strong inference
4    of scienter. (*Id.* ¶ 145.)

Accordingly, the Court finds that plaintiffs adequately alleged scienter.[8]

### 3. Loss Causation

Defendants challenge plaintiffs' loss causation allegations on the ground that none of the alleged corrective disclosures specifically identify fraud related to the KP Connector or the OPM contract. But defendants need not reveal the full extent of the fraud for the market to react to the revelations. Indeed, disclosure of fraud "is not a sine qua non of loss causation." *Nuveen*, 730 F.3d at 1120. Here, plaintiffs plausibly allege that WageWorks "cooked the books" and then revealed the unreliability of its financial reporting over a series of corrective disclosures. (*See* CAC ¶¶ 131-33, 152-59.) Moreover, plaintiffs adequately allege proximate cause because WageWorks would not have made those revelations without KPMG's refusal to certify its Annual Statement in light of the fraud. (*See id.* ¶¶ 131-33.) Finally, plaintiffs plead a "materialization of the risk" theory because the corrective disclosures revealed the risks (lack of revenue) concealed by defendants' fraudulent statements. *See Nuveen*, 730 F.3d at 1120.

Defendants cite *Loos v. Immersion Corp.* for the requirement that "fraud was *revealed* to the market and *caused* the resulting losses." 762 F.3d 880, 887 (9th Cir. 2014) (emphases in original). But *Loos* addressed only one way of pleading loss causation, not the "infinite variety" of possible proximate cause allegations. *See id.*; *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). The issue in *Loos*—distinguishing loss attributable to fraud, as opposed to poor financial health generally—is not applicable here because the market reacted to specific revelations of misstated revenue, not merely WageWorks's poor performance. In short, plaintiffs meet the low bar of pleading proximate cause for purposes of loss causation.

---

[8] Defendants claim that the misstated revenue represented less than 1% of WageWorks' total revenue, which makes it implausible that WageWorks would risk its reputation for the amount. However, plaintiffs persuasively allege that the revenue came at a crucial time for WageWorks' offering and represented the difference between missed and met guidance.

United States District Court
Northern District of California

1   Accordingly, the Court does not dismiss on this ground.

####    4.      Section 20(a)

Defendants move to dismiss plaintiffs' Section 20(a) claims on the ground that plaintiffs fail to plead a predicate violation of Section 10(b). For the reasons stated above, the Court finds the predicate violation adequately pled. Accordingly, the Court does not dismiss on this ground.

### D.      1933 Exchange Act Claims

Plaintiffs contend that defendants violated Section 11 of the 1933 Exchange Act by making untrue statements and omissions in their secondary offering documents. The 1933 Exchange Act creates a private right of action for a purchaser of a security if "any part of the registration statement . . . contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (quoting 15 U.S.C. § 77k(a)). Scienter allegations are not required—plaintiff need only establish that the offering documents contained a material omission or misrepresentation. *Id*. However, to have standing under the statute, plaintiffs must trace their shares back to an allegedly misleading registration statement. *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1179 (N.D. Cal. 2017).

Plaintiff can satisfy the standing requirement in one of two ways. First, "plaintiffs could prove that they purchased their shares directly in the secondary offering itself," which "would obviously eliminate any questions about lineage." *In re Century Alum. Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). Second, "plaintiffs could prove that their shares, although purchased in the aftermarket, can be traced back to the secondary offering." *Id*. Here, PERA alleges standing under the first option—the CAC states that PERA "purchased such securities in the June 2017 Offering." (CAC ¶ 293; *accord id.* ¶ 295.) Although elsewhere in the complaint, plaintiffs allege more generally that PERA purchased WageWorks stock "pursuant to the offering documents," the allegations in paragraphs 293 and 295 make clear that stock was purchased in the actual offering itself. (*See id.* ¶¶ 32, 285.) Accordingly, there is no genuine dispute as to lineage, and the Court does not dismiss on this ground.

//

## CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motions to dismiss.  The Court sets a case management conference for August 14, 2020 at 11:00 a.m.  The parties shall file their joint case management statement by no later than August 7, 2020.

**IT IS SO ORDERED.**

Dated:  June 1, 2020

_____
JEFFREY S. WHITE
United States District Judge

15